**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CHATTOOGA CONSERVANCY,    )
MOUNTAINTRUE, and DEBBIE    )
KRUZEN    )
   )
           Plaintiffs,    )
   )
      v.    )
   )
THE UNITED STATES DEPARTMENT    )
OF AGRICULTURE, SECRETARY    )      Case No. 1:24-CV-00518-TJK
BROOKE ROLLINS, THE UNITED    )
STATES FOREST SERVICE, CHIEF TOM    )     **PLAINTIFFS' MEMORANDUM IN**
SCHULTZ, REGIONAL FORESTER    )      **SUPPORT OF MOTION FOR**
KENDERICK ARNEY, REGIONAL    )       **SUMMARY JUDGMENT**
FORESTER ANTOINE DIXON,    )
DISTRICT RANGER ROBERT SITZLAR,    )
DISTRICT RANGER JAMES    )
BROWNING, and FOREST SUPERVISOR    )
VINCI KEELER,    )
   )
         Defendants.    )
   )

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

FACTUAL BACKGROUND.................................................................................................. 2

   I.    Climate Change and Logging................................................................................2

   II.   The National Forest System ..................................................................................3

   III.  Timber Targets .......................................................................................................4

     a.  Final Timber Targets for Fiscal Years 2019–2024.........................................8

   IV.  Individual Logging Projects ................................................................................10

     a.  Forest Health Initiative Project......................................................................11

     b.  Buck Project ..................................................................................................12

     c.  White Pine Management Project ...................................................................12

LEGAL BACKGROUND .................................................................................................... 13

   I.    Administrative Procedure Act .............................................................................13

   II.   National Environmental Policy Act.....................................................................16

STANDARD OF REVIEW .................................................................................................. 19

ARGUMENT........................................................................................................................ 20

   I.    Forest Advocates have standing to challenge the timber targets and the Projects. .................20

   II.   The challenged national, regional, and unit-specific timber targets are final agency actions under the APA. ..................................................................................22

     a.  The decision to set a specific timber target is an "agency action." .........................22

     b.  The challenged timber targets are "final."...................................................27

      i.  The challenged timber targets mark the consummation of the agencies' decision-making process. ................................................................................28

      ii.  The challenged timber targets impose obligations and legal consequences on the Forest Service. .............................................................................32

   III.  Defendants failed to comply with NEPA when setting the national, regional, and unit-specific timber targets. .............................................................................37

     a.  The challenged timber targets trigger NEPA's requirements..................................38

     b.  Defendants failed to conduct a NEPA analysis for the timber targets. ..................43

   IV.  Defendants' cumulative effects analyses for the Projects violate NEPA..............................44

CONCLUSION..................................................................................................................... 50

ii

## TABLE OF AUTHORITIES

**Cases**                                                                                                              **Page(s)**

*350 Montana v. Haaland*,
   50 F.4th 1254 (9th Cir. 2022) ...................................................................................................49

*Am. Bar Ass'n v. U.S. Dep't of Educ.*,
   370 F. Supp. 3d 1 (D.D.C. 2019) ...................................................................................22, 28, 29

*Am. Forest Res. Council v. United States*,
   77 F.4th 787 (D.C. Cir. 2023) ...................................................................................................25

*Am. Wild Horse Campaign v. Bernhardt*,
   442 F. Supp. 3d 127 (D.D.C. 2020) ................................................................................. *passim*

*Barrick Goldstrike Mines Inc. v. Browner*,
   215 F.3d 45 (D.C. Cir. 2000) .....................................................................................................14

*Batterton v. Marshall*,
   648 F.2d 694 (D.C. Cir. 1980) ...................................................................................................24

\*    *Bennett v. Spear*,
   520 U.S. 154 (1997).......................................................................................................... *passim*

*Cal. Cmtys. Against Toxics v. EPA*,
   934 F.3d 627 (D.C. Cir. 2019) .......................................................................................28, 30, 32

*Carter/Mondale Presidential Comm., Inc. v. Fed. Election Comm'n*,
   711 F.2d 279 (D.C. Cir. 1983) ...................................................................................................28

*Cobell v. Norton*,
   240 F.3d 1081 (D.C. Cir. 2001) ...........................................................................................15, 25

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
   452 F.3d 798 (D.C. Cir. 2006) ...........................................................................................15, 36

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
   144 F.4th 296 (D.C. Cir. 2025).........................................................................................20, 21

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
   72 F.4th 1166 (10th Cir. 2023) .................................................................................................17

*Diné Citizens Against Ruining Our Env't v. Haaland*,
   59 F.4th 1016 (10th Cir. 2023) .............................................................................................18, 49

*Food & Water Watch v. EPA*,
   5 F. Supp 3d 62 (D.D.C. 2013) .................................................................................................37

*Friends of the Earth, Inc. v. Laidlaw Env't Servs.*,
    528 U.S. 167 (2000)......................................................................................................20

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
    460 F.3d 13 (D.C. Cir. 2006)........................................................................................27

*Fund for Animals, Inc. v. Williams*,
    391 F. Supp. 2d 132 (D.D.C. 2005)..............................................................................37

*Gen. Elec. Co. v. EPA*,
    290 F.3d 377 (2002).................................................................................................15, 34

*Gulf v. Burgum*,
    775 F. Supp. 3d 455 (D.D.C. 2025)..........................................................................19, 21

*Humane Soc'y of U.S. v. Johanns*,
    520 F. Supp. 2d 8 (D.D.C. 2007)..................................................................................44

*Indep. Equip. Dealers Ass'n v. EPA*,
    372 F.3d 420 (D.C. Cir. 2004)......................................................................................24

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976).................................................................................................17, 18

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990).................................................................................................15, 25

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)........................................................................................................19

*Nat. Res. Def. Council, Inc. v. Butz*
    6 ERC 1895, 4 ELR 20226 (D.D.C. 1974)...................................................................44

*Nat. Res. Def. Council, Inc. v. Morton*,
    458 F.2d 827 (D.C. Cir. 1972)......................................................................................18

*Nat. Res. Def. Council, Inc. v. EPA*,
    643 F.3d 311 (D.C. Cir. 2011)..................................................................................15, 36

\*   *Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004).................................................................................................19, 44

*Ouachita Watch League v. Henry*,
    59 F. Supp. 3d 922 (E.D. Ark. 2014)............................................................................44

*Pharm. Rsch. & Manufacturers of Am. v. U.S. Dep't of Health & Hum. Servs.*,
    138 F. Supp. 3d 31 (D.D.C. 2015)................................................................................22

iv

*Safari Club Int'l v. Jewell,*
   842 F.3d 1280 (D.C. Cir. 2016) .......................................................................14, 28, 30

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,*
   145 S. Ct. 1497 (2025) ....................................................................................17, 41, 49

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
   578 U.S. 590 (2016) ...............................................................................................14, 31

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001) ...............................................................................................13, 23

*WildEarth Guardians v. Bernhardt,*
   502 F. Supp. 3d 237 (D.D.C. 2020) ...........................................................................47

\* *WildEarth Guardians v. Zinke,*
   368 F. Supp. 3d 41 (D.D.C. 2019) ........................................................45, 47, 48, 49

**Statutes**

5 U.S.C. § 551(13) ..............................................................................................................13, 23

5 U.S.C. § 704 .....................................................................................................................13, 22

5 U.S.C. § 706(1) ...............................................................................................................19, 43, 44

5 U.S.C. § 706(2) ...............................................................................................................19, 22, 43

16 U.S.C. § 472a(a) ...............................................................................................................24, 40

42 U.S.C. § 4332(2)(C) .......................................................................................................16, 38, 43

42 U.S.C. § 4336(a) .............................................................................................................16, 18, 42

42 U.S.C. § 4336(b) .........................................................................................................18, 38, 42, 43

42 U.S.C. § 4336e(10)(A) ...................................................................................................16, 39

42 U.S.C. § 4336e(12) .............................................................................................................38

Pub. L. 91-190 (1970) ..............................................................................................................16

**Other Authorities**

7 C.F.R. pt. 2.7 .........................................................................................................................33

7 C.F.R. § 1b.4 .........................................................................................................................43

7 C.F.R. § 1b.11(21) .................................................................................................................38

v

7 C.F.R. § 1b.11(50) ...............................................................................................40, 41

7 C.F.R. § 1b.11(a)(50)...........................................................................................16, 17

36 C.F.R. 219.11(d)(4).................................................................................................13

36 C.F.R. § 200.2(a)..................................................................................................3, 5

36 C.F.R. § 200.4(b)(1).................................................................................................32

40 C.F.R. § 1501.3(b) (2020).......................................................................................40

40 C.F.R. § 1501.4(b) (1978).......................................................................................42

40 C.F.R. § 1501.5 (2020) ...........................................................................................42

40 C.F.R. § 1508.1(x) (2020).......................................................................................38

40 C.F.R. § 1508.1(g) (2020)..................................................................................40, 41

40 C.F.R. § 1508.1(m) (2020)......................................................................................38

40 C.F.R. § 1508.1(q) (2020).................................................................................39, 40

40 C.F.R. § 1508.7 (1978) ......................................................................................18, 44

40 C.F.R. § 1508.8 (1978) ......................................................................................40, 41

40 C.F.R. § 1508.14 (1978) .........................................................................................38

40 C.F.R. § 1508.18 (1978) .........................................................................................40

40 C.F.R. § 1508.23 (1978) .........................................................................................38

40 C.F.R. § 1508.27 (1978) .........................................................................................40

43 Fed. Reg. 55,978 (Nov. 29, 1978).........................................................................16

85 Fed. Reg. 43,304, 43,343 (July 16, 2020)..............................................................41

90 Fed. Reg. 10,610 (Feb. 25, 2025) ..........................................................................17

90 Fed. Reg. 29,632 (July 3, 2025).............................................................................17

*    Motion to Dismiss Oral Ruling Transcript, *Chattooga Conservancy v. U.S. Dep't. of Agric.*, No. 1:24-CV-00518 (March 25, 2025) .......................................................... *passim*

**<u>INTRODUCTION</u>**

Each year, the United States Forest Service logs hundreds of thousands of acres of public national forests which releases millions of tons of carbon into the atmosphere. The Forest Service has never accounted for the aggregate carbon effects of its logging projects—at any administrative level—in violation of the National Environmental Policy Act.

Forest Service logging projects are created to fulfill mandatory agency "timber targets." The United States Department of Agriculture directs the United States Forest Service to harvest a certain timber volume from national forests by setting a national timber target. The Forest Service then apportions the national timber target among its nine regions by issuing regional timber targets. Regions then assign portions of their regional timber target to units within their jurisdiction through unit-specific timber targets. If each unit fulfills its target, then the regional targets will be achieved, resulting in fulfillment of the national target.

The timber targets are binding on lower-level agency staff who describe the timber targets as "mandated," something they "have to figure [out] a way to hit," an "assignment" with "no wiggle room," and the "bottom line." Indeed, the binding nature of the timber targets is the point—it is how agency leadership dictates how much timber will be cut. As a result, timber targets are final agency actions under the Administrative Procedure Act.

The decision about where to set timber targets has a significant effect on carbon emissions and reductions in carbon storage on national forests. Logging affects carbon storage and emissions on eastern national forests more than any other activity. Generally, as logging increases, so do emissions and reductions in storage. Nevertheless, the Department of Agriculture and Forest Service have never assessed or disclosed the carbon effects of setting timber targets at different volumes. This violates the National Environmental Policy Act.

1

Instead, the Forest Service defers consideration of carbon effects until it authorizes a specific project—three of which Plaintiffs challenge here—designed to implement the timber target. But then it invariably completes a siloed, project-specific analysis that presents the carbon effects of the project as a meaningless drop in the bucket. The Forest Service never considers the aggregate effect of all the projects in the timber-target bucket. This, too, violates the National Environmental Policy Act. To compel Defendants to correct these errors, this Court should grant Plaintiffs' ("Forest Advocates'") requested declaratory and injunctive relief.

## FACTUAL BACKGROUND

### I.    Climate Change and Logging

As explained by the Forest Service, atmospheric greenhouse gas "concentrations have increased significantly since 1750 and have greatly exceeded preindustrial values." AR021064. This is "causing the surface temperature of the Earth to increase with a number of associated large-scale changes . . . many of which are detrimental to human health and ecosystems." *Id*.

Forests counter that effect "through removal and storage of [carbon] from the atmosphere." *Id*. Through "photosynthesis, growing plants remove carbon dioxide . . . from the atmosphere and store it in forest biomass (plant stems, branches, foliage, roots)." AR020121. Carbon remains stored in forest biomass until that forest is affected by a disturbance—such as logging, wildfires, or pest outbreaks—causing tree mortality which releases carbon back to the atmosphere. *See* AR021064.

The primary disturbance leading to reductions in carbon stored on eastern national forests is logging. AR021086 (showing that timber harvest is responsible for 81% of the decrease in carbon stocks in Region 9); AR021095 (showing that timber harvest is responsible for 67% of the decrease in carbon stocks in Region 8); *see also* AR003664 ("Harvesting in United States' forests accounts for substantially more tree mortality than natural causes such as wildfire and

insect outbreaks."); AR020912 ("[H]arvesting greatly affects the U.S. forest carbon budget."). Logging produces carbon emissions because much of the logged material is never converted into an end-use wood product and is instead burned or otherwise disposed of in a way that releases the stored carbon. *See* AR020945 (showing pathways for carbon emissions from logging). As a result, the Forest Service has recognized the importance of using the "best available science-based knowledge" to assess "tradeoffs" regarding management actions that affect carbon storage and emissions. AR021068.

## II.    The National Forest System

The Forest Service "manages the 193 million-acre National Forest System through its headquarters in Washington, D.C., nine regional offices, and 154 national forests and 20 national grasslands." AR016782. Relevant here, Forest Service Regions 8 and 9 cover national forests east of the Dakotas plus Texas and Oklahoma.[1] Individual national forests, or sometimes groups of national forests, are managed as "units." *Id*. The Mark Twain National Forest unit (Missouri) is in Region 9 and the Francis Marion–Sumter (South Carolina) and National Forests in North Carolina units are in Region 8. AR016783. The Forest Service relies on a hierarchical management structure where a "regional forester heads each regional office, and a forest supervisor heads each unit." AR016782. Regional Foresters report to the head of the Forest Service, who is called the Chief, 36 C.F.R. § 200.2(a); the Chief reports to the Secretary of the Department of Agriculture (or "the Department"), *id*. § 200.1(b).

---

[1] Region 8 includes national forests in Texas, Oklahoma, Louisiana, Arkansas, Mississippi, Tennessee, Kentucky, Alabama, Georgia, Florida, South Carolina, North Carolina, Virginia, and Puerto Rico. AR016783. Region 9 includes national forests in Maine, Illinois, Ohio, Michigan, Wisconsin, Minnesota, Iowa, Missouri, Indiana, Pennsylvania, West Virginia, Maryland, New York, Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire, Delaware, and New Jersey. *Id*.

National forests are managed for "multiple uses," which include "outdoor recreation, range (i.e., livestock grazing), timber, watershed, and fish and wildlife purposes." AR016783. The Forest Service is not required to "prioritize one use over any other use" but should instead strive for "the combination of uses that will best meet the needs of the American people, and not necessarily the combination that will give the greatest dollar return or output." AR016783–84. As part of its mission, the "Forest Service sells timber each year," AR016781, for which the agency "sets timber targets," AR016787.

### III.    Timber Targets

Timber targets are set by fiscal year at national, regional, and unit-specific levels. The national timber target is issued by the Department of Agriculture, *see* AR021208; regional timber targets are issued by staff in the Forest Service's Washington Office, *see* AR019397; and unit-specific targets are issued by Regional Foresters, AR017074.

National and regional timber targets are developed "us[ing] an iterative process, with headquarters officials . . . working with the regions to set agencywide [i.e., national] and regional targets for the amount of timber the agency aims to sell each year." AR016786, *see also* AR016782. The regional targets are designed to achieve the national target. AR021215 ("Just remember that the national target is 3.4 billion board feet[2] so we have to figure a

---

[2] The Forest Service uses two primary units of measurement for timber volume. A "board foot" is a "unit of timber measurement equaling the amount of wood contained in an unfinished board 1 inch thick, 12 inches long, and 12 inches wide." AR004299. "Commonly, 1,000 board feet is written as 1 MBF, and 1,000,000 board feet is written as 1 MMBF." *Id*. The national timber target is usually conveyed in "billions of board feet." The agency also measures timber in "cubic feet." A "cubic foot" is a "unit of measure reflecting a piece of wood 12 inches long, 12 inches wide, and 12 inches thick." AR004303. "Commonly, 100 cubic feet is expressed as 1 CCF." *Id*. The Forest Service uses region-specific equations to convert CCF to MBF and vice versa. AR021263 (providing region-specific conversion factors). Throughout this brief, we use the unit of measurement reflected in the specific document cited.

way to hit that."). This process can include "[t]argets proposed by the [Washington Office] as a starting point for discussions," followed by "[r]egional submissions on capability estimates," before settling on a final target. AR018671; AR021200 (presenting "the targets proposed by the FS-Washington Office that would be necessary to achieve the national targets as set by . . . the Department" and inviting "each region to report their capabilities and the funding necessary to reach those targets"); *see* AR016786–87 (outlining the process used since fiscal year 2023).

Final unit-specific targets are assigned "based on regional target assignments from the Washington Office." AR019397; *see also* AR019618 (developing unit-specific targets considering "out-year plans, expected budgets, [and] capacity"). Ultimately, unit-specific targets are designed to fulfill regional targets, which in turn are designed to meet the national target. *See* AR019397, AR019618, AR021215.

In practice, the target-setting decision-making process plays out over an extended timeframe. It can take years to develop timber projects, which produce timber sales used to hit timber targets,[3] so regions and units are typically given estimated targets in advance so they can begin developing timber projects with the necessary volume. *See, e.g.*, AR019890 (planning timber sales to hit the estimated timber target for the National Forests in North Carolina unit for

---

[3] As an example of how this works, the National Forests in North Carolina unit was working on the Buck Project at least by 2017. AR000024. The agency issued a final decision on the project in May 2020. AR001127. The project authorized 795 acres of logging, AR001117, to produce 19,875 CCF of timber volume, AR001244. At the time, the agency was planning to divide this *project* into six different timber *sales* to be offered to fulfill timber targets in fiscal years 2020–2023. AR019897. As reflected at AR019897, the Forest Service uses a "gate" system to process timber sales. Relevant here, a timber project (like Buck) should have an approved NEPA decision before it passes through gate three but volume from a timber sale does not count toward the timber target until the sale passes through gate six. *See* AR019844. Tying these concepts together, the Forest Service was working on the Buck Project by 2017, it passed through gate three in 2020, and the agency was planning to offer for sale from the Buck Project (i.e., move through gate six) 3,300 CCF in fiscal year 2020, 4,000 CCF each in fiscal years 2020 and 2021, and 2,000 CCF each in fiscal years 2022 and 2023. *See* AR019897.

5

fiscal years 2021–2027); AR020970 (explaining that at a 2018 meeting, Forest Service officials were able "to lock in the FY19 targets and come up with our best estimates for FY20 and FY21").

Ideally, this process would leave regions and units well-prepared to hit their final timber targets, but if their estimated targets "are short of [the] national target" that is finalized, "additions to targets [are] necessary" to hit the national target. AR020972, AR018671, AR020962 (providing targets and explaining that "FY19-22 targets are regional estimates based on projected national targets" and that "[a]ny shortfall will be addressed as annual targets are set"). Shortfalls in volume are often addressed by offering timber for sale that the agency was planning to sell in a *future* fiscal year, thereby complicating the agency's ability to hit out-year (i.e., future) timber targets. AR017323 (explaining in 2022 that a region does not have sufficient volume to hit its timber target due to a "combination of offer and award at an unsustainable level in FY19 at 720 MMBF").[4]

To be sure, timber targets inform budget requests because the agency needs funding to hit its target. For example, in fiscal year 2019, Washington Office staff were instructed to "come to a decision on the final FY2020 and FY2021 regional targets," use that information to "estimate the total funding needing" to achieve the targets, which would then be presented to "the budget

---

[4] The Forest Service often uses the term "the shelf" to describe timber projects that have been authorized and have volume available for sale in a future year to achieve timber targets. These timber sales are sitting "on the shelf" and can be used as needed. *See, e.g.*, AR017228 (explaining that to increase timber volume, "we would need a few years to build our shelf"); AR017321 (explaining that a region has a goal of "having two years of signed NEPA on the shelf"); AR017323 (explaining that units "have little to no NEPA shelf stock and those units with shelf stock are carrying a significant portion of the timber target"). The problem with the "combination of offer and award at an unsustainable level in FY19 at 720 MMBF" discussed above is that it depleted that region's shelf stock, leaving too few projects to meet future timber targets.

community." AR020970; *see* AR018726 (requesting estimates of "[a]dditional funding to meet 3.7 [billion board feet]" national target which was an increase over the prior fiscal year target). Indeed, it appears to be common practice for the Forest Service to ask regions to provide "[e]stimated allocations needed to meet [the] final target" to support appropriation requests. AR020972 (requesting estimated allocations for fiscal years 2019–2021 based on projected timber targets); AR021196 (same for fiscal years 2020–2022). Eventually, the Forest Service requests appropriations from Congress sufficient to hit the national timber target, among other management objectives. *See, e.g.*, AR018478 (requesting funding to "achiev[e] a timber output of 3.7 billion board feet" in fiscal year 2020); AR018146 (requesting funding "to support an increase in timber sales and to achieve a timber output target of 4.0 billion board feet" in fiscal year 2021); AR017913 ("request[ing] budget levels" in fiscal year 2022 to harvest 3.4 billion board feet among other objectives).

The Department of Agriculture and Forest Service (collectively, "the agencies") retain discretion to change the national timber target based on final appropriations. For example, the Forest Service increased the national timber target from 3.4 billion board feet, AR017497, to 3.45 billion board feet in the middle of fiscal year 2023 based on additional funding made available under the Inflation Reduction Act, AR021243–44. But nothing requires the agency to change its timber target based on appropriations. For example, the "Secretary of Agriculture . . . directed the Forest Service to meet FY20 targets of 3.7 billion board feet of timber volume sold" even though the agency faced a "$210 million shortfall at current funding levels." AR021208. To close that gap, the Forest Service identified opportunities "to make discretionary decisions about cancellation or deferment of 'non-essential' projects" to re-allocate those funds toward achieving timber targets, AR021208; repurpose funds intended for "reforestation work . . . as well as pre-

7

commercial thinning, invasive weed control, etc.," to timber targets "resulting in substandard situations on the ground," AR021209; and use road funds to prioritize "timber sales" even if it resulted in "deferred maintenance of roads for recreation and other uses [resulting] in further deterioration and higher maintenance and repair costs in out-years" while "negatively impact[ing] local economies that rely on recreation and tourism," AR021210.

At the regional and unit levels, changes in appropriations likewise do not equate to changes in targets, and vice versa. Region 8 has expressed concern to the Washington Office that its "target has continued to go up without increases in funding." AR017228. Nor do changes to the national timber target (for appropriations or other reasons) equate to changes in regional or unit targets. The national target decreased between fiscal years 2021 and 2023, *compare* AR018228 *with* AR021243, but the Mark Twain unit target increased over the same period, *see infra* at 10.

    a.  <u>Final Timber Targets for Fiscal Years 2019–2024</u>

In fiscal years 2019–2024, the Department of Agriculture set national timber targets measured in billion board feet of 3.7 [AR018698], 3.7 [AR018558], 4 [AR018228], 3.4 [AR017910], 3.45 [AR021243], and 3.2 [AR021265], respectively.

The Washington Office of the Forest Service assigned regional timber targets during those same years except fiscal year 2022. AR017320 ("There were no FY22 targets assigned to the regions."); *see also* AR019857 (explaining that "unlike FY 22, we received a timber target this year [FY 23] from the [Washington Office]").[5]

---

[5] Because the Washington Office did not issue binding regional timber targets in fiscal year 2022, Forest Advocates abandon their claims related to fiscal year 2022 regional targets.

In fiscal year 2019, Regions 8 and 9 were initially assigned timber targets of 730,000 and 657,000 MBF, respectively. AR018728. Following a federal government shutdown, the Washington Office reduced regional timber targets (but not the national target), AR019485, to 598,600, and 611,010 MBF, respectively, AR021207.[6]

The Region 8 and 9 timber targets for fiscal year 2020 were 730,000 and 660,000 MBF, respectively. AR018277. The respective targets for the same regions in fiscal year 2021 were 780,000 and 700,000 MBF. AR017979, AR016793. As noted above, there were no regional targets in fiscal year 2022. Both regions were assigned a target of 680,000 MBF for fiscal year 2023. AR017683; *see* AR016793. In fiscal year 2024, Region 8 formally asked to reduce its timber target "from [the] Washington Office from 663,000 MBF to 560,000 MBF." AR019055. The request was granted. Region 8 was assigned a final target of 560,000 MBF and Region 9 was assigned a target of 682,640 MBF. AR021274.

The National Forests in North Carolina unit in Region 8 was initially assigned a 2019 timber target of 40,000 CCF, AR019904, but "[e]ach [unit] target was re-negotiated with the unit supervisors" following reduction of the 2019 regional target, AR021184, resulting in a final target of 32,000 CCF, AR021187. The National Forests in North Carolina unit's fiscal year 2020 and 2021 timber targets were 40,000 and 42,000 CCF, respectively. AR019616. Units in "Region 8 did not have hard target assignments for FY 2022." Ex. 1-T.[7] The unit's fiscal year 2023 and 2024 timber targets were 28,000 and 25,000 CCF, respectively. AR019616.

---

[6] The final timber targets for all regions for fiscal years 2014–2023 (including non-final fiscal year 2022 targets) are available at AR016792–94. The data there "are from the Forest Service's Timber Information Manager database and may differ from data the Forest Service reported in the past for various reasons." AR016791. For example, the Region 8 timber target for fiscal year 2020 is reported as 731,241 at AR016793 but 730,000 at AR018277.

[7] Because Region 8 did not issue binding unit-specific timber targets for the National Forests in North Carolina and Francis Marion–Sumter units in fiscal year 2022, we abandon those claims.

The Francis Marion–Sumter National Forest unit in Region 8 was initially assigned a 2019 timber target of 143,000 CCF but it was reduced to 115,000 CCF. AR019615; *see* AR019921. That unit's fiscal year 2020 and 2021 timber targets were 130,000 and 140,000 CCF, respectively. AR019616. There was no binding fiscal year 2022 target. The unit's fiscal year 2023 and 2024 timber targets were 140,000 and 124,000 CCF, respectively. *Id*.

The 2019 timber target for the Mark Twain National Forest unit in Region 9 was 68 MMBF. AR020033. The Mark Twain unit was issued the same timber target in fiscal year 2020. AR019801. In 2021, Region 9 issued the Mark Twain unit a timber target of 70 MMBF. AR019769. Despite the absence of regional units assigned by the Washington Office, Region 9 issued the Mark Twain unit a fiscal year 2022 target of 75 MMBF. AR019720. Region 9 issued the Mark Twain the same target in fiscal year 2023. AR019664. The Mark Twain unit's fiscal year 2024 timber target was 123,970 CCF, which is approximately 75 MMBF. Ex. 1-B.

## IV.    Individual Logging Projects

To fulfill the national, regional, and unit-specific timber targets, the Forest Service offers timber for sale from logging projects. *See generally* AR021217 (explaining that the Forest Service must "work to develop, implement, and administer more timber sales to attain an increased target").[8] Many of these projects are developed years in advance to produce certain timber volumes.[9] For example, the National Forests in North Carolina unit is currently developing the "GAP" Project. Kelly Decl. (Ex. 6) ¶ 23. The agency has not finalized that project but is already planning to harvest specific volumes from the project in fiscal years 2025–2027. AR019856, AR019846. If timber targets are higher than planned for, and the agency has

---

[8] *See supra* note 3.
[9] To be clear, these projects can also achieve other outcomes such as creating wildlife habitat but timber volume is a primary objective.

10

insufficient "shelf stock,"[10] units may need to quickly develop new timber projects to be sold in the same fiscal year to make up the difference which can lead to "a large amount of volume offered late in the fiscal year . . . flooding the market all at once . . . [also] resulting in additional stress on the workforce and mistakes on the ground." AR021210.

Forest Advocates challenge three individual logging projects ("the Projects") used to fulfill timber targets over fiscal years 2019–2024.

a.    Forest Health Initiative Project

The Mark Twain National Forest unit finalized the Forest Health Initiative Project in March 2018. AR014848. The project authorizes 45,885 acres of commercial logging. AR014854. When it was approved, the Mark Twain unit estimated the project would provide 138,000 MBF of timber volume, AR014792, over "the next 10 years," AR014854. That volume has been allocated over specific fiscal years to achieve timber targets starting in fiscal year 2019. AR020052. For example, as of 2020, the Mark Twain unit was planning to offer nine timber sales in fiscal year 2021 from the Forest Health Initiative Project for a total volume of 17,299 MBF to be used to achieve the expected timber target of 68,000 MBF. AR020037. The Mark Twain unit was planning additional volumes for future fiscal years. *See* AR020038–40.

The Forest Service disclosed that the "harvest of live trees" as part of the Forest Health Initiative Project would result in carbon emissions, *see* AR014855–56, but concluded that the "impacts of the proposed action on global carbon sequestration and atmospheric concentrations of $CO_2$ are very small," AR014856. More directly, the Forest Service concluded that assessment of carbon impacts is "statistically nonviable at the project level." *Id*. The Forest Service also concluded that "the carbon emissions from this and past projects in the analysis area are expected

---

[10] *See supra* note 4.

11

to have a minimal cumulative effect" because "any emissions from this project in a given year are expected to be equivalent to less than one percent of the fossil fuel emissions released from the state of Missouri in one year." AR014857.

    b.  <u>Buck Project</u>

The National Forests in North Carolina unit authorized the Buck Project in May 2020. AR001127. The project involves 795 acres of commercial "regeneration" logging—effectively clearcutting. AR001117. Across this acreage, the project was designed to produce 19,875 CCF, AR001244, and planned to contribute 15,300 CCF to timber targets for fiscal years 2020–2024, AR019849; *see also* AR019833 (explaining that the Buck Project would contribute 5,200 CCF toward the unit's expected fiscal year 2024 timber target of 29,000 CCF).

The "scope" of the Forest Service's Buck Project "analysis for direct, indirect, and cumulative effects on climate change" was limited to "the 20,638 acres of national forest lands" in the agency's "analysis area." AR001246. The Forest Service disclosed that the Buck Project would result in carbon emissions but concluded that the effects of those emissions "on global carbon sequestration and atmospheric concentrations of $CO_2$ are miniscule." AR001247. Regarding cumulative effects, the Forest Service concluded that "[w]hen combined, the carbon from this and past projects in the [20,638-acre] analysis area has a minimal cumulative effect not only at the local level, but at the larger level." AR001248. This conclusion was based on its finding that "[t]here are no ongoing projects within the [20,638-acre] analysis area that would appreciably contribute to climate change." AR001248.

    c.  <u>White Pine Management Project</u>

The Francis Marion–Sumter National Forest unit approved the White Pine Management Project in June 2021. AR005136. The project authorizes 1,952 acres of commercial logging to be

implemented over "several years." AR005101. Clearcuts over forty acres are generally prohibited in eastern national forests like the Francis Marion–Sumter. 36 C.F.R. 219.11(d)(4). The unit has had to request exemptions to this requirement to hit its timber targets, Ex. 1-C (explaining that "timber targets hinge" on a "clearcut size exemption"), and requested the exemption as part of this project, AR004972. Logging volume from the White Pine Management Project was used to fulfill timber targets in fiscal years 2022–2024. AR019905, AR019907, AR019908, AR019910, AR019913.

Documents in the project file for the White Pine Management Project show that timber "[h]arvesting accounted for approximately 75 percent of the total non-soil carbon lost" on the Francis Marion–Sumter unit from 1990–2011. AR012266. But the Forest Service ultimately concluded only that the White Pine Management Project "might temporarily contribute an extremely small quantity of greenhouse gas [ ] emissions relative to national and global emissions." AR005122. Unlike the Forest Health Initiative and Buck Projects, the Forest Service made no attempt to assess the cumulative carbon effects of the White Pine Management Project.

## LEGAL BACKGROUND

### I.   Administrative Procedure Act

The Administrative Procedure Act ("APA") authorizes judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. "Agency action" is defined to "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id*. § 551(13). This expansive definition is "meant to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). "Also expansive is the APA's definition of 'rule' which it defines as 'the whole or part of an agency statement of general or

13

particular applicability and future effect designed to implement, interpret, or prescribe law or policy.'" Motion to Dismiss Oral Ruling Transcript at 6:25-7:5, *Chattooga Conservancy v. U.S. Dep't. of Agric.*, No. 1:24-CV-00518 (March 25, 2025) (ECF No. 30) [hereinafter "Tr."] (quoting 5 U.S.C. § 551(4)).

Whether agency action is sufficiently "final" to invoke the APA's judicial review provisions "involves a 'pragmatic' and 'flexible' inquiry," Tr. 17:14–17 (quoting *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016)), that turns on a two-prong test. First, "the action must mark the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Second, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 178 (cleaned up).

Agency actions satisfy the first prong even if the agency may reconsider its decision. "The ability to reconsider or revise a prior decision 'is a common characteristic of agency action and does not make an otherwise definitive decision non-final.'" Tr. 18:23–19:3 (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016)). "What matters under *Bennett*'s first prong is whether the agency decision reflects 'a final determination' rather than a 'moving target.'" Tr. 19:19–22 (citing *Safari Club Int'l*, 842 F.3d at 1289).

The first prong can be satisfied through "a series of agency pronouncements rather than a single edict." *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48–49 (D.C. Cir. 2000); *see* Tr. 8:10–21. Courts have also "repeatedly recognized that agency action can be final as to one issue. . . even if other issues . . . remain open for later resolution." Tr. 22:5–10 (citing *Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 148 (D.D.C. 2020), *aff'd sub nom. W. Watersheds Project v. Haaland*, 850 F. App'x 14 (D.C. Cir. 2021)). "In other words, even if the implementation of a plan, rule, or order may require additional decision-making, that does not

14

mean that the decision to impose the plan, rule, or order was not the culmination of the relevant decision-making process." Tr. 22:11–17.

To be sure, *Bennett*'s first prong bars challenges seeking "wholesale improvement of [a government] program," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990), but plaintiffs can "challenge under the APA a 'specific order or regulation, applying some particular measure across the board,' even if the challenge would result in an entire program being affected," Tr. 9:25–10:4 (quoting *Lujan*, 497 U.S. at 890 n.2). Stated differently, "while 'an ongoing program or policy is not in itself a final agency action under the APA, a single step or measure within that program or policy is reviewable.'" Tr. 10:20–24 (citing *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001)).

*Bennett*'s second prong is satisfied when the agency action determines "rights," or "obligations," or results in "legal consequences." *Bennett*, 520 U.S. at 178. Under this prong, "[w]hat matters is whether [the agency action] has a binding impact, even if that impact is felt only by the agency." Tr. 23:9–11 (citing *Bennett*, 520 U.S. at 178). An "'agency pronouncement will be considered binding as a practical matter if it is applied by the agency in a way that indicates that it is binding,' even if it does not appear to be binding 'on its face.'" Tr. 13:18–14:1 (citing *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (2002)). Relatedly, "*Bennett*'s second prong is met when the agency's decision no longer permits 'the agency and its decision-makers to exercise discretion.'" Tr. 21:3–8 (quoting *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 806 (D.C. Cir. 2006)); *see also Nat. Res. Def. Council v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011) (finding final agency action where "Guidance binds EPA regional directors").

Regarding legal consequences, "'*Bennett*'s second prong is satisfied by legal consequences that affect only the agency itself.'" Tr. 20:18–23 (quoting *Am. Wild Horse Campaign*, 442 F. Supp. 3d at 149); *see also Bennett*, 520 U.S. at 169 (finding the second prong satisfied by action that "alters the legal regime to which the action agency is subject").

## II.    National Environmental Policy Act

The National Environmental Policy Act ("NEPA") requires federal agencies to prepare an environmental analysis for federal actions where three factors are met: 1) the action is a final agency action under the APA, 2) preparation of the environmental analysis would not "clearly and fundamentally conflict with the requirements of another provision of law," and 3) the agency has discretion "to take environmental factors into consideration in determining whether to take the proposed action." *See* 42 U.S.C. § 4336(a). Once triggered, agencies may satisfy NEPA's requirements by preparing an Environmental Impact Statement, Environmental Assessment, or by relying on a Categorical Exclusion.

First, Environmental Impact Statements are required for "major Federal actions significantly affecting the quality of the human environment." *Id.* § 4332(2)(C); *see id.* § 4336(b)(1) (explaining that Environmental Impact Statements are required for any proposed action "that has a reasonably foreseeable significant effect on the quality of the human environment"). An action is a "major federal action" if it "is subject to substantial Federal control and responsibility." *Id.* § 4336e(10)(A).

"Significance" is determined by "analyzing the potentially affected environment and degree of the effects of the action." 7 C.F.R. § 1b.11(a)(50).[11] "Potentially affected environment"

---

[11] When Congress enacted NEPA, it created the Council on Environmental Quality ("CEQ"). *See* Pub. L. 91-190 (1970). In 1978, CEQ promulgated regulations implementing NEPA that applied to all federal agencies. *See* 43 Fed. Reg. 55,978 (Nov. 29, 1978). Those regulations, as revised,

means "the condition of the physical, biological, social, and economic factors that may be impacted by an action." *Id*. § 1b.11(a)(50)(i). And "degree" is assessed considering "short- and long-term effects," "beneficial and adverse effects," "[e]ffects on public health and safety," "[e]conomic effects," and effects on "the quality of life for the American people." *Id*. § 1b.11(a)(50)(ii).

"[E]ffects" under NEPA are those "changes to the human environment from the proposed action or action alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives." *Id*. § 1b.11(a)(12). The scope of effects that must be considered depends on the scope of the agency action, *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1512 (2025), such that an agency action of nationwide scope demands a nationwide effects analysis, *Kleppe v. Sierra Club*, 427 U.S. 390, 400 (1976).

"Effects" under NEPA include "indirect effects" which "extend outside the geographical territory of the project or might materialize later in time," *Seven Cnty. Infrastructure Coal.*, 145 S. Ct. at 1515, and cumulative effects, *Kleppe*, 427 U.S. at 410 ("[W]hen several proposals . . . that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together."); *id*. at 413 ("Cumulative environmental impacts are, indeed, what require a

---

were in effect when Forest Advocates initiated this action and are cited frequently in the First Amended Complaint and briefing over Defendants' Motion to Dismiss. *See, e.g.*, ECF No. 22-1. They were also in effect and applied by the Forest Service when it approved the Projects discussed below. CEQ has since removed its rules from the Code of Federal Regulations. *See* 90 Fed. Reg. 10,610 (Feb. 25, 2025). The Forest Service and Department of Agriculture also revised their NEPA regulations in July 2025. *See* 90 Fed. Reg. 29,632 (July 3, 2025). This brief cites to the current regulations for the timber target claims though ultimately the outcome is the same regardless of the regulations applied. The project-specific claims "are subject to the previous regulations because the actions were all completed prior to the effective date of the new regulations and because [the agency] applied the prior regulations" in its project decisions. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166, 1178 n.6 (10th Cir. 2023).

17

comprehensive impact statement."). "Cumulative effects" were defined in NEPA regulations in effect and applied by the Forest Service in the Projects as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7 (1978). "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id*.

Second, an "agency shall prepare an environmental assessment with respect to a proposed agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown." 42 U.S.C. § 4336(b)(2). An Environmental Assessment "set[s] forth the basis of such agency's finding of no significant impact or determination that an environmental impact statement is necessary." *Id*. A Finding of No Significant Impact is simply a "determination by a Federal agency that a proposed agency action does not require the issuance of an environmental impact statement." *Id*. § 4336e(7).

Third, some federal actions can be approved using a Categorical Exclusion which is promulgated for a "category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment." *Id*. § 4336e(1).

In summary, federal actions that trigger NEPA and are not subject to a Categorical Exclusion require preparation of either an Environmental Impact Statement or Environmental Assessment. *See* 42 U.S.C. § 4336(a). When preparing an Environmental Impact Statement or Environmental Assessment, an agency must take a "hard look" at environmental impacts, *Nat. Res. Def. Council, Inc. v. Morton*, 458 F.2d 827, 838 (D.C. Cir. 1972), including cumulative effects, *Kleppe*, 427 U.S. at 410. "The impact of [greenhouse-gas] emissions on climate change is precisely the kind of impacts analysis that NEPA requires agencies to conduct." *Diné Citizens*

18

*Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1035 (10th Cir. 2023) (quoting *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008)); *see also Gulf v. Burgum*, 775 F. Supp. 3d 455, 482 (D.D.C. 2025) (recognizing the requirement to "take a 'hard look' at greenhouse gas emissions" under NEPA).

**STANDARD OF REVIEW**

Forest Advocates challenge Defendants' failure to prepare a NEPA analysis in connection with the challenged timber targets under 5 U.S.C. §§ 706(1) and (2). Pursuant to § 706(1), a reviewing court must "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Agency action is unlawfully withheld, and must be compelled, where "an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Under § 706(2), a reviewing court must "set aside agency action[s], findings, and conclusions" taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

Forest Advocates challenge the sufficiency of the Projects' NEPA analyses under 5 U.S.C. § 706(2)(A) which requires a reviewing court to "set aside agency action[s], findings, and conclusions" that it finds "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(D). Agency action is arbitrary and capricious where, among other things, the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," or where the agency's action is not based on a "reasoned analysis." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983).

19

**ARGUMENT**

The Court should grant Forest Advocates' Motion for Summary Judgment. Forest Advocates and their members have standing to bring their claims. The challenged timber targets are final agency actions for which Defendants failed to comply with NEPA. Defendants' dismissive carbon analyses of the Projects also violate NEPA's "hard look" requirement.

**I.      Forest Advocates have standing to challenge the timber targets and the Projects.**

Forest Advocates have standing to challenge the national, regional, and unit-specific timber targets, as well as the three challenged projects. To establish standing, a plaintiff must allege (i) a "concrete and particularized" injury that is "actual or imminent"; (ii) that the injury is fairly traceable to the defendant's challenged conduct; and (iii) that the requested relief is likely to redress the injury. *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 180–81 (2000). "For claims of procedural injury under NEPA . . . , the imminence and redressability prongs of standing are somewhat relaxed." *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 304 (D.C. Cir. 2025). Forest Advocates "adequately allege standing when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Id*. at 305 (citation omitted).

"For causation, a plaintiff must show two links: one connecting the omitted procedural step to some substantive government decision that may have been wrongly decided because of the lack of compliance with that procedural requirement and one connecting that substantive decision to the plaintiff's particularized injury." *Id*. at 304 (citation omitted). "For redressability of a procedural injury, a plaintiff need not show that compliance with the procedure *would* alter

20

the final agency decision, but only that the agency *could* reach a different conclusion if ordered to revisit its procedural error." *Id*. (citation omitted).

Organizations have standing when they "demonstrate that: (1) at least one of their members would otherwise have standing to sue in his or her own right; (2) the interests they seek to protect are germane to their organizations' purposes; and (3) neither the claim[s] asserted nor the relief requested requires the participation of individual members." *Gulf*, 775 F. Supp. 3d at 469 (cleaned up).

Here, Forest Advocates are injured by the national, regional, and unit-specific timber targets and the Projects implementing those targets. Forest Advocates and their members have recreational, aesthetic, spiritual, and scientific interests in areas being logged to contribute to the timber targets. Chapple Decl. (Ex. 2) ¶¶ 5–6, 9–13, 15; Hayler Decl. (Ex. 3) ¶¶ 5–6, 11, 14–20; Kruzen Decl. (Ex. 4) ¶¶ 3–4, 7, 9–14; Fullerton Decl. (Ex. 5) ¶¶ 6–7, 12–15; Kelly Decl. (Ex. 6) ¶¶ 10, 18, 23–27. The Forest Service made no effort to comply with NEPA when issuing the timber targets. If it had, it may have reached a different conclusion regarding the target level which could have better protected Forest Advocates' interests and redressed their injuries. Chapple Decl. ¶¶ 17–18; Hayler Decl. ¶¶ 27–28, 31; Kruzen Decl. ¶¶ 18–19; Fullerton Decl. ¶¶ 17–18; Kelly Decl. ¶¶ 32–33.

Forest Advocates' interests are also harmed by logging authorized by the Projects which themselves implement the timber targets. Chapple Decl. ¶¶ 5, 10, 13; Hayler Decl. ¶¶ 5, 16–20; Kruzen Decl. ¶¶ 4, 7, 9–13; Fullerton Decl. ¶¶ 6–7, 12, 15; Kelly Decl. ¶¶ 10, 24–27. The Forest Service could have reached a different decision regarding the Projects' harvest levels by assessing cumulative impacts consistent with NEPA (or by reaching a different conclusion regarding target volume) that better protects Forest Advocates' interests and redresses their

21

injuries. Chapple Decl. ¶¶ 17–18; Hayler Decl. ¶¶ 27–28, 31; Kruzen Decl. ¶¶ 18–19; Fullerton Decl. ¶¶ 17–18; Kelly Decl. ¶ 32. Forest Advocates' injuries are fairly traceable to the timber targets and the Projects which implement the challenged timber targets. *See supra* at 10–13 (showing Projects are used to achieve timber targets). The interests Chattooga Conservancy and MountainTrue seek to protect are germane to their organizations' purposes. Hayler Decl. ¶ 3; Kelly Decl. ¶ 6.

## II.    The challenged national, regional, and unit-specific timber targets are final agency actions under the APA.

The challenged timber targets are "final agency actions" subject to judicial review under 5 U.S.C. § 704. First, they are cognizable "agency actions" that meet the APA definition of "rule" or the "equivalent thereof." Second, they are also "final" because they: (1) mark the consummation of an extensive decision-making process; and (2) impose obligations and legal consequences on Forest Service staff.[12]

---

[12] In Section II, in addition to the administrative record, Forest Advocates cite to and attach to their brief non-record documents for the limited purpose of establishing that the challenged timber targets are final agency actions under 5 U.S.C. § 704 and that Forest Advocates thus have a cause of action under the APA. *See Am. Bar Ass'n v. U.S. Dep't of Educ.*, 370 F. Supp. 3d 1, 20 (D.D.C. 2019) (Kelly, J.). Forest Advocates do not submit the documents for the court's review under 5 U.S.C. § 706(2), which is limited to "the whole record or those parts of it cited by a party." Instead, the documents are submitted for evaluating the *Bennett* prongs. Evidence demonstrating satisfaction of those prongs is not limited to "materials [the agency] considered, either directly or indirectly, in making its decision." *Am. Bar Ass'n*, 370 F. Supp. at 37 (providing the standard test for including materials in the administrative record). For example, under the "first *Bennett* prong, courts . . . look to the way in which the agency subsequently treats the challenged action." *Id.* at 21. Evidence of how an agency *subsequently* treats a challenged decision would not have been "considered, either directly or indirectly, *in making its decision.*" *Id*. at 37 (emphasis added). Indeed, this Court has previously looked outside the administrative record and "consider[ed] factual assertions in declarations attached to [plaintiffs'] motion papers" when evaluating whether agency action satisfied the *Bennett* factors. *Id*. at 23 n.5; *see also Pharm. Rsch. & Manufacturers of Am. v. U.S. Dep't of Health & Hum. Servs.*, 138 F. Supp. 3d 31, 45, 57 (D.D.C. 2015) (evaluating "submitted sworn declarations" outside the

22

a.    The decision to set a specific timber target is an "agency action."

The Department of Agriculture's and the Forest Service's decisions to set specific timber targets "constitute[] agency action[s]" under the APA. *See* Tr. 17:9–10.

Under the APA, "'agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). "That is an expansive phrase 'meant to cover comprehensively every manner in which an agency may exercise its power.'" Tr. 6:20–24 (quoting *Am. Trucking Ass'ns*, 531 U.S. at 478). "Also expansive is the APA's definition of 'rule,' which it defines as 'the whole or a part of [1] an agency statement of general or particular applicability and [2] future effect [3] designed to implement, interpret, or prescribe law or policy." Tr. 6:25–7:5 (quoting 5 U.S.C. § 551(4)). Timber targets meet each criterion.

To start, the national timber target is an agency statement of general applicability that applies to the entire Forest Service. *See, e.g.*, AR021208 (Secretary of Agriculture "direct[ing] the Forest Service to meet [its] FY20" timber target.). The regional and unit-specific timber targets are agency statements of general or particular applicability that apply to geographic subsets of the agency. *See, e.g.*, AR021224–26 (Region 8 responsible for meeting "final volume assignment[]" of 680,000 MBF for FY 2023); AR021187 (Francis Marion–Sumter National Forest unit responsible for meeting "assigned target" of 115,000 CCF for FY 2019).

Next, timber targets have "a future effect" because they "spur[] future agency actions designed to achieve" them. *See* Tr. 7:25–8:1. Indeed, the decision to set discrete timber targets

---

administrative record to assess "final agency action within the ambit of 5 U.S.C. § 704"). Related, the Parties agree that Forest Advocates' use of non-record materials for the limited purpose of establishing final agency action, as referenced in the Parties' Joint Status Update (ECF No. 37), does not take this case outside the contours of LCvR 7(h)(2), which would require submission of statements of material facts.

"effectively [dictates] how much lumber" the Forest Service "will log and sell for the year at issue" at national, regional, and unit-specific levels. *See* Tr. 7:7–13; *see also, e.g.*, AR016793 (noting that, apart from the coronavirus-impacted fiscal years of 2020–21, Region 9 achieved its assigned target in seven out of the last eight fiscal years—even though its regional target increased by nearly 50% over the same period); AR021215 ("Just remember that the national target is 3.4 billion board feet so we have to figure a way to hit that."). Therefore, a "timber target does more than just leave the world as it found it." Tr. 8:2–3 (citing *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004)).

Finally, and for similar reasons, timber targets "prescribe agency policy" by setting a sales volume level that agency staff must act to fulfill. *See* Tr. 7:20–8:3; *see infra* at 32–38 (describing how targets are binding). In addition, timber targets are also designed to "implement" or "interpret" "law" applicable to the Forest Service. Tr. 13:5–11. Congress has given the Secretary of Agriculture discretion to sell timber from national forests "under such rules and regulations as he may prescribe." 16 U.S.C. § 472a(a). The Department of Agriculture and Forest Service interpret and implement that authority, in part, by setting timber targets. *See, e.g.*, AR021243–44 (noting that the Forest Service sets timber targets each year to create a "predictable, consistent volume sold each year"); AR019397 (stating that timber targets, among other directives, are "used to align and execute the program of work on [each] unit").

Even if timber targets did not meet the APA's capacious definition of "rule," they are at least the "equivalent . . . thereof." *Cf. Batterton v. Marshall*, 648 F.2d 694, 700 (D.C. Cir. 1980) (holding the breadth of the APA's definition of rule "cannot be gainsaid" and includes "nearly every statement an agency may make"). Therefore, the challenged targets are reviewable "agency actions."

24

To be clear, Forest Advocates "are not challenging defendants' timber program as a whole." Tr. 10:5–7. "Instead, [Forest Advocates] are challenging a particular and limited set of actions that defendants [under]took: The setting of the national[, regional, and unit-specific] timber targets." Tr. 10:9–11; *see also, e.g.*, AR021243 (setting fiscal year 2023 national target at 3.45 billion board feet); AR021220–21 (setting fiscal year 2022 targets for Region 9); AR021223–26 (listing fiscal year 2023 targets for Region 8 and its constituent units); AR021187 (setting fiscal year 2019 target for the Francis Marion–Sumter unit). To be sure, "these decisions set agency policy 'across the board' and, accordingly, have some effect on the entire timber program. But [Forest Advocates'] claim[s] still challenge only discrete agency actions within the larger timber program and do not represent 'a generic [and unreviewable] challenge to all aspects of' that program." Tr. 10:11–19 (quoting *Lujan*, 497 U.S. at 891).

Framed slightly differently, "while 'an ongoing program or policy is not in itself a final agency action under the APA, a single step or measure within that program or policy is reviewable.'" Tr. 10:20–24 (quoting *Cobell*, 240 F.3d at 1095). And here, Forest Advocates "have identified a particular step in defendants' lumber program"—the "setting of the national[, regional, and unit-level] timber targets." Tr. 11:22–24. "So instead of advancing a 'blunderbuss challenge to' defendants' 'failure to carry out the law's general directives,' [Forest Advocates] complain only that defendants' 'specific actions' were contrary to law." Tr. 12:1–6 (quoting *Am. Forest Res. Council v. United States*, 77 F.4th 787, 805 (D.C. Cir. 2023)). Finding that specific timber targets were reviewable under the APA would not entail a "general judicial review" of the Forest Service's "day-to-day operations." *Lujan*, 497 U.S. at 899. Rather, it would only involve this Court in a single, circumscribed decision point.

Naming the national timber targets in the Forest Service's congressional budget request,[13] known as the "annual budget justification," also does not make the target unreviewable. Tr. 14:18–20. While "budget requests" themselves "do not fit under the APA's definition of agency action," the national timber target is not equivalent to a budget request. *See* Tr. 15:1–16:25.

To be sure, the timber target *informs* the development of budget requests, Forest Service Handbook ("FSH") 1909.13, ch. 50 (explaining that the timber target should be disclosed in budget justifications for the sake of transparency), but the same is true of any agency action that requires funding. Other record documents show that the agency sets its national timber target and *then* requests appropriations to fulfill it. *See supra* at 6–8 (discussing process of developing timber targets). Importantly, the agency must still hit its timber target even if it does not receive the requested appropriation amount. For example, in fiscal year 2020 the agency faced a $210 million shortfall in appropriations but was still "directed" to hit its national timber target. AR021208.

Other indicia confirm that the national target is not a budget request or the equivalent thereof. For one, the Forest Service does not request a specific appropriation to fulfill its national timber target. Instead, the agency requests funding for various budget line items that are later drawn from as needed to fulfill the selected national target. *See* AR020970 (requiring regions to estimate the total "funding it would take to achieve not only the timber volume [sold target], but [also] the [region's] full restoration needs"); AR021224 (asking if the regional timber target will be "funded with" various budget line items—e.g., "TM," or Timber Management appropriations—or trust funds that are supported by timber receipts—e.g., Salvage logging

---

[13] Regional and unit-specific targets are not disclosed in the Forest Service's budget justifications. *See, e.g.*, AR017497 (fiscal year 2023 budget justification merely listing the national target).

receipts); AR019470 (conveying that an "additional $4,566,465 [of funds from a specific budget category] has been allocated to support the timber volume sold target" for Region 8). The Forest Service's ability to draw from multiple appropriations or local timber receipts to meet its timber target shows that the national target is not the same as the budget request itself. *Cf. Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 22 (D.C. Cir. 2006) (concluding a *specific* request for funds to implement a nonbinding "strategy" was not a cognizable agency action).

What's more, in contrast to a "budget request"—which is "merely a proposal that require[s] action from both the President and Congress," Tr. 16:14–20—the setting of the national timber target has "immediate effects on how the agency operates," Tr. 29:11–13. "[I]nstead of waiting until a final budget is received," AR019398, once the agencies finalize the national target, the Forest Service typically moves to "[i]ssue final regional targets" for the upcoming fiscal year ahead of a "Final Appropriations Bill," AR021237; *see* AR019397–98 (issuing unit-specific targets before receiving a "full year budget"). The Forest Service then issues "initial [budget] allocations" to start work to fulfill those targets. AR019397; *see also* AR021237 (same). This allows Forest Service "units to move out with delivering" on their targets, "rather than" wait for the final appropriations bill. Ex. 1-D (noting the "risk for this [approach] is held at the national level"). If the national target were merely a budget request, however, one would expect the Forest Service to wait for final appropriations before taking these steps. Because the agency takes immediate action to implement its target even though it may not receive the requested funding, the national target cannot be considered an unreviewable budget request.

b.   The challenged timber targets are "final."

Agency action is "final" if it: (1) "mark[s] the consummation of the agency's decisionmaking process," and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78 (cleaned up). The challenged timber targets satisfy both prongs.

i.    *The challenged timber targets mark the consummation of the agencies' decision-making process.*

Agency action is consummated if it can "reasonably be described as [an agency's] last word" on a particular subject. *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 636 (D.C. Cir. 2019). In other words, "[w]hat matters under *Bennett*'s first prong is whether the agency decision reflects 'a final determination' rather than a 'moving target.'" Tr. 19:19–22 (quoting *Safari Club Int'l*, 842 F.3d at 1289).

In assessing whether an agency's action is "definitive" enough to be considered its final determination, courts often look to the surrounding circumstances. *See Am. Bar Ass'n v. U.S. Dep't of Educ.*, 370 F. Supp. 3d 1, 20 (D.D.C. 2019) (Kelly, J.). For example, while not dispositive, an agency's characterization of an action as "final" suggests it is, indeed, final. *Carter/Mondale Presidential Comm., Inc. v. Fed. Election Comm'n*, 711 F.2d 279, 288 n.17 (D.C. Cir. 1983). Likewise, if the decision at issue was made by agency leadership, instead of a "mere subordinate," that too supports a finding of finality. *Cal. Cmtys.*, 934 F.3d at 636. Similarly, if a decision is "the product of a lengthy decisionmaking process" as opposed to a snap judgment, the matter is more likely to be settled. *Am. Wild Horse Campaign*, 442 F. Supp. 3d at 147. And if the agency "subsequently treats the challenged action" as settled—by adjusting its behavior to conform to the challenged decision, for example—that also indicates the action

28

"represent[s] the culmination of [the agency's] consideration of an issue." *Am. Bar Ass'n*, 370 F. Supp. at 21 (citation omitted).

These factors all support the conclusion that the challenged timber targets are sufficiently "definitive" to satisfy *Bennett*'s first prong. To start, the agencies refer to their targets as "final," "actual," "lock[ed] in," or "assigned" dozens of times in the record. *See, e.g.*, AR017228, AR017979, AR018277, AR018671, AR018728, AR019198, AR019301, AR019903, AR019905, AR019908, AR019914, AR019917, AR019920, AR019874, AR020962, AR020970, AR020972, AR021189–97, AR021224, AR021233, AR021246, AR021248.[14] Even the administrative record index refers to targets as "final." ECF No. 36-2 (referencing the "final" timber targets for fiscal year 2019). This demonstrates the agencies themselves believe their targets become "definitive" at a certain point.

Next, the challenged timber targets were set by the agencies' leadership, including the Secretary of Agriculture, Forest Service Chief, and Regional Foresters. *See* AR019485 (national timber targets are "assigned by the Department of Agriculture"); AR021200 ("[N]ational targets [are] set by leadership at the Department."); AR021243 (Forest Service Chief directing the agency to increase its FY23 target); AR016787 (noting Forest Service "headquarters . . . finalizes the agencywide and regional timber targets"); AR019857 (FY23 Region 8 target "received . . . from the [Washington Office]"); AR019397 (Region 8 target "assigned" by "Washington Office"); AR020962 (Washington Office "set[s] regional targets"); AR019845 ("The Regional Office has . . . allocated a timber target of 29,000 CCF" to the "National Forests in North Carolina."). Because targets are set by individuals with "authority to speak" for the Forest

---

[14] In contrast, the fiscal year 2022 regional targets were "unofficial/unassigned." AR021228.

Service, as opposed to "mere subordinate[s]," that too supports a finding of finality. *Cal. Cmtys.*, 934 F.3d at 636.

In addition, the record shows that timber targets are the product of a lengthy decision-making process. *See supra* at 4–8 (describing decision-making process); Tr. 18:13–17 ("[D]efendants do not dispute that this decision-making process exists, nor that the timber target results from that process."). That process involves significant information gathering. *See* AR021265 (describing "[d]ata gather[ing]" process to establish timber targets). It also entails extensive inter- and intra-agency "discussions" and "meetings." AR016786 ("Headquarters discusses potential timber target levels with the Forest Service's executive leadership team and the regional foresters" as well as "[o]fficials from the Department of Agriculture[.]"); AR017228 (describing the "need for discussion and dialogue between the Region and WO before finalizing . . . target assignments"); AR019857–58 (describing "conversation[s]" and "calls" between Region 8 and "each individual Forest" regarding timber targets); AR021184 (noting unit-level targets in Region 9 were "re-negotiated with the unit supervisors"). These meetings, discussions, and coordination efforts take place over the course of several years, AR019617 (showing planning for targets starts up to five years in advance); AR017228 (same), and can involve large expenditures of resources, *see* AR020970 (summarizing a meeting in Rapid City, SD, to "work[]on the timber targets for FY19, 20, and 21"). This all indicates that the binding target decisions produced at the end of this extended process are settled, not tentative. *See Safari Club Int'l*, 842 F.3d at 1289 (concluding a decision "based on a thorough examination" of numerous studies, data, reports, and official documents was a "final and binding determination").

Finally, Forest Service staff treat timber targets as settled by:

30

- Computing and assigning lower-level targets (regional and unit-specific targets) based on assigned higher-level targets (national and regional targets), *see, e.g.*, AR018671 (noting that since proposed regional targets "for FY20&21 are short of [the assigned] national target," some "additions to targets will be necessary"); *see also* AR020970 (same);

- Entering target numbers into the agency's metrics management database, AR017073 (FSH 1909.13 ch. 50) (ordering agency staff to document timber targets in "Metrics Management"); AR021184 (targets are "entered in the official database of record");

- Requesting that agency staff calculate the money "needed to achieve the final [timber] targets for each year," AR018671; *see also* AR020967, AR020970 ("From these targets, regions should estimate the total funding needed.");

- Demanding status reports and tracking target achievement, Ex. 1-E (noting Region 8 compiles a "timber volume sold monthly report" and hosts a "monthly timber awarded call"); Ex. 1-F (Region 6 "provides monthly" timber target achievement updates that increase to "weekly" reports in the 4th quarter); Ex. 1-G (providing "this week's updates" on timber target achievement);

None of these actions would be necessary if the timber targets were "merely tentative or interlocutory" decisions (nor if the targets were not binding). *Bennett*, 520 U.S. at 178. By taking steps to implement the targets, Forest Service staff are "plainly indicating that" those targets are, in fact, final. *Am. Wild Horse Campaign*, 442 F. Supp. 3d at 148.

Granted, the agencies retain the discretion to revise their timber targets. But the "ability to reconsider or revise a prior decision 'is a common characteristic of agency action and does not make an otherwise definitive decision non-final.'" Tr. 18:23–19:3 (quoting *Hawkes Co.*, 578 U.S. at 598). What's more, any "adjustments" to timber targets must be formally "authorized" by

31

Department of Agriculture or Forest Service leadership. *See* AR019485 (Forest Service Chief authorizing adjustments to FY19 regional targets); *see also* AR019055 (Region 8 formally requesting target reduction "from Washington Office"); AR021185 (target adjustment in 2019 had to be "confirm[ed]" by the Washington Office). Because targets cannot be changed on a whim, that too indicates that they are in a settled place once they are designated as "final." *See, e.g.*, AR020970.

In addition, as noted above, even though the agencies retain the discretion to revise their timber targets, they generally avoid doing so. Indeed, according to Forest Service staff, "[a]s a rule, once correctly established a year in advance, National targets don't change for a given fiscal year"; similarly, "once correctly established, Regional targets generally don't change for a given fiscal year." Ex. 1-H. This holds true even when the Forest Service receives less funding than it requested; in fact, agency leadership actively discourages regions from "request[ing] adjustments to their regional targets . . . based on funding" shortfalls alone. AR021200. The agencies' reluctance to revise their targets based on changed circumstances—even in the face of budget crunches—lends even more support to the notion that the targets can "reasonably be described as [the agencies'] last word" on the matter. *Cal. Cmtys.*, 934 F.3d at 636.

The Forest Service's words and actions establish that the national, regional, and unit-specific targets are sufficiently definitive to satisfy *Bennett*'s first prong.

> ii. *The challenged timber targets impose obligations and legal consequences on the Forest Service.*

The challenged timber targets also satisfy *Bennett*'s second prong. That prong is met if the challenged action (1) determines "rights or obligations" *or* (2) triggers "legal consequences." *Bennett*, 520 U.S. at 177–78; ECF No. 22-1 at 11. The challenged timber targets do both.

First, the decision to set specific targets obligates the Forest Service to meet them. This obligation is apparent in the Forest Service's Handbook and Manual,[15] as well as direct instructions from higher-level Forest Service and Department staff.

According to the Forest Service Handbook, it is the "responsibility" of national, regional, and unit-level staff to "meet . . . program targets, as assigned," including timber targets. FSH 1909.13, chs. 30.41, 30.44. This obligation is echoed in the Forest Service Manual ("FSM"), which requires District Rangers to "[m]eet the time schedules involved to accomplish annual targets" set by the Forest Supervisor. FSM 2404.17b; *see also* FSM 2404.12, FSM 2404.15a. These directives—which were promulgated under the Forest Service's regulatory authority described at 7 C.F.R. pt. 2.7—are "mandatory." FSM 1110.8. Thus, when the Department and Forest Service set timber targets, the FSH and FSM require subordinate staff to meet them.

The mandate to hit timber targets is also clearly demonstrated by directions from higher-level Department and Forest Service staff to meet targets, as assigned. *See, e.g.*, AR021208 ("The Secretary of Agriculture has directed the Forest Service to meet FY20 targets of 3.7 billion board feet of timber volume sold[.]"); AR021273 ("Commit to a target . . . and meet or exceed it!"); AR021184 (Region 9 Director emphasizing that forest units must "ensure" that timber targets "are achieve[d]"); AR018289 (directing agency to "[p]rioritize program funding and delivery to achieve selling 3.7 billion board feet of timber"); Ex. 1-I (Department Undersecretary

---

[15] The Forest Service Manual and Handbook "codif[y] the agency's policy, practice, and procedure affecting more than one unit and the delegations of continuing authority and assignment of continuing responsibilities; serve[] as the primary administrative basis for the internal management and control of all programs; and [are] the primary source of administrative direction to Forest Service employees." 36 C.F.R. § 200.4(b)(1). They "direct[] the work of Forest Service employees." FSM 1103. Use of "must," "shall," or imperative verbs in the Handbook and Manual indicate that an action is "mandatory." FSM 1110.8, Ex. 1. The Manual and Handbook establish binding, internal agency obligations whether or not they can be enforced by the non-agency public.

directing Forest Service staff to "show me" a 3.7 billion board foot target accomplishment); Ex.

1-J (Forest Service leadership directing staff to "look under every cushion for any available

dollars to achieve the [timber] target[] of 3.7 [billion board feet]"). In light of these directives, as

well as the FSH's and FSM's requirements, timber targets are clearly binding on subordinate

Forest Service staff.

Indeed, numerous Forest Service documents recognize the binding nature of its timber

targets. Agency staff variously describe those targets as: (1) "mandated," Ex. 1-K at 1;(2)

"required," FSH 1909.13, ch. 51.1; (3) "quotas," Ex. 1-L; (4) an obligation that staff "have to

figure [out] a way to hit," AR021215; (5) the "bottom line," Ex. 1-M at 437; (6) an "assignment"

with "no wiggle room," Ex. 1-N; (7) a "hard target," *id.*; (8) a "commitment," AR019928; (9) a

number they must "make sure [they] meet," *id.*; (10) something to be "held to as an agency,"

AR021232; (11) a "minimum," Ex. 1-O; (12) a number they are "on the hook for," Ex. 1-P; or

(13) a level that staff are "force[d]" to achieve, AR017322, AR017628.

Forest Service staff also apply timber targets "in a way that indicates that [they are]

binding," meaning they must "be considered binding as a practical matter." Tr. 13:18–14:1

(quoting *Gen. Elec. Co.*, 290 F.3d at 383). For example, agency staff:

- Shift money from other forest units or program areas to meet timber targets, AR017322
  (noting that a region had to shift money "from our big timber forests . . . to our smaller
  forests" to "allow them to deliver their FY23" timber targets); AR021182 (noting that
  Region 9 has achieved its targets by "refocusing" regional funding, which "reduces work
  on aquatic organism passages," "transportation system improvements," "partnership
  development," and "other high priority restoration work"); AR021208–10 (proposing to

34

"repurpose" funds to achieve the timber target); AR021217 (meeting "an increased target" requires a "reallocation of agency support staff" and "related functions");

- Prioritize timber-target achievement over other Forest Service objectives, AR021211 (ensuring sufficient volume to hit targets "is always at the forefront of the decision makers [sic] thought process in [Region 8]"); AR021210 (regions must "maximiz[e] all funding sources and authorities to ensure they meet the [agency's timber] targets"); Ex. 1-Q (describing the timber target as Region 8's "#1 priority"); Ex. 1-R (reporting that the Department Undersecretary "gave very clear message and direction on #1 priority - timber volume production");

- Evaluate employee performance based on target achievement, AR021273 (identifying target achievement as "a performance element" for Forest Service staff); *see also* AR021227 (tasking Regional Foresters to "identify performance and accountability measures" to "ensure the Region is able to . . . achieve . . . targets"); AR019457 (describing a year-end "accountability process" after units report timber target accomplishments);

- Design projects to accomplish targets, *see, e.g.*, AR019890 (Buck Project), AR020024 (Forest Health Initiative Project); AR019914 (White Pine Management Project).

These behaviors, as well as others noted above, would not be necessary if timber targets were merely nonbinding benchmarks.

Forest Service staff also indicate that timber targets are binding by regularly distinguishing "hard" targets that must be met, Ex. 1-N, from nonbinding "goals," Ex. 1-S (distinguishing between nonbinding "goals" and "assigned" "targets," warning agency staff to "be careful in our choice of words," and reminding staff that "we had numerous discussions

35

around this topic"); AR021232 (distinguishing between out-year targets, which are "more [like] goals," and current-year timber targets, which are "actual plans to expect and be held to as an agency"). For example, in 2022, the Washington Office issued only "soft targets for attainment" to the regions that were "never finalized." Ex. 1-A; Ex. 1-T ("Region 8 did not have hard target assignments for FY 2022."). Forest Service staff clearly understood these "soft targets" to lack the binding nature of typical "hard target assignments" which the agency returned to the following year. *See* Ex. 1-T; *see also* Ex. 1-U (noting the Washington Office "will assign" a "hard target" in fiscal year 2023); AR019857 (explaining that "unlike FY 22, we received a timber target this year [FY 23]").

In sum, because timber targets are "binding" on Forest Service staff—and treated as such—they create "obligations" and thereby satisfy *Bennett*'s second prong. *See* Tr. 21:13–16; Tr. 23:12–15.

Second, and for similar reasons, the challenged timber targets also have legal consequences for the Forest Service. Because timber targets are binding, once the Department and the Forest Service set their targets, the "discretion" that Forest Service staff previously enjoyed regarding how much timber to sell at the national, regional, and unit levels has been "divest[ed]." Tr. 21:3–12 (quoting *Ctr. for Auto Safety*, 452 F.3d at 806); *see also Nat. Res. Def. Council*, 643 F.3d at 319 (holding that agency action that limited EPA's discretion to reject alternatives to certain implementation plans satisfied *Bennett*). Indeed, once a target is set, agency staff are "force[d]" to achieve it. AR017322, AR017628. "That legal consequence satisfies *Bennett*'s second prong." *Am. Wild Horse Campaign*, 442 F. Supp. 3d at 150.

In addition to binding subordinate Forest Service staff (which is a standalone legal consequence), timber targets also trigger other legal consequences. For example, whether a

36

region or unit meets its target can determine whether it will receive its full budget for the following year. *See* AR018277 (calculating future budgets based, in part, on past timber target achievement); AR017979 (same); AR018671 (same); *see also* Ex. 1-M at 437 ("If we don't meet our target, we won't get the budget that we get now, and we will have to lay off people. It's that direct."). In addition, work to fulfill timber targets is eligible for overtime pay when other work is not, AR019141, and target accomplishment is also used as a performance element during staff reviews, AR021273. In part because of the key role timber targets play in opportunities for professional advancement within the agency, Forest Service staff have explained that their assigned timber target is "the bottom line for us" that "drives everything." Ex. 1-M at 437. Thus, timber targets "satisfy *Bennett*'s second prong" because they create multiple legal consequences. Tr. 28:14–15.

Finally, the mere fact that the Forest Service must make subsequent decisions before trees are cut does not defeat finality.[16] As an initial matter, "this is a ripeness concern, not one undermining the finality of an agency action." Tr. 26:3–4; *see also* Tr. 27:20–23 (further holding Forest Advocates' "challenge to the timber targets is . . . ripe"). More importantly, "[c]ourts have repeatedly recognized that agency action can be final as to one issue—here in this case, setting the timber target—even if other issues, such as how to achieve the timber target" via on-the-ground logging projects, "remain open for later resolution." Tr. 22:5–10 (quoting *Am. Wild Horse Campaign*, 442 F. Supp. 3d at 148). Put differently, even though the Forest Service "might

---

[16] While some D.C. District cases suggest that "an agency action is not final when the agency must take additional, discretionary actions before the plaintiffs' rights will be affected," those cases are "factually distinguishable" and legally suspect. Tr. 23:19–22, 24:12–13, 25:8–12 (distinguishing *Fund for Animals v. Williams*, 391 F. Supp. 2d 132, 138–39 (D.D.C. 2005), *and Food & Water Watch v. EPA*, 5 F. Supp 3d 62, 84 (D.D.C. 2013)).

37

need to take further action on the timber target before any trees are felled," that "does not mitigate the finality of the targets *themselves*." Tr. 22:17–20 (emphasis added).

### III. Defendants failed to comply with NEPA when setting the national, regional, and unit-specific timber targets.

Because the timber targets are final agency actions and satisfy other factors discussed below, they trigger the requirement to comply with NEPA. More specifically, because the timber targets significantly affect the quality of the human environment, the Department and Forest Service must prepare an Environmental Impact Statement.[17]

a. The challenged timber targets trigger NEPA's requirements.

The regulations implementing NEPA's statutory provisions have evolved since the 2019 timber targets were set but the outcome in this case is the same under all versions: Setting timber targets requires NEPA compliance. The challenged timber targets trigger NEPA's requirements because they are "[1] proposals for . . . [2] major Federal actions [3] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).[18]

First, a "proposal" exists "when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects." 42 U.S.C. § 4336e(12); 40 C.F.R. § 1508.1(x) (2020); 40 C.F.R. § 1508.23 (1978). Consideration of a specific volumetric logging objective unquestionably shows that the

---

[17] We assume this would be a programmatic Environmental Impact Statement that the agency could potentially rely on for multiple years. *See* 42 U.S.C. § 4336b (describing "programmatic environmental document[s]").

[18] While not discussed here in detail, "human environment" is defined as "comprehensively the natural and physical environment and the relationship of present and future generations of Americans with that environment." 7 C.F.R. § 1b.11(21); 40 C.F.R. § 1508.1(m) (2020); *see* 40 C.F.R. § 1508.14 (1978).

38

agency has a goal and is preparing to meet it by adopting a binding target. *See, e.g.*, ECF No. 28 at 4 (identifying timber targets as "goals").

The Forest Service must decide how to achieve its timber targets among various alternatives. When determining how to meet the national timber target, the Washington Office must decide how much volume to assign to each region, including whether to issue regional targets at all. *See, e.g.,* AR021227 (discussing how to "assign" volume by region to hit the fiscal year 2023 national target and noting that the fiscal year 2022 "timber target was held nationally at the Washington Office . . . , without issuance of regionally assigned targets"). When determining how to hit the regional targets, Regional Foresters must decide how much volume to assign to each unit within that region. *See* AR019616 (demonstrating how timber targets for units in Region 8 changed from 2017–2024). And when determining how to hit unit-specific targets, Forest Supervisors must determine how to coordinate timber sales within the unit to hit the target. *See* AR020035 (showing that the Mark Twain Forest Supervisor divided the unit into North, South, and West "zones" and set volume expectations for each zone to hit the unit-specific target).

The agencies can meaningfully evaluate how setting national, regional, and unit-specific targets at specific levels affects carbon emissions and storage. The Forest Service has impliedly admitted that such an analysis is possible for broad-scale decisions like the timber targets. When authorizing individual projects, the agency recognizes the indisputable connection between logging and carbon emissions and merely claims the analysis is "statistically nonviable at the project level"—i.e., that individual projects are "too small to warrant a more formal quantitative analysis." AR014856. The solution to that problem is to assess effects at a higher level of decision-making—i.e., the setting of the national, regional, and unit-specific targets. The Forest

Service has also shown that it can meaningfully evaluate the carbon consequences of past logging and other disturbances. *See* AR020973–021049. Those same analytical tools could be used to predict the effects of future logging.

Second, "[t]he term 'major Federal action' means an action that . . . is subject to substantial Federal control and responsibility." 42 U.S.C. § 4336e(10)(A); *see* 40 C.F.R. § 1508.1(q) (2020); 40 C.F.R. § 1508.18 (1978).[19] Unquestionably, national forest logging and timber target-setting is subject to substantial Federal control and responsibility. *See, e.g.*, 16 U.S.C. § 472a(a).

Third, "significance" "means considering whether the reasonably foreseeable impacts of the proposed action are significant and analyzing the potentially affected environment and degree of the effects of the action." 7 C.F.R. § 1b.11(50); 40 C.F.R. § 1501.3(b) (2020); *see* 40 C.F.R. § 1508.27 (1978) (assessing "significance" in terms of "context" and "intensity").[20] As used here, "impact" and "effect" have the same meaning. *Id*. § 1b.11(22); *see* 40 C.F.R. § 1508.1(g) (2020); 40 C.F.R. § 1508.8 (1978). "Effect" means "changes to the human environment from the proposed action or action alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives" *Id*. § 1b.11(12); 40 C.F.R.

---

[19] The 1978 regulations equated the terms "major" and "significance" which is discussed more below. *See* 40 C.F.R. § 1508.18(x) (1978). Both the 1978 and 2020 regulations provided examples of activities that would constitute "major federal actions" including "[a]doption of official policy, such as rules," "[a]doption of formal plans . . . which prescribe alternative uses of Federal resources, upon which future agency actions will be based," a "group of concerted actions to implement a specific policy or plan" or "systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive." 40 C.F.R. § 1508.1(q)(3) (2020); 40 C.F.R. § 1508.18(b) (1978). Timber targets satisfy multiple categories.

[20] The 1978 regulations explained explicitly that "[s]ignificance exists if it is reasonable to anticipate a cumulatively significant impact on the environment" and cautioned that "[s]ignificance cannot be avoided by . . . breaking [an action] down into small components." 40 C.F.R. § 1508.27(b)(7) (1978).

§ 1508.1(g) (2020). "Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems) . . . [and] may also include those resulting from actions that may have both beneficial and detrimental effects, even if on balance the [Forest Service] believes that the effect will be beneficial." *Id*. § 1b.11(12)(i); 40 C.F.R. § 1508.1(g)(1) (2020); *see* 40 C.F.R. § 1508.8 (1978).[21]

It is reasonably foreseeable—in fact, undisputed—that "[s]equestered carbon [in forests] is released by . . . wood harvesting." *See, e.g.*, AR020311; AR020945 ("[I]f the starting point is a mature forest with large carbon stocks . . . , then harvesting this forest . . . will reduce carbon stocks and result in a net increase in atmospheric [CO2] for some time."); AR020130 ("Timber harvesting in the Southern Region was the primary disturbance influencing carbon stocks from 1990 to 2011"); AR003202 ("Large quantities of [carbon] stored in forest ecosystems for decades to centuries can be released to the atmosphere over short time steps following [logging]."). It is also reasonably foreseeable that changes in harvest levels result in different effects to carbon stocks and emissions. *See, e.g*., AR020998 (linking "increase in [carbon] emissions" to "moderate-severity . . . harvests in 1992 and 1993"); AR020994 (same); AR003270 (connecting "reduced logging" to "accumulating carbon" in forests); AR003689 (noting that the "prospective role of forestry in helping to stabilize atmospheric [carbon dioxide] depends on harvesting . . . rates"). And it is reasonably foreseeable that changes in timber targets

---

[21] Under the 1978 regulations, the carbon effects of timber targets would have been categorized as "indirect effects" which are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. §1508.8(b) (1978). CEQ eliminated the definition of "indirect effects" in 2020 "in order to focus agency time and resources on considering whether the proposed action causes an effect rather than on categorizing the type of effect" 85 Fed. Reg. 43,304, 43,343 (July 16, 2020). But "indirect effects"—regardless of the label—still must be studied under NEPA, *see Seven Cnty. Infrastructure Coal*., 145 S. Ct. at 1515 (recognizing that "indirect effects can sometimes fall within NEPA").

drive changes in annual harvest volumes. *See, e.g.*, AR021217 (explaining that "Forest Service employees diligently work to develop, implement, and administer more timber sales to attain an increased target"). Indeed, there would be little point in issuing timber targets if it were not "reasonably foreseeable" that they would result in changes in the pace of annual logging.

These reasonably foreseeable effects are significant. As explained by the Forest Service, even "relatively small" reductions in forest carbon stocks "often represent very large amounts of climate mitigation benefit." AR020990. Here, the timber targets are driving the Forest Service to log hundreds of thousands of acres annually, *see* Answer ¶ 7 ("Defendants admit that between 1984 and 2021, the Forest Service authorized the harvest of an average of approximately 428,531 acres of forest per year") (ECF No. 31), with concomitant effects on carbon storage and emissions.

Critically, even if the significance of setting timber targets at specific levels is unclear, the agencies must prepare an Environmental Assessment. 42 U.S.C. § 4336(b)(2) ("An agency *shall* prepare an environmental assessment with respect to a proposed agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown[.]" (emphasis added)); *see also* 40 C.F.R. § 1501.5 (2020); 40 C.F.R. § 1501.4(b) (1978). Congress has explained that an agency is "not required to prepare an [Environmental Assessment or Environmental Impact Statement]" only if: 1) the proposed action is not a final agency action under the APA, 2) there is an applicable Categorical Exclusion, 3) preparing the Environmental Assessment or Environmental Impact Statement "would clearly and fundamentally conflict with the requirements of another provision of law," or 4) the proposed action is "a nondiscretionary action [and the] agency does not have authority to take environmental factors into consideration in determining whether to take the proposed

42

action." 42 U.S.C. § 4336(a). None of those factors are met here. As shown above, the timber targets are final agency actions under the APA. There is no applicable Categorical Exclusion (nor have Defendants attempted to apply one). *See* 7 C.F.R. § 1b.4 (providing Department of Agriculture Categorical Exclusions). Preparing an Environmental Assessment or Environmental Impact Statement would not "clearly and fundamentally conflict with the requirements of another provision of law." And timber targets are discretionary actions for which the agency can consider environmental factors in making its decision. For example, the Department of Agriculture reduced the fiscal year 2022 nationwide target "to focus on areas in the country affected by wildfire." AR017910. The conclusion here is inescapable: timber targets require preparation of an Environmental Impact Statement or at least an Environmental Assessment.[22]

> b.   Defendants failed to conduct a NEPA analysis for the timber targets.

NEPA's requirements are mandatory for qualifying actions which, as explained above, include the timber targets. *See* 42 U.S.C. § 4332(2)(C); *id*. § 4336(b) (explaining that agencies "shall issue" Environmental Assessments or Environmental Impact Statements). However, Defendants made no attempt to comply with NEPA when issuing the challenged timber targets. As a result, Defendants' actions were made "without observance of procedure required by law" in violation of the APA. 5 U.S.C. § 706(2)(D).

Alternatively, NEPA's requirement that agencies "shall issue" an Environmental Impact Statement or Environmental Assessment, 42 U.S.C. § 4336(b), can be compelled pursuant to 5 U.S.C. § 706(1) (reviewing courts "shall . . . compel agency action unlawfully withheld or

---

[22] To be clear, the agencies may be able to satisfy this obligation for lower-level timber targets by completing an analysis at a higher level. For example, a programmatic Environmental Impact Statement prepared for the national target may satisfy the agency's NEPA obligations for regional and unit-specific targets.

unreasonably delayed."). Preparation of an Environmental Assessment or Environmental Impact Statement is "a discrete agency action that [Defendants are] required to take." *Norton*, 542 U.S. at 64; *see also Ouachita Watch League v. Henry*, 59 F. Supp. 3d 922, 928 (E.D. Ark. 2014) ("Defendants" including the Forest Service "admit that supplementing an [Environmental Impact Statement] is a discrete agency action."); *Nat. Res. Def. Council, Inc. v. Butz* (D.D.C. 1974) 6 ERC 1895, 4 ELR 20226 (finding that NEPA imposes a "mandatory, nondiscretionary duty" to prepare an Environmental Impact Statement when increasing timber volume sold by one billion board feet over the previous fiscal year). Defendants were required to prepare one or both of those documents *before* issuing the challenged timber targets. *Humane Soc'y of U.S. v. Johanns*, 520 F. Supp. 2d 8, 16 (D.D.C. 2007) ("NEPA . . . requires that federal agencies take a "hard look" at the environmental consequences of their projects *before* taking action.") (emphasis added). Their failure to do so means a "reviewing court shall" compel the preparation of an Environmental Assessment or Environmental Impact Statement. *See* 5 U.S.C. § 706(1).

IV. **Defendants' cumulative effects analyses for the Projects violate NEPA.**

In addition to failing to comply with NEPA when setting its timber targets, the Forest Service also failed to take a "hard look" at the Projects' cumulative effects on carbon emissions and storage.

To begin with, there is no dispute that the Forest Service was required to consider cumulative effects as part of its NEPA analyses for the Projects. AR014690 (applying the definition of cumulative effects at 40 C.F.R. § 1508.7 (1978) as part of the Forest Health Initiative); AR005075 (applying 40 C.F.R. § 1508.7 (1978) in the White Pine Management Project and explaining that a cumulative effects analysis is "required under NEPA and the regulations implementing NEPA"); AR001382 (asserting that the Buck Project Environmental Assessment "addresses the direct, indirect, and cumulative environmental impacts from the

44

proposed actions"). Two of the projects included specific cumulative effects analysis sections related to carbon. AR014278–79 (assessing "Cumulative Effects on Climate Change" as part of the Forest Health Initiative Project); AR001247–48 (same for the Buck Project). However, all three cumulative-effects analyses failed to comply with NEPA.

"[A] proper NEPA cumulative impact analysis involves a discussion of: . . . [1] other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; [2] the impacts or expected impacts from these other actions; and [3] the overall impact that can be expected if the individual impacts are allowed to accumulate." *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 76 (D.D.C. 2019) (quoting *Grand Canyon Trust v. FAA*, 290 F.3d 339, 345 (D.C. Cir. 2002)).[23] The Forest Service's NEPA analyses failed at each step.

First, at step one, the agency failed to identify other past, present, and reasonably foreseeable Forest Service projects that have contributed and will contribute carbon emissions in combination with the Projects. As explained above, logging projects produce carbon emissions that have a *global* effect. Because the emissions from these projects "are thoroughly mixed in the atmosphere, [an] appropriate cumulative effects" analysis must consider logging projects outside the immediate project area. AR014857; *see also Zinke*, 368 F. Supp. 3d at 77 (D.D.C. 2019) (requiring the Bureau of Land Management to assess "the cumulative impact of [greenhouse gas] emissions generated by past, present, or reasonably foreseeable [Bureau of Land Management] lease sales in the region and nation").[24]

---

[23] *Zinke* provides five factors to discuss in cumulative impacts analysis. Forest Advocates focus on factors 3–5 which are renumbered 1–3 for purposes for this brief. *See Zinke*, 368 F. Supp. 3d at 76.

[24] This distinguishes carbon effects from other kinds of effects, such as impacts to water quality. A local Forest Service official would bear no responsibility to consider the cumulative water

At the time it issued each Environmental Assessment, the Forest Service had ample data on past, present, and reasonably foreseeable logging projects whose effects would accumulate with those of the challenged projects, including many on nearby national forest land:

- **Forest Health Initiative**: AR014943–98 (listing "past, present, and future" projects that could affect the Forest Health Initiative); AR020011 (listing forthcoming NEPA analyses on the Mark Twain unit); AR020019 (planning thousands of acres of "silvicultural" projects on the Mark Twain unit); AR020024–25 (listing ongoing and forthcoming "Timber Management" projects); AR020087 (anticipating "selling at least 35 timber sales" in the fiscal year following finalization of the Forest Health Initiative); AR016703 (listing "site-specific projects" whose "decisions affected the [Forest Health Initiative] project area" in the past ten years);

- **Buck Project:** AR019904 (document predating the final Buck decision listing twelve additional forthcoming timber sales in the National Forests in North Carolina unit); AR19903 (same); AR019890 (listing dozens of ongoing and proposed timber projects across the National Forests in North Carolina and estimating future harvest volumes); AR019893–901 (same);

- **White Pine Management Project:** AR005075 (listing other Forest Service projects that "have the greatest potential to contribute to cumulative impacts"); AR019914 (listing dozens of ongoing and proposed timber sales occurring across the Francis Marion–Sumter unit for fiscal year 2021); AR019917 (same for fiscal year 2020); AR019920–21 (same for fiscal year 2019); AR019911 (listing multiple projects for fiscal year 2022);

---

quality effects of projects outside an affected watershed because such effects would not have a measurable cumulative effect.

46

- **Regional and national timber harvest volumes:** And the agency was aware of expected harvest volumes at regional and national levels for multiple years. *See, e.g.*, AR020970 (acknowledging in 2018 preparation of "best estimates for FY20 and FY21" timber targets).

But the Forest Service did not bother to identify or assess in its analyses the contribution of these and other past, present, and future logging projects to carbon emissions and reductions in storage cumulatively with the Projects. As a result, it necessarily failed to account for "the impacts or expected impacts from these other actions" and the "overall impact" at steps two and three. *Zinke*, 368 F. Supp. 3d at 76. Each of these failures violates NEPA. *See WildEarth Guardians v. Bernhardt*, 502 F. Supp. 3d 237, 247 (D.D.C. 2020) (citation omitted) (holding the Bureau of Land Management's failure "to analyze" carbon emissions from other "lease sales in the region, and other reasonably foreseeable lease sales in the country, renders [the Bureau's] cumulative impact analysis deficient").

At step two, the Forest Service had data and studies detailing how these and other past projects have negatively affected carbon stocks within each forest unit and across Regions 8 and 9 generally. *See, e.g.*, AR021086 (2019 study showing that timber harvest is responsible for 81% of the decrease in carbon stocks in Region 9 between 1990–2011); AR021095 (2019 study showing that timber harvest is responsible for 67% of the decrease in carbon stocks in Region 8 between 1990–2011). It also had tools to calculate these and other projects' carbon emissions. For starters, the agency already knew the amount of timber it planned to produce with reasonably foreseeable projects. *See, e.g.*, AR019890 (estimating harvest volumes). It also had access to "carbon accounting model[s]," AR003669, "carbon conversion models," AR020920, as well as conversion ratios/factors drawn from multiple scientific studies, AR003685–87, AR020911, that

it could use to convert harvest data to carbon-emissions data. "With this data, [the Forest Service] could have reasonably forecasted, by multiple methods, the [greenhouse gas] emissions to be produced by" past, ongoing, and future projects. *Zinke*, 368 F. Supp. 3d at 69.

Despite knowing about other past, present, and future projects and having ample data to calculate cumulative carbon emissions, the Forest Service's NEPA analyses did not discuss them. Instead, it examined the carbon emissions of each individual project in a vacuum. *See* AR001246–48 (Buck Project) (failing to identify any "past projects" or "ongoing" or "reasonably foreseeable future Forest Service actions" that could contribute to cumulative carbon effects); AR004975–76, AR005122 (White Pine Project) (focusing solely on the greenhouse gas emissions of the "proposed project"); AR014855–57 (Forest Health Initiative) (only calculating the potential carbon "emissions from this project"). This fails step two.

To make matters worse, instead of *aggregating* effects at step three—as NEPA requires— the Forest Service inappropriately attempted to *dilute* the Projects' carbon emissions. Specifically, the agency reported that the carbon emissions from each individual project alone would be "miniscule," AR001247 (Buck), "extremely small," AR005122 (White Pine), and "too small to warrant a more formal quantitative analysis," AR014856 (Forest Health Initiative), when compared to state, "national[,] and global carbon emissions," AR005122. There are multiple problems with this approach.

To start, the conclusion that the Buck and White Pine Projects' emissions would be "miniscule" or "extremely small" is "not supported by any data because [the Forest Service] declined to quantify the 'probable [greenhouse gas] emission levels' arising from" each project. *See Zinke*, 368 F. Supp. 3d at 77. Without this quantification, "the public and agency decisionmakers had no context for the [Environmental Assessment]'s conclusions that

48

[greenhouse gas] emissions from the [Buck and White Pine Projects] would represent only an 'incremental' contribution to climate change." *See id.* This failure violates NEPA. *See id.*

More fundamentally, observing that a project's greenhouse gas emissions are "minor" relative to state, national, or global carbon emissions "boils down to an observation that could be applied to any other domestic source of [greenhouse gases]." *350 Montana v. Haaland*, 50 F.4th 1254, 1266 (9th Cir. 2022). Indeed, stating that a project "would add only a small percentage to the annual [greenhouse gas] emissions in the nation and the state . . . proves only that there are other, larger sources of [greenhouse gases]." *Dine Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1042 (10th Cir. 2023). "It does not show that [the Projects]," when considered in their proper context alongside other past, present, and reasonably foreseeable logging projects, "will not have a significant impact on the environment." *Id.* "Without some articulated criteria for significance in terms of contribution to global warming that is grounded in the record and available scientific evidence," the Forest Service's conclusion that the Projects' emissions are minimal is "insufficient to meet [the agency's] burden" under NEPA. *See 350 Montana*, 50 F.4th at 1266 (citation omitted).

The Supreme Court's recent decision in *Seven County Infrastructure Coalition v. Eagle County* cannot save the Forest Service's carbon analyses. As an initial matter, that decision did not interpret or address an agency's obligation to consider cumulative effects. To be sure, the decision instructs courts to defer to agency NEPA choices within a "zone of reasonableness," 145 S. Ct. at 1513, but here the Forest Service is outside that zone. As explained above, instead of assessing the cumulative impact of the Projects with other "past, present, and reasonably foreseeable" timber projects, the agency dismissed cumulative effects by weighing project impacts *against* state, national, and global effects. This turns cumulative effects analysis on its

49

head—using the cumulative effects of other activities to determine an agency action is insignificant, rather than assessing whether the agency action is significant cumulatively with other actions. This inverse assessment of cumulative effects deserves no deference.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to Forest Advocates and compel Defendants to correct the legal errors discussed above. Forest Advocates respectfully request oral argument regarding this Motion for Summary Judgment and Defendants' forthcoming Cross-Motion for Summary Judgment.

Respectfully submitted this 29th day of August, 2025.

/s/ J. Patrick Hunter*
J. Patrick Hunter
N.C. Bar No. 44485
/s/ Spencer Scheidt
Spencer Scheidt
N.C. Bar No. 57078
Southern Environmental Law Center
48 Patton Ave, Ste 304
Asheville, NC 28801
Telephone: (828) 258-2023
phunter@selcnc.org
sscheidt@selcnc.org

Attorneys for Forest Advocates
*Admitted Pro Hac Vice