**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CHATTOOGA CONSERVANCY, MOUNTAINTRUE, and DEBBIE KRUZEN | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES DEPARTMENT OF AGRICULTURE, SECRETARY BROOKE ROLLINS, THE UNITED STATES FOREST SERVICE, CHIEF TOM SCHULTZ, REGIONAL FORESTER KENDERICK ARNEY, REGIONAL FORESTER ANTOINE DIXON, DISTRICT RANGER ROBERT SITZLAR, DISTRICT RANGER JAMES BROWNING, and FOREST SUPERVISOR VINCI KEELER, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:24-CV-00518-TJK  **FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| | ) | |
| Federal Defendants. | ) | |
| | ) | |

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7, Federal Defendants cross-move for summary judgment on all claims in the above-captioned case. Federal Defendants are entitled to summary judgment because Plaintiffs lack standing to assert their timber target claims (Counts 1, 2, and 3); Plaintiffs' timber targets claims are moot and not capable of repetition; Plaintiffs' timber target claims are not reviewable under the Administrative Procedure Act; the National Environmental Policy Act ("NEPA") does not apply to timber targets; and the Forest Service complied with NEPA in authorizing the Forest Health Initiative, Buck, and White Pine Management Projects (Count 4).

For the reasons set forth in the accompanying memorandum, Federal Defendants oppose Plaintiffs' Motion for Summary Judgment, Dkt. No. 38, and request that the Court grant summary judgment in favor of Federal Defendants.

Respectfully submitted this 9th day of January, 2026.

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

*/s/ Reade E. Wilson*
Reade E. Wilson
(ME Bar No. 4992)
Krystal-Rose Perez
(TX Bar No. 24105931)
Trial Attorneys
Natural Resources Section
150 M Street NE
Washington, DC 20002
(202) 598-3546 (Wilson)
(202) 532-3266 (Perez)
reade.wilson@usdoj.gov
krystal-rose.perez@usdoj.gov

*Attorneys for Federal Defendants*

2

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CHATTOOGA CONSERVANCY, MOUN-  )
TAINTRUE, and DEBBIE KRUZEN        )
                                   )
           Plaintiffs,             )
                                   )
v.                                 )
                                   )
THE UNITED STATES DEPARTMENT       )    Case No. 1:24-CV-00518-TJK
OF AGRICULTURE, SECRETARY          )
BROOKE ROLLINS, THE UNITED         )    **FEDERAL DEFENDANTS'**
STATES FOREST SERVICE, CHIEF       )    **MEMORANDUM IN SUPPORT OF**
TOM SCHULTZ, REGIONAL FORESTER     )    **CROSS-MOTION FOR SUMMARY**
KENDERICK ARNEY, REGIONAL FOR-     )    **JUDGMENT AND OPPOSITION TO**
ESTER ANTOINE DIXON, DISTRICT      )    **PLAINTIFFS' MOTION FOR**
RANGER ROBERT SITZLAR, DISTRICT    )    **SUMMARY JUDGMENT**
RANGER JAMES BROWNING, and FOR-    )
EST SUPERVISOR VINCI KEELER,       )
                                   )
           Federal Defendants.     )
                                   )
                                   )
                                   )
_____    )

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

    I.     Timber targets ................................................................................................ 2

    II.    Projects .......................................................................................................... 4

           A.     The Forest Health Initiative Project ................................................. 4

           B.     The Buck Project ............................................................................... 5

           C.     The White Pine Management Project ................................................ 6

LEGAL BACKGROUND ................................................................................................... 8

    I.     The National Environmental Policy Act ....................................................... 8

    II.    The Administrative Procedure Act ................................................................ 9

STANDARD OF REVIEW ............................................................................................... 10

ARGUMENT ..................................................................................................................... 10

    I.     Plaintiffs lack standing to challenge timber targets. .................................. 10

           A.     Plaintiffs fail to demonstrate that performance targets cause them harm. .................................................................................................. 11

           B.     Plaintiffs fail to demonstrate redressability. .................................... 14

    II.    Plaintiffs' timber target claims for expired fiscal years are moot and not capable of repetition. ................................................................................... 17

    III.   Plaintiffs' timber target claims are not reviewable under the APA. ........... 19

    IV.   NEPA does not apply to timber targets. ...................................................... 28

    V.    The Court cannot compel a programmatic EIS under § 706(1). ................. 30

    VI.   The Forest Service complied with NEPA in approving the challenged projects. ...................................................................................................... 33

    VII.  Remedy ........................................................................................................ 37

           A.     Timber targets ................................................................................... 38

           B.     Projects .............................................................................................. 39

CONCLUSION .................................................................................................................. 40

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ali v. Rumsfeld*,
  649 F.3d 762 (D.C. Cir. 2011) ..................................................................................... 16

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Com'n*,
  988 F.2d 146 (D.C. Cir. 1993) ..................................................................................... 15

*Alvarez v. Smith*,
  558 U.S. 87 (2009) ..................................................................................... 17

*Am. Forest Res. Council v. United States*,
  77 F.4th 787 (D.C. Cir. 2023) ........................................................... 19, 20, 21

*American Wild Horse Campaign v. Bernhardt*,
  442 F. Supp. 3d 127 (D.D.C. 2020) ..................................................................... 26, 27

*Anglers Conservation Network v. Pritzker*,
  809 F.3d 664 (D.C. Cir. 2016) ..................................................................................... 30

*Appalachian Voices v. Fed. Energy Reg. Comm'n*,
  139 F.4th 903 (D.C. Cir. 2025) ..................................................................................... 8

*Army Corps of Eng'rs v. Hawkes Co.*,
  578 U.S. 590 (2016) ..................................................................... 21, 23, 27

*Bennett v. Spear*,
  520 U.S. 154 (1997) ..................................................................................... 10, 20

*Cal. Communities Against Toxics v. EPA*,
  934 F.3d 627 (D.C. Cir. 2019) ..................................................................................... 22, 23

*Chafin v. Chafin*,
  568 U.S. 165 (2012) ..................................................................................... 17

*Chrysler Corp v. Brown.*,
  441 U.S. 281 (1979) ..................................................................................... 21, 22

*City of Olmsted Falls, OH v. Fed. Aviation Admin.*,
  292 F.3d 261 (D.C. Cir. 2002) ..................................................................................... 10, 26

*Clinch Coalition v. U.S. Forest Service*,
  2025 WL 3473302 (W.D. Va. Dec. 3, 2025) ..................................................... 14

*Cobell v. Kempthorne*,
  455 F.3d 301 (D.C. Cir. 2006) ..................................................................................... 38

*Cobell v. Norton*,
  240 F.3d 1081 (D.C. Cir. 2001) ..................................................................... 26, 38, 39

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
452 F.3d 798 (D.C. Cir. 2006) .................................................................................. 22

*Ctr. for Biological Diversity v. Blank*,
933 F. Supp. 2d 125 (D.D.C. 2013) ........................................................................ 36

*Ctr. for Biological Diversity v. Ilano*,
928 F.3d 774 (9th Cir. 2019) ................................................................................... 28

*\*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
144 F.4th 296 (D.C. Cir. 2025) .......................................................................... passim

*Ctr. for Biological Diversity v. Zinke*,
260 F. Supp. 3d 11 (D.D.C. 2017) .......................................................................... 31

*Daimler Trucks N. Am. LLC v. EPA*,
745 F.3d 1212 (D.C. Cir. 2013) .............................................................................. 17

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) .................................................................................................. 11

*DRG Funding Corp. v. Sec'y of Hous. Urb. Dev.*,
76 F.3d 1212 (D.C. Cir. 1996) ................................................................................. 21

*FDA v. All. for Hippocratic Medicine*,
602 U.S. 367 (2024) .................................................................................................. 12

*Fed. Commc'n Comm'n v. Prometheus Radio Project*,
592 U.S. 414 (2021) .................................................................................................. 10

*Fla. Audubon Soc'y v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996) ................................................................................... 12

*Food & Water Watch v. Fed. Energy Reg. Comm'n*,
104 F.4th 336 (D.C. Cir. 2024) ............................................................................... 10

*Friends of Everglades, Inc. v. Sec'y of Dept' of Homeland Sec.*,
No. 25-cv-12873, 2025 WL 259867, at \*5 (11th Cir. Sept. 4, 2025) ...................... 31

*Friends of the Earth v. Laidlaw Env't Servs*,
528 U.S. 167 (2000) .................................................................................................. 11

*\*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
460 F.3d 13 (D.C. Cir. 2006) ............................................................................. passim

*General Electric Company v. EPA*,
290 F.3d 377 (D.C. Cir. 2002) ................................................................................. 26

*Gunn v. Minton*,
568 U.S. 251 (2013) .................................................................................................. 10

*In re Grant*,
635 F.3d 1227 (D.C. Cir. 2011) ............................................................................... 32

iii

*Juliana v. United States*,
  947 F.3d 1159 (9th Cir. 2020) ................................................................. 16

*Karst Env't Educ. & Prot., Inc. v. EPA*,
  475 F.3d 1291 (D.C. Cir. 2007) .......................................................... 28, 32

*\*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976) ................................................................. 28, 29, 30

*Lujan v. Def. of Wildlife*,
  504 U.S. 555 (1992) .............................................................................. 11

*Lujan v. National Wildlife Fed.*,
  497 U.S. 871 (1990) ................................................................. 9, 20, 24, 25

*Minisink Residents for Env't Pres. & Safety v. Fed. Energy Reg. Comm'n*,
  762 F.3d 97 (D.C. Cir. 2014) ................................................................. 34

*Montanans for Multiple Use v. Barbouletos*,
  568 F.3d 225 (D.C. Cir. 2009) ............................................................... 30

*Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*,
  554 U.S. 527 (2008) .............................................................................. 16

*Morton v. Ruiz*,
  415 U.S. 199 (1974) .............................................................................. 22

*Nat'l Ass'n of Broadcasters v. FCC*,
  569 F.3d 416 (D.C. Cir. 2009) ............................................................... 22

*Nat'l Labor Relations Bd v. Wyman-Gordon Co.*,
  394 U.S. 759 (1969) .............................................................................. 16

*Nat'l Min. Ass'n v. McCarthy*,
  758 F.3d 243 (D.C. Cir. 2014) ........................................................... 21, 22

*Nat'l Parks Conservation Ass'n v. United States*,
  177 F. Supp. 3d 1 (D.D.C. 2016) ............................................................ 33

*\*Nat'l Treasury Emps. Union v. Vought*,
  149 F.4th 762 (D.C. Cir. 2025) ........................................................ passim

*Nat'l Wildlife Fed. v. U.S. Army Corps of Eng'rs*,
  170 F. Supp. 3d 6 (D.D.C. 2016) ............................................................ 14

*Nat'l Wildlife Fed'n v. Appalachian Reg'l Com'n*,
  677 F.2d 883 (D.C. Cir. 1981) ............................................................... 29

*Natural Resources Defense Council v. EPA*,
  643 F.3d 311 (D.C. Cir. 2011) ............................................................... 27

*Newton Cnty. Wildlife Ass'n v. Rogers*,
  141 F.3d 803 (8th Cir. 1998) ................................................................. 34

*Northcoast Env't Ctr. v. Glickman*,
    136 F.3d 660 (9th Cir. 1998) ......................................................................... 28

*\*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ....................................................................... 9, 20, 30, 31

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
    523 U.S. 726 (1998) ......................................................................... 3, 20, 21

*Ouachita Watch League v. Henry*,
    59 F. Supp. 3d 922 (E.D. Ark. 2014) ............................................................. 31

*Pac. Shores Subdivision, Ca. Water Dist. v. U.S. Army Corps of Eng'rs*,
    448 F. Supp. 2d 1 (D.D.C. 2006) ................................................................... 36

*Perez v. Mortgage Bankers Ass'n*,
    575 U.S. 92 (2015) ................................................................................. 21, 24

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
    324 F.3d 726 (D.C. Cir. 2003) ....................................................................... 19

*S. Utah Wilderness All. v. Norton*,
    326 F. Supp. 2d 102 (D.D.C. 2004) ............................................................... 37

*Safari Club International v. Jewell*,
    842 F.3d 1280 (D.C. Cir. 2016) ..................................................................... 26

*Salmon Spawning & Recovery All. v. Gutierrez*,
    545 F.3d 1220 (9th Cir. 2008) ....................................................................... 14

*\*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
    605 U.S. 168 (2025) ............................................................................. passim

*Sierra Club v. Fed. Energy Reg. Comm'n*,
    867 F.3d 1357 (D.C. Cir. 2017) ..................................................................... 33

*Sierra Club v. U.S. Forest Serv.*,
    46 F.3d 835 (8th Cir. 1995) ........................................................................... 34

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ........................................................................................ 16

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ...................................................................................... 11

*Theodore Roosevelt Conservation P'ship v. Salazar*,
    744 F. Supp. 2d 151 (D.D.C. 2010) ............................................................... 17

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ...................................................................................... 11

*United States v. Fruehauf*,
    365 U.S. 146 (1961) ...................................................................................... 11

*W. Org. of Res. Councils v. Zinke,*
  892 F.3d 1234 (D.C. Cir. 2018) ............................................................... 15, 31

*Weinstein v. Bradford,*
  423 U.S. 147 (1975) ........................................................................................ 18

*WildEarth Guardians v. Jewell,*
  738 F.3d 298 (D.C. Cir. 2013) ....................................................................... 36

*WildEarth Guardians v. Zinke,*
  368 F. Supp. 3d 41 (D.D.C. 2019) ................................................................. 36

**Statutes**

5 U.S.C. § 551 ............................................................................................... 8, 18

5 U.S.C. § 551(13) ............................................................................................... 9

5 U.S.C. § 702 ................................................................................................ 9, 18

5 U.S.C. § 704 ....................................................................................................... 9

5 U.S.C. § 706 ..................................................................................................... 15

5 U.S.C. § 706(1) ......................................................................................... 30, 31

5 U.S.C. § 706(2) ......................................................................................... 10, 30

5 U.S.C. §§ 701-706 ..................................................................................... 9, 18

16 U.S.C. § 1604(b) .............................................................................................. 3

16 U.S.C. § 1604(g)(1) ......................................................................................... 3

16 U.S.C. § 1604(i) ............................................................................................... 3

16 U.S.C. § 1604(k) .............................................................................................. 3

16 U.S.C. § 475 ..................................................................................................... 2

16 U.S.C. § 529 .................................................................................... 2, 12, 14, 23

16 U.S.C. § 531 .............................................................................................. 12, 14

16 U.S.C. § 531(b) ................................................................................................ 2

42 U.S.C. § 4321 ................................................................................................... 8

42 U.S.C. § 4332 ................................................................................................... 8

42 U.S.C. § 4336 ................................................................................................. 15

42 U.S.C. § 4336(a) ............................................................................................ 18

42 U.S.C. § 4336(a)(1) .................................................................................. 8, 28

42 U.S.C. § 4336(a)(1) ...................................................................................... 28

42 U.S.C. § 4336(b)(1) ............................................................................................ 8

42 U.S.C. § 4336(b)(2) ............................................................................................ 9

42 U.S.C. § 4336e(10)(B) ...................................................................................... 18

42 U.S.C. § 4336e(12) ............................................................................................ 28

Pub. L. 103-62 ......................................................................................................... 3

Pub. L. No. 111-352 ........................................................................................... 3, 25

Pub. L. No. 119-21 ................................................................................................ 18

**Regulations**

36 C.F.R. § 219.11 .................................................................................................. 3

40 C.F.R. § 1508.27(b)(7) ..................................................................................... 39

**Other Authorities**

90 Fed. Reg. 10,610 (Feb. 25, 2025) ................................................................... 39

90 Fed. Reg. 29,632 (July 3, 2025) ...................................................................... 39

**INTRODUCTION**

By statute, the Forest Service must produce a continuous and "high-level" supply of timber from our National Forests every year. To meet this mandate, the Forest Service authorizes timber projects in National Forests across the country. Individual project authorizations dictate the scope, location, method, and timing of timber harvesting operations. Before authorizing a timber project, the Forest Service conducts the requisite site-specific administrative and environmental reviews, including analysis under the National Environmental Policy Act ("NEPA"). Separately, in conjunction with the budgeting process and as required by the Government Performance Results Modernization Act, the Forest Service has historically set an annual performance target for the volume of timber the Forest Service will sell in a given fiscal year. The Forest Service then allocates this "timber target" among its regions and National Forest units on an annual basis.

Plaintiffs challenge the Forest Service's timber targets for fiscal years 2019 through 2024, claiming that the Forest Service must conduct a NEPA programmatic review of potential climate impacts. Plaintiffs' claims, however, are constitutionally deficient. Plaintiffs lack standing to challenge timber targets because they have not demonstrated a "substantial probability" that national, regional, and unit timber targets actually cause their alleged recreational and aesthetic harms. Nor have they demonstrated that their alleged recreational and aesthetic harms will be redressed by a retrospective NEPA analysis of climate impacts. Furthermore, Plaintiffs challenge *expired* fiscal year timber targets that are moot and not capable of repetition. As set forth in HR 1, the "One Big Beautiful Bill Act," Congress set timber targets for fiscal years 2026 through 2034, and congressional action is not reviewable under the Administrative Procedure Act ("APA"). Accordingly, the Court lacks jurisdiction to decide Plaintiffs' timber target claims.

1

Plaintiffs' timber target claims fail for the additional reasons that timber targets are not final agency action reviewable under the APA. Nor does NEPA require the programmatic environmental review Plaintiffs seek; particularly where, as here, there is no way to meaningfully evaluate the environmental effects in a vacuum.

Finally, Plaintiffs challenge the Forest Service's analyses of cumulative climate impacts for three timber projects under NEPA. In doing so, however, Plaintiffs shortchange the deference afforded the Forest Service in determining the proper scope of such analyses and ignore that the Forest Service properly considered each project's potential environmental effects in proportion to their significance. Further, even if Plaintiffs could establish some NEPA shortcoming (which they cannot), the Forest Service conducted its analyses under a since-rescinded regulatory regime that required assessment of a project's cumulative impacts. With the rescission of that requirement, vacatur of the project decisions to conduct additional NEPA review would have no practical effect because neither NEPA nor any implementing regulations require the kind of cumulative impacts analysis Plaintiffs seek. Accordingly, the Court should grant summary judgment in favor of Federal Defendants on all counts.

## BACKGROUND

### I.    Timber targets

National Forests were established, in part, to "furnish a continuous supply of timber for the use and necessities of citizens of the United States." 16 U.S.C. § 475. Accordingly, the Forest Service is charged with "develop[ing] and administer[ing] the renewable surface resources of the national forests for multiple use and sustained yield," *id.* § 529, which includes timber at "a high-level annual or regular periodic output . . . without impairment of the productivity of the land," *id.* § 531(b). To produce a continuous supply of timber, the Forest Service authorizes individual timber projects, which are subject to a host of administrative and environmental review processes,

including NEPA review. *See Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 729-30 (1998) (listing several steps the Forest Service takes before timber harvest occurs).

In addition to following NEPA procedures, individual projects must be consistent with the applicable land and resource management plan, a programmatic, long-term planning framework for a national forest. 16 U.S.C. §§ 1604(g)(1), (3); 1604(i). Land and resource management plans, often referred to as forest plans, include "integrated" consideration of multiple uses as well as the "physical, biological, economic, and other sciences" and identify areas suitable and unsuitable for timber harvest, among other things. *Id.* § 1604(b), (k); 36 C.F.R. § 219.11 (prescribing limitations on timber harvests). Forest plans, like individual projects, are issued following NEPA procedures. *Id.* § 1604(g).

By the Government Performance Results Modernization Act, and similar prior legislation,[1] Congress requires federal agencies to "establish performance goals" germane to the agency's mission in an "objective, quantifiable, and measurable form" and detail progress towards achieving those goals with each budget request. Pub. L. No. 111-352, 124 Stat. 3866, 3868 (2011). The Forest Service has nine Key Performance Indicators under the Government Performance Results Modernization Act. AR_17014-16 (setting fiscal year targets for each Key Performance Indicator); *see also* AR_17013 ("Departmental [Key Performance Indicators] are performance metrics aligned with the Strategic Objectives[.]"). The annual timber target, the Forest Service's aspirational goal for the volume of timber to be sold in the fiscal year, is just one of these performance metrics to assess whether the Forest Service is meeting its obligations to the public. AR_17014.

---

[1] *See e.g.* Government Performance and Results Act of 1993, Pub. L. 103-62, 107 Stat. 285 (directing agencies to provide "quantifiable" performance goals in budget requests).

The Forest Service uses an iterative process to set national and regional targets. AR_16786-87 (describing the process of target development). The Director of Strategic Planning, Budget, and Accountability works with Deputy Chiefs and their staff to set targets and track performance towards achieving targets in the Metrics Management application and database. AR_17073. Regional Foresters then ensure processes and procedures for allocating targets and tracking performance within each region. AR_17074. The Forest Service did not achieve its national timber targets for fiscal years 2014 through 2023. AR_16787; AR_17184. Reasons for not achieving targets include no-bid sales, limited staffing, wildfires, and natural disasters, among others. AR_16787-88.

## II.      Projects

The Forest Service administers millions of forest acres throughout the nation, ensuring that forest health is maintained through site-specific projects approved after years of analyses and community input. Plaintiffs here challenge three particular projects: the Forest Health Initiative Project, the Buck Project, and the White Pine Management Project.

### A.  The Forest Health Initiative Project

In March 2018, the Forest Service authorized the Forest Health Initiative Project in the Mark Twain National Forest. AR_14848. This project's "primary objective" is to improve forest health, minimize insect infestation and disease, and protect forest resources. AR_14852. The Forest Service designed the project to move the area toward desired conditions, particularly improving the health of native vegetation like oak. *Id.* Droughts in the area have caused oaks to decline, and the project aims to harvest red, black, scarlet, and white oaks before the trees die. AR_14663. The remaining dominant trees will be a mix of white oaks, shortleaf pine, and red oaks—reflecting an increased diversity of species and a healthier forest resilient to natural disturbances such as insect outbreaks and extended drought. *Id.*

4

The Forest Health Initiative Project identifies approximately 45,885 acres as at-risk of experiencing substantially increased tree mortality from disease or insect infestation over the next 15 years. AR_14666. The Forest Service began the identification process through field reconnaissance in 2014. AR_14665. The agency then issued a scoping report in November 2015 to solicit input from the community on proposed treatments. AR_12602. The Forest Service held several collaborative meetings, site visits, and comment periods to provide for public involvement. AR_14678. The project's potential environmental impacts, including climate change impacts, were thoroughly analyzed in an Environmental Assessment ("EA"). *See e.g.*, AR_14274-80; AR_14659 (Final EA). After considering specialist reports and stakeholders' concerns, the Forest Service issued a draft decision notice to allow more public input through the pre-decisional administrative objection process. AR_14853. The Forest Service determined that the Forest Health Initiative Project would not have a significant impact on the environment and issued a final decision notice and finding of no significant impact ("FONSI") explaining the rationale. AR_14861-66. In addition to timber harvesting to improve forest health, the project includes 9,377 acres of tree planting, site treatments to encourage forest regeneration, and maintenance and reconstruction of existing forest system roads to improve watershed health. AR_14676-77.

### B. The Buck Project

In May 2020, the Forest Service authorized the Buck Project in the Nantahala National Forest, after analyzing the effects of six alternatives, including a no-action alternative. AR_1115; AR_1142. As a restoration project, the Buck Project's silvicultural treatments aim to improve wildlife habitat, tree species diversity, timber resources, forest health, watershed conditions, recreational safety and access, and stream habitat within the project area. AR_1139-40. "A key related purpose of this project is to increase the resiliency of vegetation communities and the non-game and game wildlife species," integral to maintaining a healthy forest. AR_1141.

The Buck Project will treat approximately 795 acres using the "shelterwood with reserves silvicultural method." AR_1117. Under this approach, selected trees are reserved "to meet long-term objectives not related to regeneration and are usually left to satisfy non-timber resource objectives such as visual landscape management and special wildlife habitats." AR_1378. The Forest Service will not conduct secondary harvest on these stands. *Id.* Residual trees will remain in clumps or dispersed to maintain a stand of both regenerating trees and mature trees. AR_1117. In addition to silviculture treatments, the Buck Project includes multiple watershed improvement treatments including culvert removal and bridge construction, bank stabilization and erosion control, trash dump removal, and revegetation. AR_1118-19.

The Forest Service initiated the NEPA process for the project with a scoping letter sent to interested parties and a public meeting held in November 2017. AR_1165. The Forest Service then prepared a draft EA in April 2019 explaining the potential environmental impacts of the alternatives considered. *Id.* After considering the comments received on the draft EA, the Forest Service issued the final EA and draft decision in August 2019 through the pre-decisional administrative objection process. AR_1119. In the EA, the Forest Service analyzed the reasonably foreseeable environmental effects of the project, including climate change. AR_1245-48. The final Decision Notice, signed on May 22, 2020, incorporates public input by including design criteria to minimize the spread of non-native invasive plant species, adding further analysis and clarifying language, and delaying implementation as necessary. AR_1119-20.

### C. The White Pine Management Project

In June 2021, the Forest Service authorized the White Pine Management Project in the Francis Marion and Sumter National Forests. AR_5130, 5136. The project will increase the forest structure diversity to restore natural conditions that are currently dominated by planted (not natural

6

origin) white pine. AR_5100. Although white pine is native to the area, it has been planted for timber production in locations where it is not well adapted because site productivity is relatively low and fire is historically more frequent. *Id.* "In a natural disturbance regime, white pine would not be a prominent canopy species on these sites." *Id.* The dense white pine overstory has contributed to declining tree vigor, causing stands to be more susceptible to damage from insects and disease. *Id.*

The White Pine Management Project will not include white pine of *natural origin*. AR_5101. Instead, the project proposes to treat about 1,952 acres of white pine that has been planted for timber production. *Id.* The Forest Service will use several treatments like reforestation, prescribed burning, and commercial thinning depending on whether white pine is ecologically suited to a given stand. *Id.* By moving toward desired conditions, the project will increase "vertical structural diversity, allow for other tree species in the stand to regenerate in addition to white pine, improve the vigor of remaining white pine, and increase understory plant abundance and diversity, as a result of increased light, water, and nutrient availability following thinning." AR_5100.

Before the Project decision was signed, the Forest Service carefully analyzed the potential environmental impacts, including climate change, in an EA. AR_5094, AR_5122. The Forest Service began with a pre-scoping collaboration meeting in December 2018 and developed several alternatives to achieve a more resilient forest. AR_5099. The Forest Service considered all comments received during the scoping, 60-day public notice, and 30-day comment periods. AR_5133. "The proposed action was modified and design criteria were developed as appropriate to address concerns." *Id.* Ultimately, the Forest Service determined that the White Pine Management Project would not have a significant effect on environment and issued a FONSI and final decision notice. *Id.*

7

**LEGAL BACKGROUND**

I.      **The National Environmental Policy Act**

NEPA ensures that federal agencies consider the reasonably foreseeable environmental consequences of "major federal actions" significantly affecting the environment. 42 U.S.C. §§ 4321, 4332. NEPA is a "purely procedural" statute. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 177 (2025). As such, NEPA requires no particular outcome, and it is not meant to be a "substantive roadblock" to agency action. *Id.* at 173; *see also Appalachian Voices v. Fed. Energy Reg. Comm'n*, 139 F.4th 903, 927 (D.C. Cir. 2025) (Henderson, J., concurring). "The goal of the law is to inform agency decision-making, not to paralyze it." *Id.* The Supreme Court's opinion in *Seven County* was intended as a "course correction," bringing "judicial review under NEPA back in line with the statutory text and common sense." *Id.* at 184. And "the central principle of judicial review in NEPA cases is deference." *Id.* at 179.

NEPA does not apply absent a final agency action. 42 U.S.C. § 4336(a)(1) ("An agency is not required to prepare an environmental document with respect to a proposed agency action if— (1) the proposed agency action is not a final agency action within the meaning of such term in chapter 5 of title 5."). Nor does it apply to nondiscretionary federal action or congressional action. *Id.* § 4336(a)(4) ("An agency is not required to prepare an environmental document with respect to a proposed agency action if— . . . (4) the proposed agency action is a nondiscretionary action with respect to which such agency does not have the authority to take environmental factors into consideration in determining whether to take the proposed action."); *id.* § 4336(a)(1); 5 U.S.C. § 551 (the term "agency" "does not include—(A) the Congress").

Federal agencies fulfill their NEPA obligation to study the effects of major federal actions in one of three ways. For a major federal action that will have significant environmental effects, the agency prepares a detailed environmental impact statement ("EIS"). 42 U.S.C. § 4336(b)(1).

If it is unclear whether the proposal will have significant effects, the agency may prepare a brief EA. 42 U.S.C. § 4336(b)(2). If, based on the EA, the agency concludes that the proposed action will not significantly impact the environment, it issues a FONSI in lieu of preparing an EIS. *Id.* Finally, categorical exclusions are classes of actions that an agency has determined normally do not have significant effects on the environment and therefore do not require an EA or EIS absent extraordinary circumstances. *Id.*

## II.    The Administrative Procedure Act

The Administrative Procedure Act ("APA") provides a limited waiver of sovereign immunity and a standard of review for claims challenging federal agency action. 5 U.S.C. §§ 701-706. Under the APA, a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA defines "agency action" as a "rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]" 5 U.S.C. § 551(13). Judicial review is limited to "actions made reviewable by statute and final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. The APA "requires a plaintiff to target specific agency action that has caused him an injury. It requires that action to be final, ripe for review, and discrete. And it does not permit the courts to superintend how an agency carries out its broad statutory responsibilities." *Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 778 (D.C. Cir. 2025), *pet. for reh'g en banc granted*, No. 25-5091, 2025 WL 3659406; *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62, 64 (2004) ("The limitation to discrete agency action precludes the kind of broad programmatic attack we rejected in *Lujan v. National Wildlife Fed.*, 497 U.S. 871 (1990)."). To constitute final agency action under the APA, the action "must mark the consummation of the agency's decision-making process" and "be one by which rights or obligations have

been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation modified).

## STANDARD OF REVIEW

Challenges to agency action are reviewed under the APA. A court may set aside an agency action only if plaintiffs prove the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2); *City of Olmsted Falls, OH v. Fed. Aviation Admin.*, 292 F.3d 261, 271 (D.C. Cir. 2002) ("[T]he party challenging an agency's action as arbitrary and capricious bears the burden of proof." (citation omitted)). The standard of review is "highly deferential to the agency." *Food & Water Watch v. Fed. Energy Reg. Comm'n*, 104 F.4th 336, 342 (D.C. Cir. 2024) (citation omitted). "[A] court may not substitute its own policy judgment for that of the agency." *Fed. Commc'n Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

## ARGUMENT

The Court should deny Plaintiffs' Motion for Summary Judgment and grant summary judgment in favor of Federal Defendants because (1) Plaintiffs fail to establish Article III standing to pursue their timber targets claims; (2) Plaintiffs' timber target claims are moot; (3) timber targets are not final agency actions reviewable under the APA; (4) NEPA does not apply to timber targets; and (5) the Forest Service complied with NEPA in considering the potential cumulative effects of the challenged projects on climate.

### I.    Plaintiffs lack standing to challenge timber targets.

Plaintiffs lack standing to challenge the national, regional, and unit timber targets because their proffered evidence regarding causation and redressability is too speculative and attenuated to satisfy Article III standing. Federal courts may exercise jurisdiction only over "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1; *see also Gunn v. Minton*, 568 U.S. 251, 256 (2013)

10

("Federal courts are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute." (citation modified)); *United States v. Fruehauf*, 365 U.S. 146, 157 (1961) (prohibiting issuance of advisory opinions). "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation modified).

For Article III standing, a plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth v. Laidlaw Env't Servs*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Standing is not a mere pleading requirement, "but an indispensable part of the plaintiff's case[;] each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof[.]" *Lujan*, 504 U.S. at 561. Plaintiffs must demonstrate standing for "each claim [they] seek to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006). And at summary judgment, Plaintiffs must set forth *evidence* demonstrating standing and cannot rely on mere allegations. *Lujan*, 504 U.S. at 561. Plaintiffs have not established that timber targets cause them harm and that such harm is redressable by this Court.

### A.  Plaintiffs fail to demonstrate that performance targets cause them harm.

In their brief and attached declarations, Plaintiffs fail to show that the absence of NEPA climate analysis for national, regional, and unit timber targets caused their alleged recreational and aesthetic injuries. For standing, Plaintiffs must show this omitted procedural step caused the Forest Service to issue "wrongly decided" national, regional, and unit timber targets and that these timber targets caused Plaintiffs' "particularized" injuries. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 304 (D.C. Cir. 2025) (citation omitted); *see also Summers v. Earth*

11

*Island Inst.*, 555 U.S. 488, 496 (2009)). ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."). "Unless there is a *substantial probability* that the substantive agency action that disregarded a procedural requirement created a demonstratable risk, or caused a demonstrable increase in an existing risk, of injury to the particularized interests of the plaintiffs, the plaintiff lacks standing." *Ctr. for Biological Diversity*, 144 F.4th at 304 (citation omitted) (emphasis added); *see also Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658,  664-65 (D.C. Cir. 1996)) (en banc) ("To demonstrate standing, then, a procedural-rights plaintiff must show . . . it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest."). As the Supreme Court has made clear, "[t]he causation requirement precludes speculative" and "attenuated links." *FDA v. All. for Hippocratic Medicine*, 602 U.S. 367, 383 (2024).

Here, because Plaintiffs fail to demonstrate a "substantial probability" that the absence of NEPA climate analysis for timber targets caused a "demonstratable risk" to their aesthetic and recreational interests, Plaintiffs lack standing. *Ctr. for Biological Diversity*, 144 F.4th at 304. As a preliminary matter, Plaintiffs have not shown that the absence of NEPA climate analysis caused the timber targets to be "wrongly decided." *Id.* Instead, Plaintiffs argue that if the Forest Service had conducted a programmatic climate analysis "it may have reached a different conclusion regarding the target level[.]" Pls.' Mem. in Supp. of Mot. for Summ. J., Dkt. No. 38-1 at 27. But Plaintiffs' argument disregards the Forest Service's statutory mandate to produce a "high-level" supply of timber. 16 U.S.C. § 529 (directing the Secretary of Agriculture to "develop and administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and services obtained therefrom"); *id.* § 531 (defining "[s]ustained yield of the several products and services" as the "achievement and maintenance in perpetuity of a high-

level annual or regular periodic output of the various renewable resources of the national forests without impairment of the productivity of the land."). It is highly unlikely that a NEPA climate analysis of the Forest Service's timber targets would cause the agency to forego its statutory obligation to produce a "high-level" of timber.

Further, there is no causal connection between timber targets—mere performance metrics—and Plaintiffs' alleged injuries. Plaintiffs argue that they have standing because they have "recreational, aesthetic, spiritual, and scientific interests in areas being logged to contribute to timber targets," citing various declarations. Dkt. No. 38-1 at 27. But Plaintiffs' declarations offer nothing more than speculative and attenuated links that they are "aware" of timber targets and "believe" they are connected to project outcomes. Chapple Decl. ¶ 15, Dkt. No. 38-24 at 7 ("I am aware that the Forest Service uses projects like the White Pine Management Project to fulfill its annual timber targets."); Hayler Decl. ¶ 24, Dkt. No. 38-25 at 11 ("I believe the Forest Service resists changing timber projects in response to [public comments] when those changes would require a reduction in timber volume because reducing that volume would make it harder to achieve timber targets."); Kruzen Decl. ¶ 17, Dkt. No. 38-26 at 7 ("I am aware that the Forest Service uses projects like the Forest Health Initiative to fulfill its annual timber targets."); Fullerton Decl. ¶ 14, Dkt. No. 38-27 at 6 ("I am aware that the Forest Service's timber targets are driving the agency to pursue projects like the Buck Project."); *id.* ¶ 15 ("The logging that the Forest Service is planning to fulfill its targets will negatively affect my scenic views and lessen my enjoyment of the Forest on my numerous hikes and bike rides"); Kelly Decl. ¶ 24, Dkt. No. 38-28 at 8 (claiming the Buck Project was designed to meet timber targets).

If anything, the declarations demonstrate that individually authorized timber projects, not the targets, cause Plaintiffs' alleged aesthetic and recreational harms. In *Clinch Coalition v. U.S.*

13

*Forest Service*, the Western District of Virginia held that the plaintiffs lacked standing where they challenged the promulgation of several categorical exclusions but the harm from those categorical exclusions would arise only from site-specific application for a particular project. No. 2:21-cv-3, 2025 WL 3473302, at * 3 (W.D. Va. Dec. 3, 2025). So too here. As Plaintiffs concede, the location and manner of timber harvesting—i.e., the nature of a specific project—determine the existence and extent of their alleged recreational and aesthetic injuries. Chapple Decl. ¶ 17, Dkt. No. 38-24 at 7; Hayler Decl. ¶ 18, Dkt. No. 38-25 at 8 Kruzen Decl. ¶ 10, Dkt. No. 38-26 at 5; Fullerton Decl. ¶¶ 11-12, 15, 17, Dkt. No. 38-27 at 5-6 ("Or the agency could decide to log in less biologically rich (and carbon-dense) areas than the Buck Project area, thereby eliminating the threat posed by logging to the Forest I see every day from my porch."); Kelly Decl. ¶ 25, Dkt. No. 38-28 at 8. These projects could proceed regardless of targets pursuant to the Forest Service's statutory timber and stewardship obligations. 16 U.S.C. §§ 529, 531. Accordingly, Plaintiffs have not established that targets—a mere performance metric—cause them particularized harm.

### B.  Plaintiffs fail to demonstrate redressability.

Nor have Plaintiffs met their burden of showing a favorable decision could redress their aesthetic and recreational injuries. For standing, Plaintiffs must prove redressability is "likely." *Ctr. for Biological Diversity*, 144 F.4th at 314. Although somewhat relaxed, "the redressability requirement is not toothless in procedural injury cases," *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008), and "'relaxed' does not mean erased." *Nat'l Wild-life Fed. v. U.S. Army Corps of Eng'rs*, 170 F. Supp. 3d 6, 15 (D.D.C. 2016). Thus, Plaintiffs must show it is "substantially probable" that their concrete injuries could be redressed. *Ctr. for Biolog-ical Diversity*, 144 F.4th at 314; *Nat'l Wildlife Fed.*, 170 F. Supp. 3d at 15 ("Decisions in this Circuit and others confirm that a court must look at the underlying concrete interest when assessing redressability of a procedural interest.").

14

There is no prospective relief the Court could award to Plaintiffs to redress any alleged injury caused by expired timber targets. For a court to order additional NEPA review, there must be a pending decision remaining. *See* 42 U.S.C. § 4336 (requiring consideration of environmental effects of "proposed" agency actions before they are undertaken); *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1243 (D.C. Cir. 2018) ("Appellants have failed to identify any specific pending action, apart from the Program's continued existence, that qualifies as a 'major Federal action' under NEPA."). A court will ordinarily vacate or remand the challenged decision for the agency to conduct further analysis before reissuing its decision. 5 U.S.C. § 706; *Allied-Signal, Inc. v. U.S. Nuclear Reg. Com'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). Even assuming timber targets are major federal actions under NEPA (they are not, *see infra* Section III), vacating timber targets would not impact ongoing or future timber harvesting because targets do not authorize logging. The Forest Service is not required to reissue a vacated timber target, particularly for an expired fiscal year, to continue its otherwise authorized timber operations. Timber targets are issued for purposes of appropriations and performance accountability. AR_17014. Vacating a target has no consequence in the real world, so there would be no pending agency decision for which NEPA could be required.

Nor would remanding the targets to conduct NEPA review solve Plaintiffs' redressability problem. As Plaintiffs observe, timber sold in a given fiscal year counts towards that year's target. Dkt. No. 38-1 at 5 n.3, 11. Plaintiffs challenge the timber targets for fiscal years 2019 through 2024, Am. Compl., Dkt. No. 18 ¶¶ 245- 267—in other words, timber the Forest Service has already sold. To demonstrate redressability, Plaintiffs would have to show that it is "likely," as opposed to merely speculative, *Ctr. for Biological Diversity*, 144 F.4th at 314, that remand for NEPA review could cause the Forest Service to (1) re-evaluate past fiscal year timber targets; (2) re-evaluate

15

previously authorized timber projects allegedly designed to meet those targets; (3) re-evaluate tim-ber sales it already issued pursuant to those projects in prior fiscal years; *and* (4) *terminate* on-going contracts such that Plaintiffs' prospective recreational and aesthetic injuries are ameliorated. This chain of events is entirely speculative. Thus, "remand would be an idle and useless formality." *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 544-45 (2008) (quoting *Nat'l Labor Relations Bd v. Wyman-Gordon Co.*, 394 U.S. 759, 766-67 n.6 (1969) (plurality opin-ion)).

Notably, Plaintiffs do not actually seek vacatur or remand with respect to the national, regional, or unit timber targets. *See* Am. Compl., Dkt. No. 18 at 65-6. Rather, they seek declaratory relief that Federal Defendants violated NEPA by not conducting an environmental analysis before issuing these targets. *Id.* But an order declaring a NEPA violation without corresponding injunctive relief cannot satisfy the redressability requirement of standing. *See Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011) ("[T]he availability of declaratory relief presupposes the existence of a judi-cially remediable right."); *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020) ("A dec-laration, although undoubtedly likely to benefit the plaintiff psychologically, is unlikely itself to remediate their alleged injuries absent further court action." (citations omitted)); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("By the mere bringing of his suit, *every* plaintiff demonstrates his belief that a favorable judgment will make him happier. But . . . that psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury."). A declaratory judgment will have no impact on Plaintiffs' alleged aesthetic and recreational injuries. Plaintiffs may argue that they seek an injunction against any remaining timber volume for sale to fulfill 2024 targets for Regions 8 and 9, Dkt. No. 18 at 66, but Plaintiffs have not even made a cursory assertion of standing to challenge any timber projects aside from the

16

three projects at issue in this case. The Court does not have jurisdiction to enjoin unidentified timber projects across half the United States. *Ctr. for Biological Diversity*, 144 F.4th at 311 ("Even if the challenged permits all suffer from the same legal defect, however, the Constitution requires Plaintiffs to demonstrate an injury linked to each distinct federal action."). Nor, as discussed above, is there a vehicle for ordering NEPA analysis absent a pending decision.

Plaintiffs have not demonstrated Article III standing for Counts 1 (national timber targets), 2 (regional timber targets), or 3 (unit timber targets), and, accordingly, the Court should find in favor of Federal Defendants on these claims.

## II.    Plaintiffs' timber target claims for expired fiscal years are moot and not capable of repetition.

In addition to Plaintiffs' failure to establish redressability for Counts 1, 2, and 3, Plaintiffs' claims challenging timber targets for expired fiscal years 2019 through 2024 are moot and not capable of repetition. "An actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Alvarez v. Smith*, 558 U.S. 87, 92 (2009) (citation modified). A claim becomes moot "when it is impossible for a court to grant any effectual relief." *Chafin v. Chafin*, 568 U.S. 165, 172 (2012). Courts in this Circuit have found claims moot where the challenged action has expired by its own terms or been superseded. *See, e.g.*, *Daimler Trucks N. Am. LLC v. EPA*, 745 F.3d 1212 (D.C. Cir. 2013) (holding expired annual certificates and superseding regulations mooted plaintiffs' claims); *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006) ("Because the [challenged] memo has expired, this claim is moot."); *Theodore Roosevelt Conservation P'ship v. Salazar*, 744 F. Supp. 2d 151 (D.D.C. 2010) (finding mootness where decision superseded). Because Plaintiffs challenge expired fiscal year timber targets that are superseded on an annual basis, Plaintiffs' claims with respect to those fiscal years are moot.

17

Nor do Plaintiffs' claims qualify for an exception to the mootness doctrine as capable of repetition yet evading review. *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (per curiam) (describing exception). Congress, not the Forest Service, set the annual timber targets for fiscal years 2026 through 2034:

> For each of fiscal years 2026 through 2034, the Secretary shall sell timber annually on National Forest System land in a total quantity that is not less than 250,000,000 board-feet greater than the quantity of board-feet sold in the previous fiscal year.

Act of July 4, 2025 ("One Big Beautiful Bill Act"), Pub. L. No. 119-21, § 50301(a)(2)(A), 139 Stat. 72, 147. And congressional action is neither reviewable under the APA nor subject to NEPA.

The APA limits judicial review to "agency action," 5 U.S.C. § 702; *Fund for Animals, Inc.*, 460 F.3d at 18 (recognizing APA review is limited to "*agency action*" (quoting 5 U.S.C. § 702)), and it expressly excludes Congress from the definition of "agency." 5 U.S.C. § 701 ("agency," by definition, does not include Congress); 5 U.S.C. § 551 (the term "agency" "does not include—(A) the Congress"). As a result, congressionally set targets for future years are not "agency action" reviewable under the APA.

Nor are future fiscal year targets subject to NEPA, which applies only to "agency" action as defined in the APA. 42 U.S.C. § 4336(a) ("An agency is not required to prepare an environmental document with respect to a proposed agency action if—(1) the proposed agency action is not a final agency action within the meaning of such term in chapter 5 of title 5[.]"); 5 U.S.C. § 551 (the term "agency" "does not include—(A) the Congress"). Since fiscal year 2026 targets and beyond are not "agency action," but rather congressional action, NEPA does not apply. *Id.* Furthermore, future timber targets are non-discretionary because they are set by Congress and thus exempt from the definition of "major federal action" under NEPA. 42 U.S.C. § 4336e(10)(B) ("The term 'major Federal action' does not include-- . . . (vii) activities or decisions that are non-discretionary and

18

made in accordance with the agency's statutory authority."); *see also* 7 C.F.R. § 1b ("In circumstances where Congress, by statute, has prescribed decisional criteria with sufficient completeness and precision such that a Federal agency retains no residual discretion to alter its action based on the consideration of environmental factors, then that function of USDA is nondiscretionary within the meaning of NEPA[.]"). In sum, since timber targets for fiscal years 2026 through 2034 are congressional action that is neither reviewable under the APA nor subject to NEPA, Plaintiffs' timber target claims are moot and not capable of repetition.

### III.    Plaintiffs' timber target claims are not reviewable under the APA.

Plaintiffs' timber target claims also fail because national, regional, and unit timber targets are not discrete, final agency actions reviewable under the APA. *Am. Forest Res. Council v. United States*, 77 F.4th 787, 791, 804-05 (D.C. Cir. 2023) (holding Bureau of Land Management's determination and declaration of the annual allowable sale quantity for timber was not "discrete agency action" that could be compelled under section 706(1) of the APA); *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) ("If there is no final agency action here, there is no doubt that [plaintiffs] would lack a cause of action under the APA.").

The D.C. Circuit's opinion in *American Forest Resource Council v. United States* is on point. There, the Court resolved several consolidated cases related to the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act, commonly referred to as the O & C Act, which requires the Bureau of Land Management ("BLM") to determine and declare the "annual productive capacity" of lands covered by the O & C Act and sell timber from such lands in an amount "not less than the annual sustained yield capacity . . . , or so much thereof as can be sold at reasonable prices on a normal market." 77 F.4th 787, 791 (D.C. Cir. 2023) (quoting 43 U.S.C. § 2601). Consistent with this duty, the BLM determined and declared the annual allowable sale

19

quantity—synonymous with sustained yield—which is the estimated "volume of O & C timber that can be cut and sold in a given year without depleting the timberland." *Id.*

Plaintiffs in one of the consolidated cases sought to compel BLM to sell the declared allowable sale quantity, arguing that the O & C Act imposes a nondiscretionary duty to do so. *Id.* at 796. Relying on the Supreme Court's analysis in *Norton v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55 (2004), the D.C. Circuit determined that the allowable sale quantity is not a "discrete" agency action, as required for judicial review under the APA. *Am. Forest Res. Council* 77 F.4th at 804. The court reasoned that the timber sales comprising the timber volume BLM offers in a given year to attempt to meet the declared allowable sale quantity require years of planning to finalize. *Id.* at 804-05. "The total timber volume the BLM offers for sale in a given year is thus not a discrete agency action. Instead, it is a measurement—a synthesis of multiple sales made over several years." *Id.* at 805. "The total timber volume offered does not involve the determination of rights and obligations and is not a decision 'from which legal consequences will flow.'" *Id.* (quoting *Bennett v. Spear*, 520 U.S. at 178). The D.C. Circuit further reasoned that the plaintiffs' request was akin to an impermissible broad programmatic attack, as rejected by the Supreme Court in *Lujan v. National Wildlife Federation*, 497 U.S. 871, 890-91 (1990) and *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004). *Id.*

Like the BLM's declared allowable sale quantity for O & C lands, Forest Service timber targets are not discrete agency actions reviewable under the APA. Both inform agency management of federal land, but they are not rules, orders, sanctions, or equivalent relief. *Am. Forest Res. Council*, 77 F.4th at 804-05. And like BLM's timber sales in *American Forest Resource Council*, the Forest Service's timber projects are the product of years of planning and coordination, *Ohio Forestry Ass'n, Inc.*, 523 U.S. at 729-30 (listing several steps the Forest takes before timber harvest

20

occurs), as explicitly recognized by Plaintiffs here in their briefing, Dkt. No. 38-1 at 11-12. Timber targets provide performance goals based on expected sales for the year, *id.*, and are not a discrete agency action. *Am. Forest Res. Council*, 77 F.4th at 804-05.

Nor do timber targets have any independent legal effect on Plaintiffs. As the D.C. Circuit recently emphasized, "[i]f an action affects the challenger's rights only 'on the contingency of future administrative action,' *it is not final.*" *Nat'l Treasury Emps. Union*, 149 F.4th at 778 (quoting *DRG Funding Corp. v. Sec'y of Hous. Urb. Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996)) (emphasis added). The APA requires Plaintiffs to identify a "specific agency action that has caused him an injury. It requires that action be final, ripe for review, and discrete. And it does not permit the courts to superintend how an agency carries out its broad statutory responsibilities." *Id.* at 778 ("The APA cabins the timing, focus, and intensiveness of judicial review of federal agency action."). To be final, the agency action "must impose 'direct and appreciable legal consequences' on the *plaintiff*[.]" *Id.* at 778 (quoting *Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016)) (emphasis added).

Plaintiffs argue that timber targets are "final agency action" because they constitute "rules" or "the equivalent thereof" that "bind" the agency. Dkt. No. 38-1 at 30, 34. But neither the caselaw nor the Administrative Record support Plaintiffs' characterization. Nor do Plaintiffs clarify the type of rule they think targets are, which is a significant shortcoming in their argument because not all rules carry the "force and effect of law." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015); *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251, 253 (D.C. Cir. 2014) (distinguishing between legislative rules and general policy statements). Rules issued through notice-and-comment procedures, often called "legislative rules," have the "force and effect of law," *Perez*, 575 U.S. at 96 (quoting *Chrysler Corp v. Brown.* 441 U.S. 281, 302-303 (1979)), and only legislative

21

rules are "binding." *Chrysler Corp.* 441 U.S. at 301-302 (quoting *Morton v. Ruiz*, 415 U.S. 199, 235, 236 (1974)); *Nat'l Min. Ass'n*, 758 F.3d at 250 (only legislative rules, not general statements of policy, have the "force and effect of law"). To be "binding" or have the "force and effect of law," there must be a "nexus between the regulations and some delegation of the requisite legislative authority by Congress." *Chrysler Corp.* 441 U.S. at 304.

Conversely, general statements of policy do not bind the agency. *Nat'l Min. Ass'n*, 758 F.3d at 250; *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 807-08 (D.C. Cir. 2006) ("The guidelines are nothing more than general policy statements with no legal force."); *Nat'l Ass'n of Broadcasters v. FCC*, 569 F.3d 416, 426 (D.C. Cir. 2009) (noting standards at issue do not bind agency to a particular result). Unlike a legislative rule, "an agency plan is unreviewable insofar as it reflects only a nonbinding statement of something the agency intends to do in the future." *Nat'l Treasury Emps. Union*, 149 F.4th at 779 (citing *Fund for Animals, Inc.*, 460 F.3d at 18-20). "Because such a plan has no immediate effect, a plaintiff cannot challenge the plan itself but must instead await further agency actions implementing it." *Id.*

As the D.C. Circuit has explained, "the most important factor in this analysis" of determining the type of rule, "is whether an action has 'actual legal effect[.]'" *Cal. Communities Against Toxics v. EPA*, 934 F.3d 627, 635 (D.C. Cir. 2019) (holding memo had no direct and appreciable legal consequences because "neither [the agency] nor regulated sources can rely on it as independently authoritative in any proceeding; state permitting authorities face no penalty or liability of any sort in ignoring it; and state permitting authorities and regulatory beneficiaries have clear statutory avenues by which to challenge a permitting decision adopting the reasoning in the [memo.]"). To determine whether an action has actual legal effect the reviewing court must assess

22

the "concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it." *Id.* at 637.

Timber targets have no "actual legal effect." *Id.* Nor do they impose any "direct or appreciable legal consequences on the plaintiffs." *Nat'l Treasury Emps. Union*, 149 F.4th at 778 (quoting *Hawkes Co.*, 578 U.S. at 598) (citation modified). The targets do not authorize any logging. The Forest Service must separately authorize any timber project that counts towards fulfilling a target. Nor are targets a prerequisite for logging. The Forest Service can cut timber for sale in conjunction with its organic statute and regulations, 16 U.S.C. § 529, following administrative and environmental review. Nor are the challenged timber targets made binding by any statute or regulation. And finally, as discussed above, *supra* Section I, Plaintiffs' alleged aesthetic and recreational injuries are contingent on the Forest Service authorizing timber projects that cause them concrete, particularized harm. The targets have no "direct" legal consequences for Plaintiffs in this case. *Hawkes Co.*, 578 U.S. at 598. Like in *California Communities Against Toxics*, timber targets are "all bark and no bite." 934 F.3d at 637.

Nor can Plaintiffs contort general statements of policy into binding legislative rules by citing a collection of internal agency documents and emails. In *National Treasury Employees Union*, the D.C. Circuit held that a collection of discrete agency actions did not add up to a final agency action to "shut down" the Consumer Financial Protection Bureau reviewable under the APA. 149 F.4th at 777, 783-84. There, while the Court did not contest that the Acting Director had decided to shut down the Bureau, there was no final agency action that did in fact shut it down, and a final agency action could not be "inferred" from "various discrete actions." *Id.* at 777, 790. At most these various discrete actions showed *intent* to close the agency, "which has no legal

23

consequence except as implemented through other decisions." *Id.* at 790. Thus, plaintiffs were limited to challenging the "specific actions taken to implement" the plan. *Id.*

Like in *National Treasury Employees Union*, timber targets represent the Forest Service's *intent* to sell a certain volume of timber and are not a final agency action doing so or authorizing that sale. Plaintiffs can challenge individual, discrete actions—timber projects—that implement that plan and allegedly cause them injury in fact. And any remedy to Plaintiffs' alleged recreational and aesthetic injuries can be achieved in those project-specific challenges. But a collection of timber projects across a region combined with an assortment of internal documents does not render the policy goal of selling a certain amount of timber a *legal mandate* to sell that amount nor subject it to judicial review.[2] The target is the timber volume the Forest Service intends to sell. That the Forest Service strives to meet its targets through its own internal processes—as would any agency with any self-prescribed quota or goal—does not give targets the "force and effect of law." *Perez*, 575 U.S. at 96.

This case also is similar to *Fund for Animals v. U.S. Bureau of Land Management*, 460 F.3d 13 (D.C. Cir. 2006). There, the D.C. Circuit considered whether the BLM's national "strategy" for addressing wild horse overpopulation outlined in its budget proposal was reviewable under the APA. The Court concluded that the strategy was not reviewable final agency action because it "represents the sum of 'many individual actions,' including some 'yet to be taken.'" *Id.* at 20 (citing *Lujan*, 497 U.S. at 893). "Even if the Bureau's budget request were somehow considered to be a regulation . . . there must still be 'some concrete action applying the regulation to claimant's

---

[2] In support of their argument, Plaintiffs offer an email in which quarterly goals for timber volume are distinguished from timber targets. Dkt. No. 38-1 at 41 (citing Dkt. No. 38-21 at 8). But this email does nothing other than confirm that there are no quarterly timber targets, which was never at issue in this case.

24

situation in a fashion that harms or threatens to harm him.'" *Id.* at 20-21 (citing *Lujan*, 497 U.S. at 891). The strategy merely represented the agency's "latest plan to comply with its broad statutory mandate." *Id.* at 21. Accordingly, the Court's "long-standing practice in circumstances like this is to require the complaining party to challenge the specific implementation of the broader agency policy." *Id.* at 22.

So too here. Timber targets are established as part of the budget and accountability process before Congress. AR_17013-14. As required by the Government Performance Results Modernization Act, the Forest Service sets "performance goals" germane to the agency's mission in an "objective, quantifiable, and measurable form" and details progress towards achieving those goals with each budget request. Pub. L. No. 111-352, 124 Stat. 3866, 3868 (2011). Timber targets are one of nine Key Performance Indicators designed to track the Forest Service's progress towards achieving strategic objectives. AR_17013-16. Like in *Fund for Animals*, the timber target represents the Forest Service's plan for satisfying its broad statutory mandate to produce a continuous and high-level supply of timber each year. And like in *Fund for Animals*, targets do not directly impact Plaintiffs. Consequently, Plaintiffs are limited to challenging individual timber projects that fulfill timber target objectives and allegedly cause Plaintiffs harm.

Plaintiffs rely almost exclusively on the Court's oral ruling on Federal Defendants' Motion to Dismiss without any meaningful engagement in the caselaw. Dkt. No. 38-1 at 28-38. But the Court issued its ruling based on pleading standards that no longer apply, *i.e.* whether Plaintiffs had alleged sufficient facts. Transcript of Oral Ruling at 4, *Chattooga Conservancy v. U.S. Dep't of Agric.*, No. 1:24-cv-518-TJK (March 25, 2025) ("To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must have pleaded 'enough facts to state a claim to relief that is plausible on its face[.]'"

25

(citation omitted)). At summary judgment, allegations are no longer enough. *City of Olmsted Falls*, 292 F.3d at 271.

Regardless, none of Plaintiffs' parenthetically cited cases supports their argument. For example, in *General Electric Company v. EPA*, Dkt. No. 38-1 at 40, the D.C. Circuit reviewed a guidance document that required third-party applicants to use a particular toxicity factor and therefore dictated how the agency interacts with regulated parties. 290 F.3d 377, 385 (D.C. Cir. 2002). Unlike *General Electric Company v. EPA*, timber targets neither regulate third parties nor require anything from third parties. Timber targets are purely metrics for agency operations and performance indicators for budgeting and accountability.

Plaintiffs also argue that a single step in an ongoing program may be reviewable under the APA. Dkt. No. 38-1 at 21 (citing *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001)). That may be true in some circumstances, but in every circumstance that single step must still be a final agency action to be reviewable. The timber targets are no such final agency action. *See Fund for Animals*, 460 F.3d at 19 ("Much of what an agency does is in anticipation of agency action.").

And Plaintiffs misunderstand *Safari Club International v. Jewell*, 842 F.3d 1280 (D.C. Cir. 2016), in asserting timber targets are "final" because they are the product of thorough analysis. Dkt. No. 38-1 at 36. In *Safari Club*, the agency action had a direct impact on regulated parties by denying all hunting trophy permits in 2014. 842 F. 3d at 1289. Conversely, timber targets have no immediate effect on Plaintiffs or any other third party.

Plaintiffs rely on *American Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127 (D.D.C. 2020), to argue an agency action must merely bind the agency itself to be reviewable under the APA. Dkt. No. 38-1 at 22, 42. Notably, no Circuit Court has cited this opinion or written in support of this broad proposition. In fact, the D.C. Circuit's recent opinion in *National Treasury*

26

*Employees Union v. Vought* flatly rejects Plaintiffs' argument. To be final, the agency action "must impose 'direct and appreciable legal consequences' on the *plaintiff*[.]" *Nat'l Treasury Emps. Union*, 149 F.4th at 778 (quoting *Hawkes*, 578 U.S. at 598) (emphasis added). *American Wild Horse Campaign* is otherwise distinguishable in two key respects. First, there, the BLM confirmed that the challenged resource management plans were "final agency action." 442 F. Supp. 3d at 148. Second, the challenged resource management plans were made binding by regulation. *Id.* at 149. No statute or regulation makes the challenged timber targets binding on the Forest Service or any third party. In fact, the Forest Service did not achieve its national timber targets for the ten fiscal years preceding the Amended Complaint, AR_16787, despite congressional pressure, *see* Comm. on Appropriations, Dep't of the Interior, Env't, and Related Agencies Appropriations Bill, 2022, H. R. Rep. No.117-83, at 116 (July 6, 2021) (directing the Forest Service to provide information on resources necessary to increase national timber target to four billion feet annually), to no legal consequence for the agency. The Forest Service is neither punished nor rewarded depending on whether it meets a given target. While Forest Service staff may treat targets as required internal benchmarks, they are not legally binding on the agency.

Lastly, Plaintiffs assert that timber targets are final agency action because Forest Service staff lack discretion to deviate from assigned timber targets, citing *Natural Resources Defense Council v. EPA*, 643 F.3d 311 (D.C. Cir. 2011). But in *Natural Resources Defense Council*, the guidance at issue "announc[ed] a binding change in the law" with legal consequences for states submitting Clean Air Act implementation plans to EPA. *Id.* at 319-20. Again, the timber targets have no impact on regulated third parties.

In sum, the national, regional, and unit timber targets are not reviewable final agency action under the APA because they are not discrete agency actions nor do they have any direct or

27

appreciable legal consequences for Plaintiffs. Accordingly, the Court should grant summary judg-ment in favor of Federal Defendants on Counts 1, 2, and 3.

## IV.    NEPA does not apply to timber targets.

Since timber targets do not constitute final agency action, NEPA review is not required. 42 U.S.C. § 4336(a)(1). The statute is clear: "[a]n agency is not required to prepare an environ-mental document with respect to a proposed agency action if—(1) the proposed agency action is not a final agency action within the meaning of such term in chapter 5 of title 5." *Id.*

Even if timber targets constitute final agency action under the APA, they would still not be "proposals" for "major federal actions" triggering NEPA. *Karst Env't Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1295 (D.C. Cir. 2007) ("In the NEPA context, the 'final agency action' required by the APA must also be a 'major federal action' under NEPA."). NEPA defines "proposal" as a "proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and *can meaningfully evaluate its ef-fects*." 42 U.S.C. § 4336e(12) (emphasis added). "As the Supreme Court has explained, where 'it is impossible to predict the level of . . . activity that will occur in the region,' it is 'impossible to analyze the environmental consequences and the resource commitments involved in, and the alter-natives to, such activity." *Ctr. for Biological Diversity v. Ilano*, 928 F.3d 774, 780 (9th Cir. 2019) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412, 414 (1976)) (holding designation of landscape-scale areas did not trigger NEPA because it did not authorize any particular project). An agency cannot meaningfully evaluate the environmental effects of "speculative or hypothetical projects." *Northcoast Env't Ctr. v. Glickman*, 136 F.3d 660, 668 (9th Cir. 1998) ("Long-range aims are quite different from concrete plans[.]").

The Administrative Record further demonstrates that there is no meaningful way to analyze the environmental effects of timber targets across diverse landscapes and ecosystems. The

28

environmental impacts of a given timber harvest depend on the location, climate, and ecosystem dynamics, among other variables. As the Forest Service explained in its 2019 Disturbance Assessment:

> Forests are highly dynamic systems that are continuously repeating the natural progression of establishment, growth, death, and recovery, while cycling [carbon] through the ecosystem and the atmosphere. This cycle, which drives overall forest [carbon] dynamics, varies geographically and by forest type, and by the frequency, magnitude, and type of disturbance events.

AR_21065. Moreover, "[d]ifferent ecosystems sequester carbon in different ways, at different rates, and within differing mosaics of landscape plans and trends." AR_21068. How the timber is used also affects the carbon calculation.

> For forests managed for timber products, it is important to account for the [carbon] that is retained in harvested wood as well as substitution effects of using wood instead of other energy-intensive materials, because these quantities may be large and should not be considered as emitted [carbon dioxide].

AR_21066. As a result, there is no meaningful way to evaluate the environmental impacts of timber targets determined on a geopolitical scale. Rather, and as discussed below, the Forest Service regularly conducts a carbon analysis for each project, accounting for these variables at the site-specific level. *See* AR_1246-48; AR_4975-76; AR_12256-80; AR_14274-80; AR_16334-39.

Plaintiffs now appear to narrow their request to a programmatic EIS on climate impacts, but the case law is clear that it is within the Forest Service's discretion whether to conduct a programmatic review. *Kleppe*, 427 U.S. at 412, 414; *Nat'l Wildlife Fed'n v. Appalachian Reg'l Com'n*, 677 F.2d 883, 889 (D.C. Cir. 1981) ("determining need for programmatic environmental consideration is within the province of agency expertise[.]"). Determining whether to conduct a programmatic EIS "requires the weighing of a number of relevant factors, including the extent of the interrelationship among proposed actions and practical considerations of feasibility." *Kleppe*, 427 U.S. at 412. As the Supreme Court concluded in *Kleppe*, "[r]esolving these issues requires a

29

high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies." *Id.*

The plaintiffs in *Kleppe* argued that the Department of the Interior violated NEPA by failing to prepare a regional programmatic EIS of its coal-leasing operations on federal land. 427 U.S. at 394-95. The Court noted that the agency completed NEPA analyses for the individual projects, *id.* at 399, 402, but there was no regional proposal that would allow for meaningful environmental review at the regional level. *Id.* at 402, 404. So too here. The national, regional, and unit timber targets constitute performance metrics, but they do not dictate how that metric will be met in order to meaningfully evaluate the environmental effects. There is simply "no factual predicate for the production of an environmental impact statement of the type envisioned by NEPA." *Id.* at 402.

## V.    The Court cannot compel a programmatic EIS under § 706(1).

Plaintiffs alternatively argue that the Court can compel NEPA review under 5 U.S.C. § 706(1) even if timber targets are not final agency action reviewable under 5 U.S.C. § 706(2). Dkt. No. 38-1 at 49. Not so. A claim under section 706(1) can proceed "only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *SUWA*, 542 U.S. at 64. The limitation to "*discrete*" agency actions precludes using "broad statutory mandates" to attack agency policy while "[t]he limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law[.]" *Id.* at 64-66. Section 706(1) "carried forward" the traditional writ of mandamus; as such, a court may review a 706(1) claim only if the agency has a "'ministerial or non-discretionary' duty amounting to 'a specific, unequivocal command.'" *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016) (quoting *SUWA*, 542 U.S. at 63-64); *see also Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 226 (D.C. Cir. 2009) (affirming dismissal of 706(1) claims for lack of specific

30

agency action and noting that "plaintiffs' grievance lies with legally permissible policy decisions made by Congress and the Forest Service").

Neither a programmatic EIS nor NEPA review generally is a discrete agency action equivalent to a rule, order license, sanction, or other relief that a court can compel under section 706(1). *See W. Org. of Res. Councils*, 892 F.3d at 1242-43 (declining to compel updated NEPA analysis to account for climate impacts under section 706(1)); *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 27 (D.D.C. 2017) (noting NEPA regulation "prescribes only an agency's general mode of operations, not any discrete agency action, and thus cannot be the basis for a valid § 706(1) claim"). "An EIS is merely an 'input' into an agency decision, and not an agency action in and of itself." *Friends of Everglades, Inc. v. Sec'y of Dept' of Homeland Sec.*, No. 25-cv-12873, 2025 WL 259867, at *5 (11th Cir. Sept. 4, 2025) (quoting *Seven Cnty.*, 605 U.S. at 180). And this Court cannot compel "compliance with broad statutory mandates" such as NEPA under section 706(1). *SUWA,* 542 U.S. at 66. As this district reasoned in *Center for Biological Diversity v. Zinke*, the fact that an agency can conduct an EIS or other NEPA review without subsequently "undertaking any judicially reviewable final action underscores the inappropriateness" of using a section 706(1) claim to compel NEPA analysis. 260 F. Supp. 3d at 27.

The two cases Plaintiffs cite do not contradict this authority. In *Ouachita Watch League v. Henry*, the Eastern District of Arkansas did not engage in whether a supplemental NEPA analysis constituted a discrete agency action because, according to the opinion, the Forest Service did not contest that part of the inquiry, focusing instead on whether the agency was required to supplement. 59 F. Supp. 3d 922, 928 (E.D. Ark. 2014). A review of the filings in that case, however, demonstrate that the Forest Service did not, as Plaintiffs here suggest, "admit" that supplemental NEPA was a "discrete final agency action." *See Ouachita Watch League v. Henry*, No. 4:11-cv-425-KGB,

31

Fed. Defs.' Mem. in Supp. of Mot. to Dismiss, Dkt. No. 20-1 at 24 ("While [*Resource Management Plans*] may be discrete, final agency actions, the agencies cannot be compelled to complete or amend them because doing so is not required by law." (emphasis added)). Plaintiffs' out-of-context quotation does not render a programmatic EIS a "discrete agency action" under the APA.

Plaintiff's reliance on *Natural Resource Defense Council, Inc. v. Butz*, an unpublished 50-year-old decision, fares no better. Dkt. No. 38-1 at 50. There, plaintiffs challenged a Nixon Administration initiative to redirect funding to increase timber production on federal lands to address a housing crisis. *Nat. Res. Def. Council, Inc. v. Butz*, No. 1358-73 (D.D.C. Feb. 25, 1974). Not only is this case not binding, *see In re Grant*, 635 F.3d 1227, 1232 (D.C. Cir. 2011) (holding unpublished opinions "do not constrain a panel of the court from reaching a contrary conclusion"), but it is not even an APA case. *Butz* pre-dates now well-settled law that NEPA does not provide a cause of action and that NEPA claims must proceed under the APA. *See Karst Env't Educ. and Prot., Inc.*, 475 F.3d at 1297 (noting courts previously interpreted NEPA as allowing claims independent of the APA). It is not enough that the decision contains the word "discrete" in a different legal context. *Butz* has no bearing on whether NEPA analysis can be compelled under the APA, and Plaintiffs' reliance on it highlights the weakness of their argument.

\*\*\*

Plaintiffs have not met their burden of proving this Court has jurisdiction to review their timber targets claims, nor established that timber targets are reviewable under the APA. Accordingly, the Court should grant summary judgment in favor of Federal Defendants on Counts 1, 2, and 3.

32

**VI.    The Forest Service complied with NEPA in approving the challenged projects.**

With respect to Count 4, the Forest Service followed the standard NEPA process in developing and authorizing the Forest Health Initiative, Buck, and White Pine Management Projects. Nonetheless, Plaintiffs complain that the Forest Service's cumulative impacts analyses should have included more information about climate change than NEPA requires. But in choosing the scope of analysis, the Forest Service made the exact type of line-drawing determinations that the Supreme Court recently reiterated should be left to the agency. *See Seven Cnty.*, 605 U.S. at 182-83 ("Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness.").

In setting a "course correction" for judicial review under NEPA, the Supreme Court in *Seven County* explained that "when the effects of an agency action arise from a separate project—for example, a possible future project or one that is geographically distinct from the project at hand—NEPA does not require the agency to evaluate the effects of that separate project." *Id.* at 188-89. "The agency may draw what it reasonably concludes is a 'manageable line'—one that encompasses the effects of the project at hand, but not the effects of projects separate in time or place." *Id.* at 189. Specifically, the Forest Service is owed deference in deciding "(i) how far to go in considering indirect environmental effects from the project at hand and (ii) whether to analyze environmental effects from other projects separate in time or place from the project at hand." *Id.* at 182. And courts should take care not to elevate form over substance by requiring specific information because an agency has discretion on how to present its analyses. *See Sierra Club v. Fed. Energy Reg. Comm'n*, 867 F.3d 1357, 1370 (D.C. Cir. 2017) (finding cumulative effects analysis adequate even though agency "did not mention [specific] existing polluters in its discussion"); *Nat'l Parks Conservation Ass'n v. United States*, 177 F. Supp. 3d 1, 26 (D.D.C. 2016) (upholding

33

Forest Service's decision even though the EA's cumulative impacts "could have been more ro-bust").

Here, the Forest Service reasonably exercised its discretion in each of the projects' cumulative impacts analyses. For the Forest Health Initiative Project's impacts, the Forest Service explained that "only a limited cumulative impact assessment" was warranted for this project of limited scope. AR_14691; *see also Minisink Residents for Env't Pres. & Safety v. Fed. Energy Reg. Comm'n*, 762 F.3d 97, 113 (D.C. Cir. 2014) ("[B]ecause the Minisink Project *itself* was expected to have minimal impacts, no significant *cumulative* impacts were expected."). After all, an "EA cannot be both concise and brief and provide detailed answers for every question." *Sierra Club v. U.S. Forest Serv.*, 46 F.3d 835, 840 (8th Cir. 1995). The Forest Service further explained that forest-wide cumulative effects were disclosed in the Forest Plan's NEPA documents to which the Forest Health Initiative Project's EA was tiered. AR_14690; *Newton Cnty. Wildlife Ass'n v. Rogers*, 141 F.3d 803, 809 (8th Cir. 1998) (endorsing the same tiered approached to "save money and time by avoiding repetitive inquiries"). The Forest Plan EIS is the programmatic NEPA document for management activities across the entire forest. AR_15478. Accordingly, the Forest Service focused on analyzing the effects of implementing *this* project. AR_14690. The Forest Service thus considered reasonable cumulative effects at two levels, the Forest level and the project level.

Even with this reasonable line drawn, the Forest Service provided detailed calculations of climate change impacts at the national level. *See* AR_14856. The Forest Service explained that national forests sequester approximately 200 teragrams of carbon annually, which offsets about ten percent of fossil fuels emissions. *Id.* The Mark Twain National Forest stores about 0.000151 teragrams of carbon per hectare, with half of that stored in live and dead trees and the other half belowground in soil and roots. *Id.* The Forest Health Initiative Project accounts for three percent

of the total carbon stored on the Forest. *Id.* Overall, the project improves forest resilience thereby contributing to a carbon sink in the long term. AR_14857; *see also* AR_16335 ("[E]ffects would be largely compensated for by simultaneous carbon dioxide absorption and conversion occurring within the project area and the Forest."). The Forest Service therefore reasonably concluded that the Forest Health Initiative Project will have "a minimal cumulative effect." AR_14857.

For the Buck Project, the Forest Service similarly provided a thorough discussion of carbon emissions and related calculations. *See* AR_1245-48. The Forest Service acknowledged that the project area would "remain a source of carbon to the atmosphere until carbon uptake by new trees and other vegetation exceeds the emissions from decomposing dead organic material." AR_1246. But as the stands develop over the years, their carbon source would become a carbon sink. *Id.* ("Recent scientific literature confirms this general pattern of changes in net ecosystem productivity (NEP) and carbon stocks over the period of forest stand development."). Based on the same national carbon stocks and sequestration rates as reported in the Forest Health Initiative Project decision, the Forest Service determined that the Buck Project would contribute an extremely small impact on the carbon cycle and in fact "may improve the overall capacity of the forest to sequester carbon." AR_1247.

Likewise, the Francis Marion-Sumter National Forest relied on a lengthy carbon analysis in developing the White Pine Management Project. *See* AR_12256-80. In particular, the Forest Service explained that with the majority of stands younger than 80 years, the Forest is expected to continue as a carbon sink for decades. AR_12271. Indeed, the Forest Service provided projections of carbon stock changes expressed in teragrams per year for the next 35 years, forthrightly disclosing a downward trend in carbon sequestration due to loss in forestland use. AR_12272. But as explained in the White Pine Management EA, the project will "not convert forest land to other

35

non-forest uses, thus allowing any carbon initially emitted from the proposed action to have a temporary influence on atmospheric GHG concentrations, because carbon would be removed from the atmosphere over time as the forest regrows." AR_5122. The carbon would also be stored in the harvested wood for several decades, substituting for more emission intensive materials or fuels. *Id.* As a result, the Forest Service appropriately determined that the White Pine Management Project would have only a minor cumulative impact on climate change. *Id.*

Despite the Forest Service's robust analyses, Plaintiffs take issue with the cumulative impacts disclosed for each project. First, Plaintiffs contend that the Forest Service had to "identify other past, present, and reasonably foreseeable Forest Service projects that have contributed and will contribute carbon emissions in combination with the Projects." Dkt. No. 38-1 at 51. But by citing the Administrative Record, Plaintiffs point out all of the projects that the Forest Service *did* consider. *See Id.* at 52-53; *Pac. Shores Subdivision, Ca. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 4 (D.D.C. 2006) (recognizing that "all documents and materials that the agency 'directly or indirectly considered'" comprises the administrative record); *see also Ctr. for Biological Diversity v. Blank*, 933 F. Supp. 2d 125, 151-52 (D.D.C. 2013) ("In ensuring an agency's compliance with NEPA, the Court is not strictly confined to the portion of an environmental assessment labeled 'cumulative impacts analysis,' or even to the four corners of the EA or EIS more broadly."). Plaintiffs' reliance on *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 76 (D.D.C. 2019), is therefore misplaced. *See* Dkt. No. 38-1 at 53. At any rate, *Zinke* approved the very approach the Forest Service took with these projects: comparing the project's percentage of carbon emissions with the statewide and nationwide emissions. 368 F. Supp. at 77 (relying on *WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013), and *WildEarth Guardians v. BLM*, 368 F. Supp. 3d 41 (D.D.C. 2019)).

36

Second, Plaintiffs confusingly assert that the Forest Service did not discuss cumulative carbon emissions. Dkt. No. 38-1 at 54. As noted above, the Forest Service went to great lengths to explain the Projects' carbon emissions and put them into context. That the Plaintiffs would have expressed the impacts in different terms "does not render the cumulative impacts analysis violative of NEPA." *S. Utah Wilderness All. v. Norton*, 326 F. Supp. 2d 102, 117 (D.D.C. 2004); *see also Seven Cnty.*, 605 U.S. at 181 ("The agency is better equipped to assess what facts are relevant to the agency's own decision than a court is."). Just as in *Norton*, the record here supports the Forest Service's decision that the Projects would have a "light footprint," and the Court should reject Plaintiffs' claim to the contrary. *Id.* at 118.

In short, "[t]he proper judicial approach for NEPA cases is straightforward: Courts should review an agency's [NEPA analysis] to check that it addresses the environmental effects of the project at hand. The [NEPA analysis] need not address the effects of separate projects. In conducting that review, courts should afford substantial deference to the agency as to the scope and contents of the [NEPA analysis]." *Seven Cnty.*, 605 U.S. at 192. Plaintiffs have clearly set out to prevent these important forest management projects. But "[c]itizens may not enlist the federal courts, 'under the guise of judicial review' of agency compliance with NEPA, to delay or block agency projects based on the environmental effects of other projects separate from the project at hand." *Id.* The Court should dismiss Plaintiffs' claim as to the individual projects because the Forest Service properly analyzed their cumulative impacts.

## VII.    Remedy

Even if the Court were to find legal error in the Forest Service's timber targets or the individually challenged timber projects, which it should not, there is no remedy available that could redress Plaintiffs' alleged aesthetic and recreational harms.

### A. Timber targets

For the same reasons that Plaintiffs' timber targets claims are not redressable, *supra* Section 1.B, there is no judicial remedy that the Court can award for Counts 1, 2, and 3. The D.C. Circuit's decision *National Treasury Employees Union v. Vought* is instructive. There, the Court noted a "mismatch" between the inferred agency action and remedy. *Nat'l Treasury Emps. Union*, 149 F.4th at 790. Even if the apparent decision to close the Consumer Financial Protection Bureau were final agency action and the court set it aside, the court could not "enjoin or set aside *other* agency actions—such as a [reduction in force] announced at the same time" absent a direct challenge to those actions. *Id.*

As in *National Treasury Employees Union*, there is a "mismatch" in remedy in this case. *Id.* at 790. Plaintiffs seek declaratory relief that timber targets violate NEPA and ask the Court to enjoin timber projects in Regions 8 and 9 that they allege fulfill those targets. But those timber projects are "*other* agency actions" separately authorized pursuant to the Forest Service's authority to cut trees. *Id.* at 790. And aside from the three projects challenged in Count 4, Plaintiffs have not challenged any other project that allegedly "fulfills" targets. As in *National Treasury Employees Union*, "the APA does not allow [courts] to leverage [their] review from one discrete action to another." *Id.* Thus, the Court cannot enjoin projects not challenged in this case.

Nor can this Court order broad, programmatic reforms such as requiring a programmatic EIS for timber targets. *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006). As the D.C. Circuit has made clear, its "equitable powers, limited at one end of the spectrum to the court's inability to order broad, programmatic reforms, are also limited in the opposite direction by an inability to require the agency to follow a detailed plan of action." *Id.* (citing *Cobell v. Norton*, 240 F.3d 1081, 1099 (D.C. Cir. 2001)). The Court "must allow [the agency] to exercise its discretion

38

and utilize its expertise in complying with broad statutory mandates." *Id.* Accordingly, should the Court find any legal error in the setting of national, regional, or unit timber targets, the Court cannot order the Forest Service to conduct a programmatic NEPA review of its timber program.

### B. Projects

As explained above, the Forest Service complied with NEPA in approving the Projects, and the Court should grant summary judgment in Federal Defendants' favor on Count 4. If the Court nevertheless rules in favor of Plaintiffs, a remand would be futile because the Forest Service would not be required to analyze cumulative impacts in the manner that Plaintiffs suggest. The only purported deficiency Plaintiffs allege is the Projects' cumulative impacts analyses. *See* Dkt. No. 38-1 at 50. Federal Defendants agree that at the time the projects were developed and authorized, the Council on Environmental Quality's ("CEQ") regulations required the Forest Service to consider whether the Projects were "related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7); *see also* Dkt. No. 38-1 at 50. But as of April 2025, "all iterations of [CEQ's] NEPA implementing regulations" have been rescinded. *Removal of National Environmental Policy Act Implementing Regulations*, 90 Fed. Reg. 10,610-01 (Feb. 25, 2025). CEQ concluded that it "may lack authority to issue binding rules on agencies[.]" , *Id.* at 10,611. Similarly, the Forest Service's NEPA regulations were rescinded and replaced by USDA's revised interim department-level NEPA regulations, which do not require a cumulative effects analysis. 90 Fed. Reg. 29,632-74 (July 3, 2025). And NEPA itself does not mandate a special look at cumulative impacts. Thus, a finding that the Projects' cumulative impacts analyses were somehow deficient would not inform future Forest Service decision-making.

For that same reason, the Court should not vacate the Projects' decision notices. "Even if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might

39

disapprove the project if it added more to the [NEPA analysis]." *Seven Cnty.*, 605 U.S. at 185. As explained, there would be no further analysis required that could produce a different outcome than the one reached by the Forest Service, especially in light of the plethora of information about each Projects' individual carbon footprint. Plaintiffs fail to provide any evidence otherwise.

## CONCLUSION

Plaintiffs have not met their burden of proving this Court has jurisdiction to review the national, regional, or unit timber targets, nor have they established that timber targets are review-able under the APA. Further, Federal Defendants complied with NEPA in authorizing the Forest Health Initiative, Buck, and White Pine Management Projects by considering the reasonably fore-seeable climate impacts. Accordingly, the Court should grant summary judgment in favor of Federal Defendants on all Counts.

Respectfully submitted this 9th day of January, 2026.

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

*/s/ Reade E. Wilson*
Reade E. Wilson
(ME Bar No. 4992)
Krystal-Rose Perez
(TX Bar No. 24105931)
Trial Attorneys
Natural Resources Section
150 M Street NE
Washington, DC 20002
(202) 598-3546 (Wilson)
(202) 532-3266 (Perez)
reade.wilson@usdoj.gov
krystal-rose.perez@usdoj.gov

*Attorneys for Federal Defendants*

40