**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CHATTOOGA CONSERVANCY,       )
MOUNTAINTRUE, and DEBBIE     )
KRUZEN,                      )
                             )
          Plaintiffs,       )
                             )
    v.                       )
                             )       Case No. 1:24-CV-00518-TJK
THE UNITED STATES DEPARTMENT )
OF AGRICULTURE, SECRETARY    )       **PLAINTIFFS' COMBINED RESPONSE**
BROOKE ROLLINS, THE UNITED   )       **IN OPPOSITION TO DEFENDANTS'**
STATES FOREST SERVICE, CHIEF TOM )   **MOTION FOR SUMMARY JUDGMENT**
SCHULTZ, REGIONAL FORESTER    )      **AND REPLY IN SUPPORT OF**
KENDERICK ARNEY, REGIONAL     )      **PLAINTIFFS' MOTION FOR**
FORESTER ANTOINE DIXON,       )      **SUMMARY JUDGMENT**
DISTRICT RANGER ROBERT SITZLAR, )
DISTRICT RANGER JAMES         )
BROWNING, and FOREST SUPERVISOR )
VINCI KEELER,                 )
                             )
          Defendants.       )
_____  )

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 1

I.    Forest Advocates have standing to challenge timber targets. ................................... 2

   a.    Forest Advocates have satisfied causation standards.......................................... 2

   b.    Forest Advocates have satisfied redressability standards. ................................... 6

II.   Forest Advocates' claims are not moot. .................................................................. 10

III.  The challenged timber targets are final agency actions. ......................................... 13

   a.    Timber targets are "agency actions" under the APA.......................................... 14

   b.    Timber targets are "final" agency actions.......................................................... 16

IV.   Defendants must conduct NEPA review of their timber targets. ........................... 18

V.    Defendants' project-level cumulative-effects analyses violate NEPA................... 21

CONCLUSION................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*Advanced Mgmt. Tech. v. F.A.A.*,
211 F.3d 633 (D.C. Cir. 2000) ...............................................................................6

*American Forest Resource Council v. United States*,
77 F.4th 787 (D.C. Cir. 2023) ...............................................................................15

*Atchison, T. & S. F. Ry. Co. v. Callaway*,
431 F. Supp. 722 (D.D.C. 1977) .............................................................................8

\*    *Bennett v. Spear*,
520 U.S. 154 (1997) ...........................................................................4, 13, 17, 18

*Cal. Cmtys. Against Toxics v. Env't Prot. Agency*,
934 F.3d 627 (D.C. Cir. 2019) .........................................................................17, 18

*Chafin v. Chafin*,
568 U.S. 165 (2013) ..............................................................................................10

*Clinch Coalition v. U.S. Forest Serv.*,
2025 WL 3473302 (W.D. Va. Dec. 3, 2025) ..........................................................4

*Ctr. for Biological Diversity v. Env't Prot. Agency*,
861 F.3d 174 (D.C. Cir. 2017) .............................................................................7, 8

\*    *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
144 F.4th 296 (D.C. Cir. 2025) ...................................................................2, 3, 5, 6

*Ctr. for Biological Diversity v. Zinke*,
260 F. Supp. 3d 11 (D.D.C. 2017) ...............................................................3, 6, 21

*Daimler Trucks N. Am. LLC v. Env't Prot. Agency*,
745 F.3d 1212 (D.C. Cir. 2013) ............................................................................10

*Fla. Audubon Soc. v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996) ...............................................................................3, 5

*Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*,
397 F. Supp. 2d 1241 (D. Mont. 2005) ..................................................................20

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
460 F.3d 13 (D.C. Cir. 2006) .............................................................................10, 15

*Grand Canyon Tr. v. F.A.A.*,
290 F.3d 339 (D.C. Cir. 2002) ..............................................................................25

*H.R. v. D.C.*,
  2024 WL 3580663 (D.D.C. July 30, 2024) (Kelly, J.) ..........................................................11

*Healthy Gulf v. FERC*,
  107 F.4th 1033 (D.C. Cir. 2024).....................................................................................23, 24

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976)...............................................................................................13, 19, 20

*Maldonado v. D.C.*,
  61 F.4th 1004 (D.C. Cir. 2023)...........................................................................................10, 13

*McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud. Conf.*
  *of U.S.*,
  264 F.3d 52 (D.C. Cir. 2001) ...............................................................................................13

*McDowell v. Schlesinger*,
  404 F. Supp. 221 (W.D. Mo. 1975) .....................................................................................21

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)...............................................................................................................24

* *Narragansett Indian Tribal Historic Pres. Off. v. FERC*,
  949 F.3d 8 (D.C. Cir. 2020) ........................................................................................2, 6, 7

*Nat. Res. Def. Council, Inc. v. Callaway*,
  524 F.2d 79 (2d Cir. 1975)..................................................................................................13

*Nat. Res. Def. Council, Inc. v. Hodel*,
  865 F.2d 288 (D.C. Cir. 1988) ............................................................................................24

*Nat'l Treasury Emps. Union v. Vought*,
  2025 WL 3659406 (D.C. Cir. Dec. 17, 2025)........................................................................9

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
  2004 WL 1592606 (D. Or. July 15, 2004)...........................................................................21

*Or. Wild v. U.S. Forest Serv.*,
  2026 WL 96908 (D. Or. Jan. 13, 2026) ..........................................................................24, 25

*PDK Labs Inc. v. Ashcroft*,
  338 F. Supp. 2d 1 (D.D.C. 2004) ........................................................................................14

*Recent Past Pres. Network v. Latschar*,
  701 F. Supp. 2d 49 (D.D.C. 2010)......................................................................................20

*Reed v. Salazar*,
  744 F. Supp. 2d 98 (D.D.C. 2010) ........................................................................................8

*Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*,
481 F.2d 1079 (D.C. Cir. 1973) ..................................................................................13

*Seven County Infrastructure Coalition v. Eagle County*,
605 U.S. 168 (2025) ...........................................................................................22, 23, 24

*Sierra Club v. FERC*,
827 F.3d 59 (D.C. Cir. 2016) .......................................................................................6

*Sierra Club v. Van Antwerp*,
719 F. Supp. 2d 77 (D.D.C. 2010) ...............................................................................9

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) .......................................................................................................9

*Theodore Roosevelt Conservation P'ship v. Salazar*,
744 F. Supp. 2d 151 (D.D.C. 2010), *aff'd*, 661 F.3d 66 (D.C. Cir. 2011) ...............10

*TOMAC, Taxpayers of Michigan Against Casinos v. Norton*,
433 F.3d 852 (D.C. Cir. 2006) ...................................................................................23

*Uzuegbunam v. Preczewski*,
592 U.S. 279 (2021) .....................................................................................................9

*Western Organization of Resource Councils v. Zinke*,
892 F.3d 1234 (D.C. Cir. 2018) ..............................................................................7, 21

*WildEarth Guardians v. Jewell*,
738 F.3d 298 (D.C. Cir. 2013) .....................................................................................2

\* *WildEarth Guardians v. Zinke*,
368 F. Supp. 3d 41 (D.D.C. 2019) .........................................................................22, 25

*Wyoming Outdoor Coordinating Council v. Butz*,
484 F.2d 1244 (10th Cir. 1973) .................................................................................21

**Statutes**

5 U.S.C. § 551(4) .........................................................................................................14

5 U.S.C. § 551(13) .......................................................................................................14

5 U.S.C. § 706(1) ............................................................................................18, 20, 21

5 U.S.C. § 706(2) .........................................................................................................20

16 U.S.C. § 531 .............................................................................................................5

42 U.S.C. § 4332(2)(C) ................................................................................................18

42 U.S.C. § 4336(b)(1) ...............................................................................................................21

42 U.S.C. § 4336e(12) ...............................................................................................................18

Pub. L. No. 119-21 § 50301(a)(2)(A) ........................................................................................12

**INTRODUCTION**

The Court should grant Plaintiffs' ("Forest Advocates'") motion for summary judgment and deny Defendants' cross-motion. In their cross-motion, Defendants rely (extensively) on a case they admit was vacated, recycle already-rejected legal arguments, and mischaracterize key cases and binding legal standards. Critically, Defendants do not dispute the core facts provided in Forest Advocates' memorandum and accompanying declarations. Applying those facts to the correct legal standards confirms Forest Advocates' claims.

At bottom, Defendants maintain that they have no obligation under the National Environmental Policy Act ("NEPA") to consider the aggregate carbon effects of their logging projects—at *any* level of decision-making. Not when the Department of Agriculture sets a mandatory national timber target; not when Forest Service leadership develops binding regional and unit-specific targets to meet the national target; and not when Forest Service line-officers design logging projects to fulfill those targets. In Defendants' opinion, the public must forever remain in the dark regarding how Forest Service logging projects on public lands collectively contribute to climate change. Because that opinion flies in the face of NEPA's text and binding precedent, this Court should grant summary judgment to Forest Advocates.

**ARGUMENT**

The Court should grant Forest Advocates' motion for summary judgment because: (1) Forest Advocates have standing to bring their claims; (2) this dispute is not moot; (3) the challenged timber targets are final agency actions under the Administrative Procedure Act ("APA"); (4) timber targets require compliance with NEPA; and (5) Defendants' NEPA analyses for the Buck, Forest Health Initiative, and White Pine Management projects (the "Projects") completely ignored cumulative carbon effects.

1

## I.    Forest Advocates have standing to challenge timber targets.

To establish standing in a procedural-rights case,[1] a plaintiff must show that it has (1) suffered an injury in fact, (2) that is fairly traceable to the challenged action, and (3) that the plaintiff's concrete interests *could* be better protected if the defendant followed the correct procedure. *See Narragansett Indian Tribal Historic Pres. Off. v. FERC*, 949 F.3d 8, 12–13 (D.C. Cir. 2020). Defendants do not challenge Forest Advocates' injuries in fact.[2] And they acknowledge the possibility that completing NEPA analysis could lead the Forest Service to reevaluate its timber targets and the challenged projects implementing those targets, which could redress Forest Advocates' injuries. *See* ECF No. 40 at 15–16.

Nevertheless, Defendants argue Forest Advocates have not satisfied causation and redressability requirements. *See id.* at 11–12. Their arguments suffer from the same overarching flaw: an attempt to force Forest Advocates to show that their injuries would absolutely be redressed through NEPA compliance. It is unclear how any plaintiff could make that showing when "NEPA requires no particular outcome." *Id.* at 8. Consequently, it is not required by the controlling standards which Forest Advocates readily satisfy.

a.    Forest Advocates have satisfied causation standards.

In procedural-rights cases, a plaintiff must show two links to establish causation: "one connecting the omitted procedural step to some substantive government decision that may have been wrongly decided because of the lack of [compliance with] that procedural requirement and

---

[1] An "agency's failure to prepare (or adequately prepare) an [Environmental Impact Statement] before taking action with adverse environmental consequences" is "the archetypal procedural injury." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013) (cleaned up).
[2] Or any element of standing related to the Projects.

2

one connecting that substantive decision to the plaintiff's particularized injury." *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 304 (D.C. Cir. 2025).

Defendants never directly apply this standard and instead attempt to rewrite it by collapsing the two links into a single inquiry, asking whether "the absence of NEPA climate analysis . . . for timber targets"—i.e., the "omitted procedural step"—"caused . . . [Forest Advocates'] injuries." ECF No. 40 at 11. The Court should reject this rewrite which is built on legal mischaracterization. Applying the controlling two-link standard, instead, exposes the flaws in Defendants' arguments.

The core of Defendants' error relates most closely to the second link in the two-link standard so we address that first. As noted above, Defendants argue that Forest Advocates must show that the source of their injuries is the "absence of NEPA climate analysis." *See* ECF No. 40 at 11–12 (arguing Forest Advocates must show a "substantial probability that the absence of NEPA climate analysis . . . caused a demonstrable risk to their . . . interests" (cleaned up)). That is backwards. As the D.C. Circuit explained in *Center for Biological Diversity*, plaintiffs in procedural-rights cases must show "a substantial probability that the *substantive* agency action,"—here, the promulgation of timber targets, not the *procedural* NEPA failure—created a "demonstrable risk" to the plaintiff's particularized interests. 144 F.4th at 304 (emphasis added). "In other words," to "prove causation, a plaintiff seeking the preparation of [a NEPA document] must demonstrate that the particularized injury that the plaintiff is suffering or is likely to suffer is fairly traceable to the *agency action* that implicated the need for [the NEPA document]." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 669 (D.C. Cir. 1996) (emphasis added).[3] Here, Forest

---

[3] *Florida Audubon Society* explained this standard as a correction to "incomplete" causation analyses in past cases which wrongly viewed the "key injury [as] the omission of the [NEPA document], not whether the [substantive agency decision] will in fact injure the plaintiffs'

Advocates have explained that their injuries flow from Defendants' decisions to set and implement mandatory timber targets in places where Forest Advocates have particularized interests—specifically, in areas impacted by the Projects. *See* ECF No. 38-1 at 10–13, 21–22.

Trying a different tack, Defendants argue Forest Advocates' declarations are too "speculative" and "attenuated" to connect timber targets to project outcomes at link two. ECF No. 40 at 13. To the contrary, Forest Advocates have shown that: (1) in general, the Forest Service designs projects to meet timber targets, *see* ECF No. 38-1 at 10–11 (citing AR021217); and (2) Forest Advocates have concrete and particularized interests in at least the three challenged Projects that were specifically designed to accomplish targets, *see, e.g.*, AR019890; AR019850; AR020024; AR020035–40; ECF No. 38-1 at 11–13 (providing additional citations). Defendants have no answer for these record citations.

Taking another swing at the second link, Defendants argue that the Projects are the actions that directly harm Forest Advocates, not the timber targets. ECF No. 40 at 13. This misunderstands the causation requirement. To be "fairly traceable," the challenged action does not have to be "the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997). And as Forest Advocates have explained, the Forest Service designs logging projects *to meet* timber targets. ECF No. 38-1 at 10–11. So, while the Projects may be the ultimate source of Forest Advocates' injuries, those injuries are traceable to the targets themselves.

Finally, Defendants' citation to *Clinch Coalition v. U.S. Forest Serv.*, 2025 WL 3473302 (W.D. Va. Dec. 3, 2025), does not help their second-link argument. That out-of-circuit case found plaintiffs lacked standing because "they fail[ed] to tie the contested [categorical exclusions] to

---

particularized interest." 94 F.3d at 668. Ironically, Defendants use this quote to argue that the "absence of NEPA climate analysis" is the key injury—exactly what *Florida Audubon Society* rejected.

any site-specific application that would affect their interests." *Id.* at \*3. Here, by contrast, Forest Advocates have tied the contested timber targets to site-specific projects which indisputably affect their interests. *See supra*. That is enough to satisfy the second link.

Turning to the first link, Defendants argue Forest Advocates must show that the omitted procedural step "caused the timber targets to be 'wrongly decided.'" ECF No. 40 at 11–12. This is simply wrong. The very case Defendants cite for this proposition holds that a plaintiff need only show an agency action "*may have been wrongly decided*" due to a procedural failure. *Ctr. for Biological Diversity*, 144 F.4th at 304 (emphasis added); *see also Fla. Audubon Soc'y*, 94 F.3d at 668. Defendants conspicuously omit "may have been" from their brief. Forest Advocates have shown that Defendants may have made different timber target decisions had they complied with NEPA, which is all that is required. *See* ECF No. 38-1 at 20–22.

Defendants' only response is to assert that "it is highly unlikely that NEPA climate analysis of the Forest Service's timber targets would cause the agency to forego its statutory obligation to produce a 'high-level' of timber." ECF No. 40 at 13. This non sequitur raises a redressability issue—whether NEPA analysis could change the substantive agency decision (addressed below)—but it should be rejected out of hand either way. Defendants' only support for this statement is 16 U.S.C. § 531 which defines "sustained yield" as the achievement in perpetuity of a "high-level annual or regular periodic output of the various renewable resources"—not a "high-level of timber," ECF No. 40 at 12–13. Moreover, Defendants have repeatedly argued that timber targets are "subject to change at the agency's discretion." ECF No. 22-1 at 1. Indeed, the Forest Service has demonstrated for decades that it can—and does—adjust its timber targets annually, including by millions of board feet nationally. *See*, *e.g.*, ECF No. 38-1 at 8 (disclosing national timber targets). Defendants cannot plausibly argue that adjusting timber

targets "cause[s] the agency to forego its statutory obligations." ECF No. 40 at 13. Forest Advocates have demonstrated causation by satisfying the two-link standard.

> b.  Forest Advocates have satisfied redressability standards.

Like causation, Defendants attempt to subject Forest Advocates to heightened, incorrect redressability standards. Those efforts should be rejected. In any event, Defendants' own analysis explains how Forest Advocates' injuries could be redressed.

Defendants get off on the wrong foot by asserting that Forest Advocates must show a favorable decision is "likely" to redress their injuries. ECF No. 40 at 14 (citing *Ctr. for Biological Diversity*, 144 F.4th at 314).[4] That may be true in cases involving *substantive* environmental claims. But in "*procedural*-rights cases" like this one, "courts relax the normal standards of redressability." *Sierra Club v. FERC*, 827 F.3d 59, 65 (D.C. Cir. 2016) (emphasis added). The "relaxed redressability requirement is met when correcting the alleged procedural violation *could* still change the substantive outcome in the petitioner's favor; the petitioner need not go further and show that it *would* effect such a change." *See Narragansett*, 949 F.3d at 13. Forest Advocates have made this showing. *See* ECF No. 38-1 at 21.

Defendants next argue the Court cannot provide "prospective relief" for injuries caused by "expired timber targets" because, for "a court to order additional NEPA review, there must be a pending decision remaining." ECF No. 40 at 15.[5] This argument suffers from two key errors.

---

[4] Defendants suggest that *Center for Biological Diversity* adopts the "likely" standard for procedural-rights cases. *See* ECF No. 40 at 14, 15. To the contrary, that case confirms that "[f]or redressability of a procedural injury, a plaintiff need not show that compliance with the procedure would alter the final agency decision, but only that the agency could reach a different conclusion if ordered to revisit its procedural error." 144 F.4th at 304 (cleaned up).

[5] To the extent Defendants' argument turns on the "expiration" of timber targets, this is a mootness issue which Defendants themselves recognize. *See* ECF No. 40 at 17 (arguing Forest Advocates' claims with respect to "expired fiscal year timber targets" are moot). Redressability

First, it is incorrect that there must be a "pending decision remaining" to redress a NEPA violation. As Defendants acknowledge, courts routinely vacate challenged decisions so an agency can "conduct further [NEPA] analysis before *reissuing* its decision"—not prior to a "pending" decision. *Id*. (emphasis added). Undoubtedly, Defendants would argue Forest Advocates' claims were unripe if they challenged "pending" timber targets that had not been finalized. Defendants' reliance on *Western Organization of Resource Councils v. Zinke*, 892 F.3d 1234 (D.C. Cir. 2018) is also misplaced. That case considered whether sufficient "major federal action" remained to require supplementation of an existing NEPA analysis under a now-rescinded regulation, not agency compliance with NEPA in the first instance. *Id*. at 1241.

Second, and more importantly, Defendants defeat their own argument by explaining at least one way the Court *could* grant effective relief: "remand for NEPA review could cause the Forest Service to (1) re-evaluate past fiscal year timber targets; (2) re-evaluate previously authorized timber projects allegedly designed to meet those targets: (3) re-evaluate timber sales it already issued [but has not implemented] pursuant to those projects . . . ; and (4) terminate [or change] on-going contracts such that Plaintiffs' prospective recreational and aesthetic injuries are ameliorated." ECF No. 40 at 15–16.[6] Defendants argue this outcome is "speculative," instead of "likely." *Id*. at 15. But again, Forest Advocates' burden is only to show that "correcting the alleged procedural violation *could* still change the substantive outcome in [their] favor." *Narragansett*, 949 F.3d at 13; *Ctr. for Biological Diversity v. Env't Prot. Agency*, 861 F.3d 174, 185 (D.C. Cir. 2017) (finding redressability satisfied where "there remains at least the possibility

---

"is assessed at the time the action commences." *Advanced Mgmt. Tech. v. F.A.A.*, 211 F.3d 633, 636 (D.C. Cir. 2000) (cleaned up).

[6] Notably, if the Court grants Forest Advocates' requested relief, the Projects would be enjoined pending this "NEPA review." *See* ECF No. 18 at 66.

7

that [the defendant agency] could reach a different conclusion"). Moreover, it makes little sense to allow Defendants to defeat redressability in a case like this, where redressability is entirely within Defendants' control, simply by stating that they are not "likely" to grant Forest Advocates' relief. *See Ctr. for Biological Diversity*, 861 F.3d at 185 (finding relaxed redressability standard met even when defendant asserted a "serious possibility" its substantive decision would not change). Because Defendants' own arguments confirm that Forest Advocates' claims are redressable, remand would not be "idle and useless." ECF No. 40 at 16.

Finally, Defendants argue that "an order declaring a NEPA violation without corresponding injunctive relief cannot satisfy the redressability requirements of standing." *Id.* Even if that were accurate (it is not),[7] it is beside the point because Forest Advocates *have* requested injunctive relief for projects implementing the challenged timber targets "until [Defendants] have complied with [NEPA]." ECF No. 18 at 66. Defendants' *own brief* admits that "Plaintiffs seek declaratory relief that timber targets violate NEPA and ask the Court to enjoin timber projects in Regions 8 and 9 that they allege fulfill those targets" including "the three projects challenged in Count 4." ECF No. 40 at 38.[8] Forest Advocates' requested declaratory and injunctive relief would redress their injuries at least partially, which is all that is required for

---

[7] *See Atchison, T. & S. F. Ry. Co. v. Callaway*, 431 F. Supp. 722, 730 (D.D.C. 1977) ("[T]his Circuit has at least twice affirmed that declaratory relief alone is sufficient to enforce NEPA's [Environmental Impact Statement] requirement."); *Reed v. Salazar*, 744 F. Supp. 2d 98, 120 (D.D.C. 2010) (finding plaintiffs' NEPA claims redressed through declaratory relief without injunctive relief).

[8] Defendants argue that "aside from" the Projects, the "Court does not have jurisdiction to enjoin unidentified timber projects" in Forest Service Regions 8 and 9. ECF No. 40 at 16–17. This is presumably in reference to Forest Advocates' request to enjoin "Defendants from offering additional timber volume for sale to fulfill their Region 8 [and] Region 9 . . . timber targets for fiscal year 2024." ECF No. 18 at 66. Forest Advocates acknowledge this relief is no longer available because timber can no longer be *sold* to satisfy fiscal year 2024 targets. Regardless, Forest Advocates' claims are redressable without this specific relief.

standing. *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) ("[T]he ability to effectuate a partial remedy satisfies the redressability requirement." (cleaned up)).[9]

None of Defendants' cited cases compel a different result. *Ali v. Rumsfeld* says nothing about redressability; it found that plaintiffs had "not alleged a cognizable cause of action and therefore ha[d] no basis upon which to seek declaratory relief." 649 F.3d 762, 778 (D.C. Cir. 2011). *Juliana v. United States* was not a procedural-rights case; it concluded plaintiffs' claims were not redressable because "order[ing] . . . the government to develop a plan to 'phase out fossil fuel emissions and draw down excess atmospheric [carbon dioxide]," was "beyond the power of an Article III court." 947 F.3d 1159, 1164–65, 1171 (9th Cir. 2020). The plaintiff in *Steel Co. v. Citizens for a Better Environment*, sought "not remediation of its own injury . . . but vindication of the rule of law," which was insufficient to sustain standing. 523 U.S. 83, 106 (1998). Forest Advocates' demonstration of standing suffers from none of these flaws.

Elsewhere, Defendants cite *National Treasury Employees Union v. Vought* to argue there is a "mismatch" between Forest Advocates' requested remedy and those available to the Court which prevents the Court from granting relief on the timber targets claims. ECF No. 40 at 38. As Defendants were aware, ECF No. 40 at 9, that decision *has been vacated* and has no application. *See Nat'l Treasury Emps. Union v. Vought*, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025) (setting rehearing en banc for February 24, 2026). Even so, Defendants' core argument under *Vought* is

---

[9] As part of this argument, Defendants imply that vacatur is unavailable. "[B]oth the Supreme Court and the D.C. Circuit Court have held that remand, along with vacatur, is the presumptively appropriate remedy for a violation of the APA." *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 78 (D.D.C. 2010). To the extent this argument is an attack on Forest Advocates' pleading under Fed. R. Civ. P. 8, they have plainly alleged that Defendants' timber target decisions violate the APA, ECF No. 18 ¶¶ 251, 259, 267, and must be "set aside," *id.* ¶ 76 (quoting 5 U.S.C. § 706(2)). Defendants are on notice of this argument, addressing vacatur multiple times in their brief. *See* ECF No. 40 at 15 (explaining that a "court will ordinarily vacate or remand" agency decisions under the APA), *id.* at 39 (arguing the Court "should not vacate the Project[s]").

that this Court "cannot enjoin projects not challenged in this case," while implicitly conceding that "the three projects challenged in Count 4" could be enjoined if the "timber targets violate NEPA." ECF No. 40 at 38. Thus, there is indeed a judicial remedy the Court can award for the timber targets claims—at minimum, it can declare a NEPA violation and enjoin the Projects.

## II.     Forest Advocates' claims are not moot.

Defendants also assert that Forest Advocates' claims are moot. As the party asserting mootness, Defendants face a "heavy burden" to show that it is "*impossible* for a court to grant any effectual relief." *Maldonado v. D.C.*, 61 F.4th 1004, 1006 (D.C. Cir. 2023) (citation omitted). Defendants do not come close to meeting this heavy burden.

Start with the timber target claims. For the reasons described above, this Court can provide meaningful relief by declaring Defendants' promulgation of timber targets in violation of NEPA and enjoining the remaining portions of the Projects which implement those targets pending NEPA compliance. As noted above, Defendants concede this relief is available. ECF No. 40 at 15. "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (citation omitted).

Defendants cite three cases to argue that "[c]ourts in this Circuit have found claims moot where the challenged action has expired." ECF No. 40 at 17. But in each of those cases, activities were no longer being implemented under the expired approvals. *See Daimler Trucks N. Am. LLC v. Env't Prot. Agency*, 745 F.3d 1212, 1213 (D.C. Cir. 2013) (finding challenge to agency action moot when it no longer had any "effect whatsoever"); *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 n.6 (D.C. Cir. 2006) (finding challenge to expired memorandum moot where there was "no evidence of [its] continued implementation"); *Theodore Roosevelt Conservation P'ship v. Salazar*, 744 F. Supp. 2d 151, 164–65 (D.D.C. 2010) (finding moot

10

challenge to action that "cease[d] to have any effect"), *aff'd*, 661 F.3d 66 (D.C. Cir. 2011). Here, timber projects which implement the expired timber targets are still happening on the ground in specific places where Forest Advocates have particularized interests. *See, e.g.*, ECF No. 38-24 ¶ 18 (noting logging for the White Pine Management project "will continue for several more years"). To be sure, timber must be "*sold* in a given fiscal year [to] count[] toward that year's target," ECF No. 40 at 15 (emphasis added), but it is often not *cut* for years after it is sold. Because portions of the Projects that were sold to satisfy prior timber targets have not been cut, Forest Advocates' claims are not moot.

Even if Forest Advocates' timber targets claims were moot, they qualify for an exception to the mootness doctrine as capable of repetition yet evading review. "That exception applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *H.R. v. D.C.*, 2024 WL 3580663, at *5 (D.D.C. July 30, 2024) (Kelly, J.). This Court has previously found an agency order that, like timber targets, only applied for one year to be "too short [in duration] to be fully litigated prior to its . . . expiration." *Id.* (cleaned up). It is also reasonable to expect Forest Advocates to be subject to actions implementing future year timber targets which the agency acknowledges it will continue to use at least for fiscal years 2026 through 2034. *See* ECF No. 40 at 18.

Defendants argue this exception is unavailable because "Congress, not the Forest Service, set the annual timber targets for fiscal years 2026 through 2034," thereby converting timber targets into nonreviewable congressional action and removing all agency discretion regarding target levels. *Id.* In support, Defendants point to legislation stating that for "fiscal years 2026 through 2034, the Secretary shall sell timber annually on National Forest System land in a total

11

quantity that is not less than 250,000,000 board-feet greater than the quantity . . . sold in the previous fiscal year." *Id*. (citing Pub. L. No. 119-21 § 50301(a)(2)(A)).

As an initial matter, this language—which applies to the "total quantity" from the "National Forest System," i.e., the national timber target—says nothing about regional and unit-specific timber targets and is therefore incapable of "setting" them. Defendants provide no support for their (implied) contention that regional and unit-specific target setting will cease. *See also* AR021230–35 (providing information on planning processes through 2028 that involve "establish[ing] target assignments" among other things).

Neither does the language convert the national timber target into congressional action or remove all agency discretion. The cited language sets a floor, requiring the Department of Agriculture to sell "not less" than 250,000,000 board-feet greater than the quantity sold the previous fiscal year. Pub. L. No. 119-21 § 50301(a)(2)(A). Defendants retain discretion to set a national timber target in excess of that amount. This would be closer to "congressional action" if Congress had set specific volumetric timber targets and instructed Defendants to hit them. Congress didn't. Instead, it set a minimum year-to-year increase and left it to Defendants to determine the appropriate target from there. To be sure, this is an additional input into Defendants' calculation of the national timber target but it does not eliminate the agency's discretion and convert the national timber target from final agency action to congressional action.

Moving on to the project-specific claims, Defendants assert that intervening events now make it impossible for this Court to "redress" Forest Advocates' project-level cumulative-effects claims. Specifically, Defendants claim that the recission of several NEPA regulations now means

the Forest Service is no longer obligated to consider cumulative effects during NEPA review.[10] That is incorrect. While the *regulations* requiring a cumulative-effects analysis are gone, the *NEPA statute itself* was interpreted to require a cumulative-effects analysis before those regulations even existed. *See, e.g.*, *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976) (")[P]roposals . . . that will have cumulative or synergistic environmental impact . . . must be considered together."); *Nat. Res. Def. Council, Inc. v. Callaway*, 524 F.2d 79, 89 (2d Cir. 1975) (holding that projects that "can be expected to produce a cumulative environmental impact . . . must be evaluated as a whole"); *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1087–88 (D.C. Cir. 1973) (holding that NEPA itself "ensures consideration of cumulative impacts that might be slighted in a case-by-case analysis"). Therefore, this Court can still afford meaningful relief to Forest Advocates by remanding for further NEPA study of the Projects.

## III.    The challenged timber targets are final agency actions.

For the many reasons explained in Forest Advocates' opening brief, the administrative record shows that the challenged timber targets are "final agency actions" under the APA. *See* ECF No. 38-1 at 22–37. Specifically, the timber targets are (1) cognizable "agency actions" under the APA and (2) "final" because they (a) "mark the consummation of the agency's decisionmaking process" and (b) impose "obligations" or "legal consequences." *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Defendants do not contest Forest Advocates' scores of citations to the record demonstrating that the timber targets constitute "final agency actions."

---

[10] Though Defendants confusingly frame this as a "remedy" issue, ECF No. 40 at 37, Defendants are essentially arguing that an intervening change of law now makes it impossible for this Court to redress Forest Advocates' Project-level injuries. That is a quintessential mootness issue, *see McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud. Conf. of U.S.*, 264 F.3d 52, 55 (D.C. Cir. 2001) ("If events outrun the controversy such that the court can grant no meaningful relief, the case must be dismissed as moot."), and Defendants fail to carry their "heavy burden," *Maldonado*, 61 F.4th at 1006.

Instead, Defendants resort to a series of legal mischaracterizations, appeals to vacated opinions, and recycled case law arguments that this Court already rejected. This Court should reject them again.

       a.   <u>Timber targets are "agency actions" under the APA.</u>

Defendants repeatedly deny that timber targets are cognizable "agency actions," specifically that they are "rules."[11] Yet while Defendants contest this overarching conclusion, they do not contest the underlying facts. For example, Defendants do not contest that, as a factual matter, timber targets are statements of general and particular applicability. *See* ECF No. 40 at 21–24; ECF No. 38-1 at 23–24. Similarly, Defendants deny that timber targets have any "future effect" on agency activities, but do not contest Forest Advocates' dozens of record citations to the contrary. *See* ECF No. 38-1 at 23–24, 30–31, 33–36. In fact, Defendants effectively admit that Forest Service staff "treat targets as *required* internal benchmarks" that can influence subsequent decisions. ECF No. 40 at 27 (emphasis added). Finally, Defendants confirm that timber targets are "designed to implement, interpret, or prescribe law or policy," including the Forest Service's supposed "statutory mandate to produce a continuous and high-level supply of timber each year." *Id.* at 25. Thus, Defendants do not truly contest that timber targets, on this record, facially meet the definition of a "rule" or the "equivalent thereof." 5 U.S.C. § 551(13). Instead, Defendants rehash legal arguments this Court has already refused.[12]

---

[11] A rule is defined as "the whole or a part of [1] an agency statement of general or particular applicability and [2] future effect [3] designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4).

[12] On this basis alone, the Court should reject their arguments. *See PDK Labs Inc. v. Ashcroft*, 338 F. Supp. 2d 1, 7 (D.D.C. 2004) ("[A] summary judgment motion "may not be made on the same grounds and with the same showing that led to the denial of a previous motion to dismiss." (quoting 10A Wright & Miller's Federal Practice & Procedure § 2713 (2d. ed. 1998))).

First, Defendants reprise their argument that timber targets are not "agency actions" under *American Forest Resource Council v. United States*, 77 F.4th 787 (D.C. Cir. 2023). This Court already rejected that comparison, *see* Tr. 10:25–12:6, and Defendants offer no new evidence to support their recycled argument, *see* ECF No. 40 at 19–21 (citing the record zero times). The administrative record further confirms that *American Forest* is inapposite. Importantly, unlike the nonbinding "Allowable Sale Quantity" at issue in that case, *see* 77 F.4th 791–92 (noting the Allowable Sale Quantity was "neither a minimum level that must be met nor a maximum level that cannot be exceeded," only "an approximation"), timber targets are discrete and "mandated" benchmarks, ECF No. 38–13 at 1, that Forest Service staff say they are "force[d]" to achieve, AR017322, AR017628. Defendants have no answer for these distinctions.

Second, Defendants restate their legal argument that timber targets are not "agency actions" because they are a "budget request" akin to that described in *Fund for Animals v. U.S. Bureau of Land Management*, 460 F.3d 13 (D.C. Cir. 2006). Again, this Court already rejected this comparison, *see* Tr. 14:18–17:10, and Defendants offer no new record evidence to support their recycled argument. To show that targets are equivalent to a budget request, Defendants again point to the agency's Fiscal Year 2024 Budget Justification, ECF No. 40 at 25 (citing AR017013–16), the same approach they took in their motion to dismiss, *see* ECF No. 22-2. At the cited pages, the agency reports the fiscal year 2023 and 2024 national targets.[13] AR017014. But as this Court already held, *Fund for Animals* did not find that mentioning something in a budget document makes it categorically "unreviewable." Tr. 15:15–18. And here, the record is

---

[13] Forest Advocates have repeatedly pointed out that the agency's budget justifications say nothing about regional and unit-specific targets. ECF No. 25 at 17–18; ECF No. 38-1 at 26 n.13. As they have before, Defendants ignore this nuance and focus exclusively on the national target. ECF No. 40 at 25.

clear that timber targets are set *outside* of the budget process. *See, e.g.*, ECF No. 38-1 at 6–8, 26–27 (explaining that the agency sets its targets *then* requests appropriations to fulfill them) (citing AR020970, AR018726, AR020972, AR021196, AR018478, AR018146, and AR017913, among others). Defendants' failure to contest this point with any relevant record citations of their own forfeits the argument.[14]

    b.   Timber targets are "final" agency actions.

Shifting to finality, Defendants do not contest that timber targets mark the consummation of the agency's decision-making process under *Bennett*'s first prong. *See* ECF No. 38-1 at 28–32. And under *Bennett*'s second prong, Defendants do not dispute that, as a factual matter: (1) the Forest Service Handbook and Manual direct agency staff to "meet" timber targets; (2) high-level agency staff direct subordinates to meet targets, as assigned; (3) numerous Forest Service documents recognize the binding nature of its timber targets; and (4) Forest Service staff apply targets in a way that indicates they are binding, including by (a) shifting money around to meet targets, (b) prioritizing target achievement over other objectives, (c) evaluating employee performance based on target achievement, and (d) designing projects to accomplish targets. *See* ECF No. 38-1 at 33–36. In fact, as noted above, Defendants concede Forest Service staff "treat targets as *required* internal benchmarks" or "quota[s]" that the agency "strives to meet." ECF No. 40 at 24, 27 (emphasis added). Thus, Defendants do not truly contest that, on this record, timber targets satisfy *Bennett*'s test.

---

[14] As part of this argument, Defendants imply that they did not set timber targets until passage of the Government Performance and Results Acts of 1993 and 2011. *See* ECF No. 40 at 25, 3. This is not accurate. *See*, *e.g.*, U.S. Forest Serv., Periodic Timber Sale Accomplishment Report, https://perma.cc/9BYN-SGJG (providing national and regional targets for fiscal year 1990).

Instead of contesting these facts, Defendants recycle additional legal arguments. First, Defendants resurrect their legal argument that *Bennett*'s second prong is only satisfied by legal consequences that affect plaintiffs themselves. ECF No. 40 at 21, 26–27. As support, Defendants point again to *National Treasury Employees Union v. Vought* which, again, has been vacated. Puzzlingly, Defendants proceed to rely *extensively* on this case as if it were still good law. *See* ECF No. 40 at 21, 23–24, 26–27. It is not. Even if it were, the D.C. Circuit cannot overrule the Supreme Court. And in *Bennett v. Spear* itself, the Supreme Court held that the "legal consequences" prong is satisfied by consequences that affect only the agency itself. *See* 520 U.S. at 178 (finding an agency action final because it "alter[ed] the legal regime to which the [federal] agency is subject"). Thus, Defendants' argument is wrong twice over.

Second, Defendants revisit their legal argument that timber targets are not binding (and therefore not final) because they are not "legislative rules" with the "force and effect of law." ECF No. 40 at 21–24. This Court summarily rejected this argument in its oral ruling on Defendants' motion to dismiss, Tr. 13:12–24, Tr: 28:7–15—for good reason. It is well settled that "the test for finality is independent of the analysis for whether an agency action is a legislative rule." *Cal. Cmtys. Against Toxics v. Env't Prot. Agency*, 934 F.3d 627, 635 (D.C. Cir. 2019) (discussing *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015)).[15] "[R]ules can be final" for APA purposes even if they do not qualify as "legislative rules." *See id.* Accordingly, the relevant question is not whether a rule is "legislative," interpretive, or a "general statement[] of policy," ECF No. 40 at 21–24, but whether a rule gives "rise to 'direct and appreciable legal consequences,'" *Cal. Cmtys.*, 934 F.3d at 635 (quoting *U.S. Army Corps of Eng'rs v. Hawkes*,

---

[15] Defendants cite *California Communities* several times in their brief. *See* ECF No. 40 at 22–23. Yet Defendants fail to disclose that *this very case* rejects their primary contention—that non-legislative rules are categorically non-final.

17

578 U.S. 590, 598 (2016)), or determines "rights or obligations," *Bennett*, 520 U.S. at 178. For the reasons explained here and in Forest Advocates' opening brief, timber targets do just that.

## IV.    Defendants must conduct NEPA review of their timber targets.

Defendants do not contest that timber targets are "major federal actions" or that targets have reasonably foreseeable significant effects. *See* 42 U.S.C. § 4332(2)(C). Instead, they argue that: (1) timber targets are not "proposals" under NEPA; (2) agencies have total discretion whether to conduct programmatic NEPA analyses; and (3) this Court cannot compel NEPA compliance under § 706(1). None of these arguments survive scrutiny.

First, Defendants argue that timber targets are not "proposals" for NEPA purposes[16] because the agencies cannot "meaningfully evaluate [timber targets' carbon] effects." ECF No. 40 at 28 (quoting 42 U.S.C. § 4336e(12)). According to Defendants, forests are too "dynamic" and "vari[able]" to permit broad-scale carbon storage and emissions analyses. *Id.* at 28–29 (quoting AR021065). Ironically, the very source that Defendants cite for this proposition is itself a broad-scale assessment of "how carbon [] stocks on [national] forest land . . . are affected by timber harvesting" and other variables. *See* AR021056.

This document, and others like it in the record, show that such broad-scale carbon analyses are not just possible, but also that the agency has completed them in the past. *See, e.g.*, AR020120–45 (conducting a forest carbon assessment for the entire Southern Region); AR020146–200 (conducting a "broad scale" analysis of "carbon stocks and fluxes" across the Southern Region); AR020917–37 (estimating carbon stocks and emissions across the National Forest System); AR012256–80 (calculating carbon uptake, storage, and emissions across the

---

[16] A "proposal" exists "when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects." 42 U.S.C. § 4336e(12).

Sumter National Forest).[17] So, contrary to Defendants' ipse dixit, logging's carbon effects *can* be meaningfully evaluated at a broad scale.

Defendants counter that logging's carbon effects are *more accurately* captured at the project level. *See* ECF No. 40 at 29. But that is neither here nor there. The question is whether timber targets' effects on carbon fluxes can be "meaningfully evaluated" at a broad scale—not whether carbon analyses at the project level are somehow better or more accurate than a broad-scale study.[18] At any rate, Defendants themselves have explained that *individual project* carbon analyses are "imprecise and statistically nonviable." AR014856. That's because the agency's "Forest Inventory and Analysis" data—which form the basis for its carbon flux estimates—are "not available at a fine enough scale to assess (with statistical confidence) differences in carbon density or carbon sequestration rate among specific community types and management within the project area." *Id.* In other words, Defendants have it exactly backwards; statistically viable carbon analyses should be performed at a broad scale, not cabined to an individual project.

Second, Defendants contend that the Forest Service has complete "discretion whether to conduct a programmatic" NEPA analysis of timber targets. ECF No. 40 at 29. As support, Defendants primarily point to *Kleppe v. Sierra Club*, 427 U.S. 390 (1976). That decision said no such thing. *Kleppe* held that an agency was not required to prepare a programmatic NEPA study for a regional plan that respondents argued the agency was "contemplating" but which they ultimately agreed did not exist. *Id.* at 403–04. Even Defendants acknowledge the case turned on

---

[17] If anything, the agency's experience with these studies and tools should make it easier to assess under NEPA the carbon effects of different timber targets.

[18] Notably, Defendants disclaim any obligation to consider at the project level the effects of multiple timber projects authorized to fulfill timber targets. ECF No. 40 at 39–40. And even if Defendants undertook that analysis at the project level, it would be too late because the timber target decision that analysis should inform would have already been made.

the fact that "there was no regional proposal." ECF No. 40 at 30. Here, of course, the Forest Service is not merely "contemplating" timber targets—*it has issued them* at national, regional, and unit-specific levels and charged agency staff with fulfilling them. *See* ECF No. 38-1 at 4–10, 33–35. If anything, *Kleppe* indicates that when NEPA's predicates are satisfied—as is the case here—the agency is "*required*" to conduct a NEPA analysis, even if the action at issue has a "national scope." 427 U.S. at 400 (emphasis added).

Third, and finally, Defendants repeat their argument that this Court cannot compel preparation of an Environmental Assessment ("EA") or Environmental Impact Statement ("EIS") pursuant to 5 U.S.C. § 706(1). *See* ECF No. 40 at 30–32 (arguing that courts cannot compel a "programmatic EIS" or "NEPA analysis" generally). As an initial matter, Defendants' argument has no bearing on Forest Advocates' alternative § 706(2) claims. It is undisputed that this Court has the equitable power under § 706(2) to "set aside" unlawful agency actions and order Defendants to comply with the NEPA statute. As a result, this Court need not consider Defendants' secondary § 706(1) argument at all.

If the Court considers that argument, it should reject it as deeply flawed. Despite Defendants' conclusory statements to the contrary, it is well settled that a NEPA study is "a discrete action" that agencies are "required to take" when "NEPA is applicable." *See, e.g.*, *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, 397 F. Supp. 2d 1241, 1250–52 (D. Mont. 2005) (reiterating that "[t]here is no agency discretion with respect to whether NEPA is applicable"). Accordingly, a court can "order agencies to comply with NEPA" pursuant to § 706(1). *Id.* at 1251; *see also Recent Past Pres. Network v. Latschar*, 701 F. Supp. 2d 49, 60 (D.D.C. 2010) (agreeing that because an agency failed to prepare a NEPA study "before reaching a final decision" it "withheld or unreasonably delayed agency action under 5 U.S.C. § 706(1)");

20

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 2004 WL 1592606, at \*9 (D. Or. July 15, 2004) (holding that a challenge to an unreasonable delay in "undertaking NEPA analyses" is "valid pursuant to Section 706(1) of the APA").[19]

Defendants provide no published on-point authority to support their contrary—and unworkable—position. Instead, Defendants twist several opinions far beyond their modest holdings. For example, Defendants claim that *Western Organization of Resource Councils v. Zinke*, 892 F.3d 1234 (D.C. Cir. 2018), held that NEPA compliance cannot be compelled via § 706(1). Far from it. In that case, the D.C. Circuit declined to compel an agency to *supplement* a NEPA study for a program because the agency action at issue had "terminated." *Id.* at 1243. Similarly, Defendants argue that *Center for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11 (D.D.C. 2017), held that it was "inappropriate[]" to compel NEPA compliance with § 706(1). ECF No. 40 at 31. Again, not so. That case merely held that it would be inappropriate to compel compliance with a vague (and now rescinded) NEPA regulation that required agencies to "continue to review" their NEPA procedures. *Ctr. for Biological Diversity*, 260 F. Supp. 3d at 23–27. This is a far cry from Congress's explicit instruction that agencies "shall issue an [EIS]." 42 U.S.C. § 4336(b)(1). The Court should reject Defendants' crabbed interpretation of § 706(1).

**V.      Defendants' project-level cumulative-effects analyses violate NEPA.**

Defendants' project-level cumulative-effects analyses were unlawful. Defendants' arguments to the contrary are unavailing.

---

[19] Defendants argue that Section 706(1) is akin to the traditional writ of mandamus which courts also used to enforce NEPA's mandatory requirements before it was clear that NEPA claims must proceed under the APA. *See McDowell v. Schlesinger*, 404 F. Supp. 221, 241 (W.D. Mo. 1975) (enforcing the requirement "to prepare and file an environmental impact statement" under mandamus; *Wy. Outdoor Coordinating Council v. Butz*, 484 F.2d 1244, 1251 (10th Cir. 1973) (subsequent history omitted) ("requiring that impact statements be prepared" in a case seeking mandamus relief). Whether under mandamus or the APA, courts have long enforced NEPA's mandatory requirements.

Once again, it is helpful to begin with what is not disputed. Defendants do not dispute that, at the time the Projects were authorized, they were required to consider cumulative effects. Defendants also seemingly do not dispute what a proper cumulative-effects analysis entails: a discussion of (1) other "past, present, and proposed, and reasonably foreseeable" actions; (2) the effects of those actions; and (3) "the overall impact" from those actions when added to the effects of the project at issue. *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 76 (D.D.C. 2019). Defendants also do not contest that, since carbon emissions from logging "are thoroughly mixed in the atmosphere, [an] appropriate cumulative effects" analysis must consider logging projects outside the immediate project area. AR014857. In addition, Defendants do not dispute that other logging projects described in the record will emit carbon, *see* ECF No. 38-1 at 46, or that they had tools to calculate these other projects' carbon emissions, *id.* at 47–48.

Instead of disputing these facts, Defendants make several unpersuasive rejoinders. To start, Defendants argue that *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168 (2025), permits them to ignore the cumulative carbon effects of other Forest Service logging projects. Not so. *Seven County* held that the Surface Transportation Board had no obligation under NEPA to consider a proposed railroad's *indirect* effects on upstream and downstream oil and gas drilling, leasing, and refining projects, in part because the Board had no authority to regulate these activities. *Id.* at 186. *Seven County* did not hold that an agency has zero obligation to consider the *cumulative* effects of its own projects. In fact, the Court confirmed that when other projects are (1) "within the authority of the agency in question"; (2) "interrelated" to the project at issue; and (3) "close in time and place to the project at hand," an agency may be obligated to consider those effects together under NEPA. *Id.* at 190. This is consistent with the

22

longstanding precedent described above, which has held that the NEPA statute itself requires consideration of relevant cumulative effects. *See supra* at 13.

To be sure, the Court in *Seven County* at times suggested that a NEPA study "need not address the effects of separate projects" at all. *See, e.g.*, 605 U.S. at 192. But this broad language must be read in its context—over a dispute about a railroad's indirect effects on separate projects *that the Board had no authority to regulate*. This is a horse of a different color. Unlike the Board in *Seven County*, the Forest Service has sole authority over its logging projects. It admits that the carbon effects of these projects are interrelated. *See* AR014857 (acknowledging that emissions from logging intermix in the atmosphere). It has identified other logging projects that are close in time and place. *See, e.g.*, AR016703 (listing "site-specific projects" whose "decisions affected the [Forest Health Initiative] project area" in the past ten years). And it is advancing these projects to achieve a single shared purpose—achieving the agency's timber targets. The cumulative effects of these logging projects are thus exactly the sorts of effects that an agency must consider under NEPA—even after *Seven County*.

As a fallback argument, Defendants posit that they complied with their obligation to consider "cumulative effects" by discussing each *individual* project's total carbon emissions— without aggregating the emissions of *other* logging projects. *See* ECF No. 40 at 34–37. Defendants "appear[] to misunderstand the function of a cumulative impacts analysis." *TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006). A cumulative-effects analysis, by definition, requires *adding* the "effects of *other* past, present, and reasonably foreseeable actions" to the effects of the studied project. *Healthy Gulf v. FERC*, 107 F.4th 1033, 1044 (D.C. Cir. 2024) (emphasis added) (quoting 40 C.F.R. § 1508.1(g)(3) (2022)). "Simply measuring the Project's own emissions" in a vacuum necessarily "fails to satisfy that

requirement." *Id.* Yet that is exactly what the Forest Service did here—analyzing each Project's emissions in a vacuum without aggregating the emissions from other similar projects. *See* AR014855–57 (Forest Health Initiative) (only calculating the potential carbon "emissions from this project"); AR001246–48 (same for Buck Project); AR004975–76, AR005122 (same for White Pine Management Project). That violates NEPA.

Defendants gamely insist that—despite what their Project NEPA documents say—they *did* account for the carbon effects of other projects because those projects appear somewhere in the administrative record. Specifically, Defendants contend that since the record comprises "all documents and materials that the agency 'directly or indirectly considered,'" and since the record contains mentions of other projects, *see, e.g.*, AR016703, the agency must have considered the carbon effects of these projects, ECF No. 40 at 36. That simply doesn't follow. The mere fact that other projects are listed somewhere in the record hardly shows that the Forest Service analyzed their cumulative carbon effects.[20] *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 299 (D.C. Cir. 1988) (holding that "perfunctory references do not constitute [an] analysis"). Defendants' backwards reasoning cannot be used to imply the existence of a "nonexistent" analysis. *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983).

Defendants counter that *Seven County* compels this Court to defer to the "scope and contents" of their NEPA analyses. ECF No. 40 at 37. But "*Seven County* does not grant an agency discretion to forgo NEPA requirements"—like a cumulative-effects analysis. *Or. Wild v. U.S. Forest Serv.*, 2026 WL 96908, at *10 (D. Or. Jan. 13, 2026). After all, a "court cannot defer to a void." *Id.* at *11 (citation omitted).

---

[20] Tellingly, Defendants fail to point to any document where this analysis occurred.

Casting about, Defendants next argue that they appropriately tiered the Forest Health Initiative's project-level carbon analysis to the Mark Twain Forest Plan EIS.[21] ECF No. 40 at 34. Yet the Forest Plan EIS does not assess carbon emissions from logging or account for climate change more generally. *See* AR015748–016028. Again, Defendants cannot rely on a nonexistent analysis. *Or. Wild*, 2026 WL 96908, at *10.

Finally, Defendants contend that calculating each Project's *siloed* carbon emissions as a "percentage" of statewide and nationwide emissions satisfied NEPA. ECF No. 40 at 36. Yet Defendants did not even do that much for the Buck and White Pine Management Projects. *See* AR001246–48, AR004975, AR005122. In fact, Defendants did not quantify the carbon emissions from those two Projects at all. *See id.* As a result, Defendants had "no support" for their assertion that "emissions from the [Projects] would represent only an 'incremental' contribution to climate change." *Zinke*, 368 F. Supp. 3d at 77. Even if Defendants had quantified the Projects' emissions and calculated statewide and national percentages, Defendants' cumulative-effects analyses would still fall short. That is because the Forest Service never *aggregated* the Projects' carbon emissions with those from other logging projects. Instead, the agency considered the Projects' carbon effects "in a vacuum," which it cannot do. *Grand Canyon Tr. v. F.A.A.*, 290 F.3d 339, 346 (D.C. Cir. 2002).

## **CONCLUSION**

For the foregoing reasons, the Court should grant summary judgment to Forest Advocates and deny Defendants' cross-motion.

Respectfully submitted this 30th day of January, 2026.

*/s/ J. Patrick Hunter\**

---

[21] Defendants do not make a similar argument for the Buck or White Pine Management Projects.

J. Patrick Hunter
N.C. Bar No. 44485
*/s/ Spencer Scheidt*
Spencer Scheidt
N.C. Bar No. 57078
Southern Environmental Law Center
48 Patton Ave, Ste 304
Asheville, NC 28801
Telephone: (828) 258-2023
phunter@selc.org
sscheidt@selc.org

*Attorneys for Forest Advocates*
*\*Admitted Pro Hac Vice*