## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CHATTOOGA CONSERVANCY,                )
MOUNTAINTRUE, and DEBBIE              )
KRUZEN                                )
                                      )
                   Plaintiffs,        )
                                      )
v.                                    )
                                      )
THE UNITED STATES DEPARTMENT          )
OF AGRICULTURE, SECRETARY             )       Case No. 1:24-CV-00518-TJK
BROOKE ROLLINS, THE UNITED            )
STATES FOREST SERVICE, CHIEF          )       **FEDERAL DEFENDANTS' REPLY**
TOM SCHULTZ, REGIONAL FORESTER        )       **IN SUPPORT OF CROSS-MOTION**
KENDERICK ARNEY, REGIONAL             )       **FOR SUMMARY JUDGMENT**
FORESTER ANTOINE DIXON,               )
DISTRICT RANGER ROBERT SITZLAR,       )
DISTRICT RANGER JAMES                 )
BROWNING, and FOREST SUPERVISOR       )
VINCI KEELER,                         )
                                      )
                   Federal Defendants. )
                                      )

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 2

    I.    Plaintiffs lack standing to challenge timber targets. .............................................. 2

        A.    Plaintiffs fail to demonstrate that performance metrics cause them harm. .................................................................................................... 3

        B.    Plaintiffs fail to demonstrate redressability. ............................................. 7

    II.    Plaintiffs' timber target claims for expired fiscal years are moot and not capable of repetition.......................................................................................... 9

    III.    Plaintiffs have not proven that timber targets are reviewable under the APA...... 11

        A.    Timber targets are not discrete agency action.......................................... 12

        B.    Timber targets have no legal consequences for Plaintiffs and therefore are not suitable for review under the APA. ............................... 14

    IV.    NEPA does not apply to timber targets.................................................................. 16

    V.    The Court cannot compel a programmatic EIS under § 706(1)............................ 20

    VI.    The Projects' cumulative effects analyses comply with NEPA............................ 21

CONCLUSION.................................................................................................................. 25

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Com'n*,
988 F.2d 146 (D.C. Cir. 1993) ....................................................................................... 24

*Am. Forest Res. Council v. Hall*,
533 F. Supp. 2d 84 (D.D.C. 2008) ................................................................................. 12

*Am. Forest Res. Council v. United States*,
77 F.4th 787 (D.C. Cir. 2023) ............................................................................... 1, 3, 13

*Atchison, Topeka and Santa Fe Ry. Co. v. Callaway*,
431 F. Supp. 722 (D.D.C. 1977) ...................................................................................... 8

*Bark v. U.S. Bureau of Land Mgmt.*,
643 F. Supp. 2d 1214 (D. Or. 2009) .............................................................................. 24

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................................................................ 3, 11, 15

*Cal. Communities Against Toxics v. EPA*,
934 F.3d 627 (D.C. Cir. 2019) ....................................................................................... 14

*Citizens Alert Regarding the Env't v. Leavitt*,
355 F. Supp. 2d 366 (D.D.C. 2005) ................................................................................. 7

*City of Olmstead Falls v. Fed. Aviation Admin.*,
292 F.3d 261 (D.C. Cir. 2002) ....................................................................................... 11

*Clinch Coalition v. U.S. Forest Serv.*,
2025 WL 3473302 (W.D. Va. Dec. 3, 2025) ................................................................... 5

*Conservation Cong. v. U.S. Forest Serv.*,
235 F. Supp. 3d 1189 (E.D. Cal. 2017) ......................................................................... 23

*Ctr. for Biological Diversity v. Burgum*,
No. 1:24-cv-2014, 2026 WL 180258 (D.D.C. Jan. 23, 2026) ................................. 12, 21

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
144 F.4th 296 (D.C. Cir. 2025) .................................................................................... 3, 7

*Ctr. for L. and Educ. v. U.S. Dep't of Educ.*,
396 F.3d 1152 (D.C. Cir. 2005) ....................................................................................... 3

*Env'l Def. Fund, Inc. v. Higginson*,
655 F.2d 1244 (9th Cir. 1981) ....................................................................................... 20

*Fla. Audubon Soc. v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996) ................................................................................... passim

*Fund for Animals v. U.S Bureau of Land Mgmt.*,
    460 F.3d 13 (D.C. Cir. 2006) ................................................................... passim

*Hollingsworth v. Perry*,
    570 U.S. 693 (2013) ................................................................................... 3

*Illinois Com. Comm'n v. I.C.C.*,
    848 F.2d 1246 (D.C. Cir. 1988) ................................................................ 24

*Indep. Equip. Dealers Ass'n v. EPA*,
    372 F.3d 420 (D.C. Cir. 2004) ............................................................. 1, 14

*Izaak Walton League of Am. v. Marsh*,
    655 F.2d 346 (D.C. Cir. 1981) ................................................................. 20

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976) ...................................................................... 20, 24, 25

*LaShawn A. v. Barry*,
    87 F.3d 1389 (D.C. Cir. 1996) ................................................................. 15

*Lujan v. Nat'l Wildlife Fed.*,
    497 U.S. 871 (1990) .......................................................................... 3, 13, 21

*Nat. Res. Def. Council, Inc. v. Callaway*,
    524 F.2d 79 (2d Cir. 1975)................................................................... 24, 25

*Nat'l Ass'n of Home Builders v. Norton*,
    298 F. Supp. 2d 68 (D.D.C. 2003) .......................................................... 12

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) ............................................................ 14, 15

*Nat'l Treasury Emp. Union v. Vought*,
    2025 WL 3659406 (D.C. Cir. Dec. 17, 2025).......................................... 14

*Nat'l Treasury Emp. Union v. Vought*,
    149 F.4th 762 (D.C. Cir. 2025) ............................................................... 14

*Nat'l Wildlife Fed'n v. Appalachian Reg'l Com'n*,
    677 F.2d 883 (D.C. Cir. 1981) ................................................................. 20

*Nevada v. Dep't of Energy*,
    457 F.3d 78 (D.C. Cir. 2006) ................................................................... 20

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ............................................................................. 12, 20

*Ohio Forestry Ass'n v. Sierra Club*,
    523 U.S. 726 (1998) ................................................................................. 16

*PDK Labs Inc. v. Ashcroft*,
    338 F. Supp. 2d 1 (D.D.C. 2004) ............................................................. 12

iii

*Radtke v. U.S Bureau of Customs & Border Protection*,
  No. 17-cv-2412, 2025 WL 2718979 (D.D.C. Sept. 24, 2025) .................................................. 15

*Reed v. Salazar*,
  744 F. Supp. 2d 98 (D.D.C. 2010) ......................................................................................... 9

*Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*,
  481 F.2d 1079 (D.C. Cir. 1973) ........................................................................................... 25

*Seven County Infrastructure Coalition v. Eagle County*,
  605 U.S. 168 (2025) ....................................................................................................... 2, 22

*Sierra Club v. EPA*,
  955 F.3d 56 (D.C. Cir. 2020) ......................................................................................... 15, 16

*Sierra Club v. FERC*,
  867 F.3d 1357 (D.C. Cir. 2017) ........................................................................................... 23

*Town of Cave Creek v. F.A.A.*,
  325 F.3d 320 (D.C. Cir. 2003) ............................................................................................. 23

*U.S. Army Corps of Engineers v. Hawkes Co.*,
  578 U.S. 590 (2016) .................................................................................................... 14, 15

*W. Org. of Res. Council v. Zinke*,
  892 F.3d 1234 (D.C. Cir. 2018) ........................................................................................... 21

*Weinstein v. Bradford*,
  423 U.S. 147 (1975) ........................................................................................................... 10

*Wilderness Soc'y v. Grilles*,
  824 F.2d 4 (D.C. Cir. 1987) ................................................................................................. 12

**Statutes**

5 U.S.C. § 551(13) ................................................................................................................ 11

5 U.S.C. § 704 ...................................................................................................................... 11

5 U.S.C. § 706(1) ................................................................................................................. 20

16 U.S.C. § 1604(g)(1) .......................................................................................................... 18

16 U.S.C. § 1604(k) .............................................................................................................. 17

16 U.S.C. § 529 .................................................................................................................... 17

42 U.S.C. § 4332(2)(C) .......................................................................................................... 21

42 U.S.C. § 4336 .................................................................................................................... 8

42 U.S.C. § 4336e(11) ........................................................................................................... 21

Pub. L. No. 119-21 § 50301(a)(2)(A) ............................................................................. 9, 10, 11

**Rules**

D.C. Cir. Rule 40(d).................................................................................................................. 14

**Regulations**

36 C.F.R. § 219.11 .................................................................................................................... 17

36 C.F.R. § 219.4...................................................................................................................... 18

36 C.F.R. § 219.6(b) ................................................................................................................. 18

**INTRODUCTION**

Timber targets represent the aggregate of the Forest Service's anticipated timber sales for a fiscal year—performance metrics for public accountability and budgeting. Plaintiffs attempt to portray timber targets as a top-down directive to cut a specific timber volume. In reality, however, the reverse is true, as evidenced by the intra-agency iterative process for timber target development, the land and resource management plans that dictate the framework for authorizing timber projects, and the many years required to study and authorize a project before a single tree is cut.

Accordingly, Plaintiffs lack standing to bring Counts I, II, and III because they have not produced "competent evidence" that it is "substantially probable" that these performance measures cause their alleged recreational and aesthetic harms or that vacating targets from expired fiscal years could redress these harms. *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 666-65 (D.C. Cir. 1996) (en banc). The Forest Service's obligation to produce timber on a sustained yield basis will continue regardless of any past performance metric. Plaintiffs' Counts I, II, and III are also now moot and not capable of repetition since Congress, not the Forest Service, has prescribed future fiscal year targets as neither agency action under the Administrative Procedure Act ("APA") nor subject to NEPA. The Court therefore lacks jurisdiction over Plaintiffs' timber target claims.

Even if the Court has jurisdiction, however, Counts I, II, and III are not reviewable under the APA because (1) D.C. Circuit precedent holds that the sum of individual actions such as timber sales is not a discrete agency action under the APA, *Am. Forest Res. Council v. United States*, 77 F.4th 787, 805 (D.C. Cir. 2023); *Fund for Animals v. U.S Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006), and (2) timber targets lack legal consequences for Plaintiffs, *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 426-27 (D.C. Cir. 2004).

In addition, the Court should find in favor of Federal Defendants on Counts I, II, and III

because timber targets are not proposals for major federal actions significantly affecting the environment, and the National Environmental Policy Act ("NEPA") does not apply. The Forest Service considers potential carbon effects, as appropriate, at the site-specific level, and these NEPA analyses are publicly available, so Plaintiffs and the public are not "in the dark" on the carbon effects of forest management. But the Forest Service cannot meaningfully evaluate the carbon effects of a national timber target removed from the site-specific climate conditions, forest dynamics, and project characteristics that determine the environmental effects of timber harvesting.

Finally, the Forest Service conducted the site-specific analyses for the Forest Health Initiative Project, the Buck Project, and the White Pine Mountain Project (collectively, the "Projects"). Plaintiffs' Count IV takes issue with the way the Forest Service presented its cumulative effects analysis, but the Forest Service's choices are owed substantial deference and are not to be second-guessed under *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168 (2025). The Forest Service disclosed the potential climate change impacts from the three forest restoration projects that will improve the health and resiliency of the forest by calculating the carbon sequestration rates for the National Forest System lands and reasonably concluding that these projects will not have significant cumulative impacts. NEPA requires nothing more.

Because Counts I, II, and III fail on multiple fronts, and the Forest Service's cumulative effects analyses for the projects challenged in Count IV comply with NEPA, the Court should grant Federal Defendants' Cross-Motion for Summary Judgment and enter judgment in favor of Federal Defendants on all four counts of Plaintiffs' Amended Complaint.

## ARGUMENT

### I.      Plaintiffs lack standing to challenge timber targets.

Plaintiffs fail to prove standing to bring their timber targets claims, and this alone should

2

end the Court's inquiry for Counts I, II, and III. *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) (the party invoking the court's jurisdiction "must demonstrate standing to do so"). While the redressability prong of standing is "somewhat relaxed" in a NEPA case, *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 304 (D.C. Cir. 2025), the causation prong is not. *Ctr. for L. and Educ. v. U.S. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005) ("Where plaintiffs allege injury resulting from violation of a *procedural* right afforded to them by statute and designed to protect their threatened concrete interest, the courts relax—while not wholly eliminating—the issues of imminence and redressability, but not the issues of injury in fact or causation."). Thus, Plaintiffs must prove causation like any "other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of litigation." *Bennett v. Spear*, 520 U.S. 154, 167-68 (1997). And they must show a favorable judgment could redress their alleged recreational and aesthetic harms. *Ctr. for Biological Diversity*, 144 F.4th at 304. Together, "[c]ausation and redressability . . . assure that proper parties have brought their dispute to the proper branch of the federal government." *Fla. Audubon Soc.*, 94 F.3d at 663.

Plaintiffs have not demonstrated that timber targets—internal agency performance metrics—cause their specific alleged recreational and aesthetic harms and that vacating expired timber targets from past fiscal years could redress those alleged injuries. Plaintiffs' timber target claims belong in the "halls of Congress," not this Court. *Am. Forest Res. Council*, 77 F.4th at 805 (quoting *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 891 (1990)).

### A.    Plaintiffs fail to demonstrate that performance metrics cause them harm.

To prove causation in a procedural case, Plaintiffs must show that "it is *substantially probable* that the procedural breach will cause the essential injury to the plaintiff's own interest." *Fla. Audubon Soc.*, 94 F.3d at 664-65 (emphasis added). The chain of causation cannot be too

3

"protracted" or "speculative." *Id.* at 670. And at summary judgment, the court "need not accept [plaintiffs'] alleged chain of events if they are unable to demonstrate competent evidence to support each link." *Id.* at 672. Thus, it is incumbent upon Plaintiff to demonstrate, with "competent evidence[,]" how each challenged target causes their alleged recreational and aesthetic harm. *Id.* Plaintiffs' cursory attempt to do so falls far short of Article III's demands.

Plaintiffs argue that timber targets are top-down directives that require agency staff to develop projects to meet targets, the challenged Projects were "specifically designed" to meet targets, and that the Projects cause them recreational and aesthetic harm. Dkt. No. 42 at 7, 10.[1] Plaintiffs fundamentally misunderstand timber targets. They are estimates that come from the bottom up. As explained in the Record:

> Prior to the beginning of a fiscal year, the agency begins assembling projections from field units on likely accomplishments associated with volume sold based on budget projections and scenarios. These projections are rolled up at the regional and then the national level to develop an agency projection for what we estimate our timber volume sold will be for the fiscal year. This projection evolves as budgets and staffing are finalized for a particular fiscal year. This projection has come to be known as the agency's "timber target."

AR_19618. "[T]imber target/volume sold is the primary metric used for reporting accomplishments to the department, industry and congress." *Id.* They are "program and budgetary performance measures[.]" AR_16786 (GAO Report describing target development); AR_21217-18.

Plaintiffs fail to prove that these performance metrics, which do not authorize any activities, cause their alleged harm from logging. Plaintiffs concede that a lower national target does not equate to a lower regional or unit target, Dkt. No. 38-1 at 14, undermining their theory that higher national targets increase their risk of local injury. Plaintiffs acknowledge that there were no regional targets for fiscal year 2022. AR_16794; Dkt. No. 38-1 at 14. Yet even without regional

---

[1] Page numbers refer to the ECF page.

4

targets that year, the Forest Service continued to sell a comparable volume of timber, AR_16792-94, discrediting Plaintiffs claim that targets drive project development. The Record demonstrates, and Plaintiffs admit, that targets are determined through an iterative process based on the volume the Forest Service expects to sell, not an untethered Washington directive. *See e.g.*, AR_20033 (noting the Mark Twain National Forest anticipates selling 68 MMBF in fiscal year 2019 through 36 contracts); AR_19616 (5-year anticipated contracting schedule for Region 8); AR_19810-29 (5-year anticipated contracting schedule for Region 9); AR_16786-87 (GAO report describing the iterative process); Dkt. No. 38-1 at 10. And the Record is clear that the Forest Service did not fulfill its anticipated timber sales (i.e. timber targets) in the 10 fiscal years preceding the Complaint because of no-bid sales, staffing shortages, and natural disasters. AR_16787. In short, Plaintiffs' causation theory is completely backwards.

Plaintiffs attempt to distinguish *Clinch Coalition v. U.S. Forest Service* by asserting that they have "tied" timber targets to site-specific projects that cause them harm, Dkt. No. 42 at 10-11, but *Clinch* demonstrates that harm is only realized from the site-specific application of a policy not the policy itself. No. 2:21-cv-0004, 2025 WL 3473302, at * 3 (W.D. Va. Dec. 3, 2025) ("[Plaintiffs] fail to tie the contested CEs to any site-specific application that would affect their interests."). Here, notwithstanding Plaintiffs' rhetoric, individually authorized projects are not an "application" of targets, and timber targets do not authorize any land management activities. Rather, timber targets are the aggregate of anticipated sales from authorized projects for the fiscal year. AR_19618.

Plaintiffs argue that the Forest Service "designs" projects to meet timber targets, citing the Forest Service's response to a congressional inquiry on the resources necessary to increase the national timber target. Dkt. No. 42 at 10 (citing AR_21217); *see* H.R. Rep. No. 117-83, at 116 (2021). But this document says no such thing. AR_21217. And tellingly, Plaintiffs fail to identify

5

the language in this document that supposedly supports their theory. *See* Dkt. No. 42 at 10. Plaintiffs' other citations show contracts sold under project authorizations are counted toward target progress, but not, as Plaintiffs argue, that the challenged Projects were "specifically designed to accomplish targets." Dkt. No. 42 at 10. Rather, the challenged Projects were designed to meet applicable land and resource management plan ("forest plan") goals and desired conditions. AR_1139; AR_5100; AR_14668. At the end of the day, "the primary objective of the timber program is accomplishing other critical objectives including forest health and hazardous fuels mitigation, wildlife habitat, removing undesired species, [and] ecosystem restoration[.]" AR_19618.

For example, the Buck Project "is designed to improve, or maintain, wildlife habitat, species diversity of stands, soil and water resources, and forest health," AR_1139, and "increase the resiliency of vegetation communities and the non-game and game wildlife species" that rely on early successional habitat. AR_1141. Similarly, the White Pine Management Project is designed to move the project area from "largely monoculture eastern white pine plantations" to more "diverse mixed species stands that are ecologically suited to the site" to restore natural conditions. AR_ 5100. And the Forest Health Initiative Project's goal is to "regenerate and retain oak and other more long-lived species" in areas where oak is declining. AR_14663. Without the project, "[d]ead and down trees would increase fuel levels leading to increased wildfire danger[,]" AR_14706, and there would be a "gradual loss of oak species in general." AR_14734. Plaintiffs' argument that these projects were "specifically designed to accomplish targets" is incorrect and unsupported.

Plaintiffs argue that the challenged agency action does not need to be the very last step in causation to satisfy Article III standing. Dkt. No. 42 at 10. But the D.C. Circuit is clear that an attenuated, "protracted chain of causation" is not enough. *Fla. Audubon Soc.*, 94 F.3d at 670

6

("Such a protracted chain of causation fails both because of the uncertainty of several individual links and because of the number of speculative links that must hold for the chain to connect the challenged acts to the asserted particularized injury."). Causation is "too attenuated" where the alleged injuries would occur regardless. *See Citizens Alert Regarding the Env't v. Leavitt*, 355 F. Supp. 2d 366, 373 (D.D.C. 2005) ("Thus, plaintiffs would have sustained their alleged injuries . . . notwithstanding the Agency's purported noncompliance with NEPA[.]"). Here, there is no evidence that the Forest Service authorized the challenged Projects specifically to fulfill targets, and Plaintiffs' alleged injuries would occur regardless.

Plaintiffs fail prove that it is "substantially probable" that national, regional, and unit timber targets cause their alleged recreational and aesthetic injuries, and thus they lack standing to bring these claims.

### B.    Plaintiffs fail to demonstrate redressability.

Plaintiffs next argue that their speculation is sufficient to satisfy redressability in a case alleging procedural injury. Dkt. No. 42 at 12. But the D.C. Circuit could not have been clearer in *Florida Audubon Society v. Bentsen*, holding that even in a procedural rights case, the "particular nature of a case does not—and cannot—eliminate any of the 'irreducible' elements of standing[.]" 94 F.3d at 664. And the Court in *Center for Biological Diversity v. U.S. Department of the Interior* held that plaintiffs had not plausibly alleged "that, if [the agency] were ordered to revisit the specific procedural errors [plaintiffs] seek to challenge, it is '*substantially probable*' that their injuries would be ameliorated." 144 F.4th at 314 (citation modified) (emphasis added). "Plaintiffs must offer more to establish a justiciable case or controversy." *Id.* Speculation is not enough. But that is all Plaintiffs can muster here. The fact remains that timber targets do not authorize logging and duly authorized timber projects can proceed without targets. Thus, vacating expired targets—the challenged conduct in Counts I, II, and III—will have no effect on Plaintiffs' alleged aesthetic and

7

recreational injuries.

Plaintiffs' redressability argument hinges on the three challenged Projects being incomplete and their speculation that the possibility of a revised, expired timber target could cause the Forest Service to reconsider these authorized Projects and cancel awarded timber contracts.[2] But Plaintiffs' argument is flawed because it presumes that the Forest Service would reissue a vacated, expired timber target that does not authorize logging and is unnecessary for on-the-ground operations. The Forest Service can abandon a vacated target without any impact on its ongoing operations or Plaintiffs' alleged injuries, as evidenced by the absence of regional timber targets for fiscal year 2022,[3] AR_16794; Dkt. No. 38-1 at 14, and the continuation of normal Forest Service operations during that time. *See* AR_16792-94. There would thus be no pending decision related to targets for which NEPA could be required, 42 U.S.C. § 4336, and the Projects and their awarded contracts would remain unchanged.

Plaintiffs cite a decades-old case that predates modern standing jurisprudence for the proposition that declaratory relief is enough for redressability. Dkt. No. 42 at 14 n.7 (citing *Atchison, Topeka and Santa Fe Ry. Co. v. Callaway*, 431 F. Supp. 722 (D.D.C. 1977)). But in that case, the U.S. Army Corps of Engineers was required to submit its environmental impact statement to Congress with its legislative proposal, and, accordingly, plaintiffs there had asserted an informational injury that would be redressed by disclosure of a sufficient report that would inform congressional deliberations. 431 F. Supp. at 724, 730. That is not this case here. Plaintiffs have not argued or

---

[2] Plaintiffs disregard that the challenged Projects are more than just timber projects, adding yet another link in Plaintiffs' daisy chain redressability argument. AR_1141; AR_ 5100; AR_14663.

[3] There were no regional targets in fiscal year 2022 in part because the Forest Service did not receive its appropriation until late in the fiscal year, highlighting that timber targets are tied to the budgeting process. AR_16794.

proven an informational injury.

Similarly, *Reed v. Salazar*, 744 F. Supp. 2d 98 (D.D.C. 2010), does not support Plaintiffs' argument. Dkt. No. 42 at 14 n.7. There, the court did more than declare a NEPA violation; it vacated the challenged agreement that caused the alleged harm. *Reed*, 744 F. Supp. 2d at 120. Since timber targets do not authorize logging, nor are they required for the authorization of logging, vacating expired targets would have no real-world effect on Plaintiffs' alleged recreational and aesthetic injuries. Plaintiffs lack standing to press their timber target claims.

## II.     Plaintiffs' timber target claims for expired fiscal years are moot and not capable of repetition.

Furthermore, Plaintiffs' timber target claims are now moot and not capable of repetition because the challenged timber targets expired with each fiscal year, and Congress established timber targets for fiscal years 2026 through 2034, which are neither reviewable agency action under the APA nor subject to NEPA. *See* Dkt. No. 40 at 27-29.

In response, Plaintiffs argue that there are still trees to be cut under timber contracts that counted toward expired timber targets, attempting to contrast the cases Federal Defendants cite where "activities were no longer being implemented under the expired approvals." Dkt. No. 42 at 16. Plaintiffs' statement, however, simply underscores that timber targets do not authorize timber operations. They are not "expired approvals" for logging. The expiration or vacatur of a timber target has no practical effect on what the Forest Service can and cannot do under the laws and regulations that govern its management of National Forests. They are internal agency performance goals that have now expired and been superseded by statute.

Plaintiffs argue their regional and unit timber target claims are capable of repetition because the One Big Beautiful Bill Act, Pub. L. No. 119-21 § 50301(a)(2)(A), is silent with respect to regional and unit targets. Dkt. No. 42 at 18. But the capable of repetition yet evading review

9

exception to mootness applies only if there is a "*reasonable expectation* that the same complaining party would be subject to the same action again." *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (per curium) (emphasis added). And it is beyond dispute that Congress enacted a sea-change in Forest Service operations by setting the national targets for future fiscal years at a year-over-year increase of 250,000,000 board feet. Pub. L. No. 119-21 § 50301(a)(2)(A). Unlike prior fiscal years where the Forest Service engaged in an iterative intra-agency process with the regions and units to set the national and regional targets based on what regions expected to sell in the next five years, AR_16786, it is unclear what that process will look like now that Congress is dictating what the Forest Service sells. As a result, there can be no "reasonable expectation" that there will be regional and unit targets as they may have existed in the past.[4]

Next, Plaintiffs argue their claims are capable of repetition because the One Big Beautiful Bill Act establishes only the floor, and the Forest Service could issue a target in excess of the statutory minimum. Dkt. No. 42 at 18. But any argument that the Forest Service may set a target greater than the year-over-year increases set by Congress is pure speculation, and certainly not a "reasonable expectation" given that the Forest Service failed to meet its own targets for the 10 fiscal years preceding the Complaint. AR_16787; *Weinstein*, 423 U.S. at 149.

Plaintiffs' argument here also undercuts their redressability argument, *i.e.*, that if the Forest Service conducted NEPA review of the carbon impacts of its timber program, it may decide to set a *lower* target. *See* Dkt. No. 38-1 at 27 ("If it had, it may have reached a different conclusion

---

[4] Plaintiffs point to a 2023 national 5-year plan as demonstrating planning through 2028, Dkt. No. 42 at 18, but this document predates the 2025 legislation, and it contemplates the iterative process for setting timber targets that is no longer at play. AR_21232 ("This will serve as the starting point for Regions to enter their current and outyear expected acres, volume and NEPA coverage based on the current trajectory the Region is trending toward in FY24 and beyond."). Regardless, "[t]he [Washington Office] views FY26-28 projects more as goals than actual plans to expect and be held to as an Agency." *Id.*

regarding the target level which could have better protected [Plaintiffs'] interests and redressed their injuries."). Following the recent legislative change requiring year-over-year increases, however, even if the Forest Service conducted a NEPA review, it would lack the discretion to set a lower national timber target.[5] Pub. L. No. 119-21 § 50301(a)(2)(A) (directing the Forest Service to sell a quantity "not less than 250,000,000 board-feet greater than" the prior fiscal year); *see also* 42 U.S.C. § 4336e(10)(B)(vii) (agency not required to prepare a NEPA document for "activities or decisions that are non-discretionary"). Plaintiffs' timber target claims are not capable of repetition because of this significant legislative change.

**III.    Plaintiffs have not proven that timber targets are reviewable under the APA.**

Nor have Plaintiffs met their burden of proving that national, regional, and unit timber targets are reviewable under the APA. Plaintiffs have not (1) proven that timber targets are "rules" or otherwise discrete agency actions or (2) established that timber targets—internal performance metrics—have any legal consequences for Plaintiffs in order to be reviewable under the APA. 5 U.S.C. § 551(13) (defining "agency action" as a "rule, order, license, sanction, relief, or the equivalent or denial thereof"); 5 U.S.C. § 704 (limiting judicial review to "final agency action"); *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (describing the test for finality as whether the agency action is both (1) the consummation of the decisionmaking process and (2) one by which "'rights or obligations have been determined,' or from which 'legal consequences will flow'" (citation modified)); *see generally* Dkt. No. 40 at 29-38. It is not the government's obligation to prove the negative, *City of Olmstead Falls v. Fed. Aviation Admin.*, 292 F.3d 261, 271 (D.C. Cir. 2002) (plaintiffs bear the burden of proof); rather, Plaintiffs must prove that timber targets are a rule and

---

[5] And regardless, Plaintiffs acknowledge that a lower national target does not equate to a lower regional or unit target. Dkt. No. 38-1 at 14.

a rule that has direct and appreciable legal consequences *for them*. *See Am. Forest Res. Council v. Hall*, 533 F. Supp. 2d 84, 94 (D.D.C. 2008) (granting summary judgment for defendants where plaintiff failed to establish final agency action reviewable under the APA); *Nat'l Ass'n of Home Builders v. Norton*, 298 F. Supp. 2d 68, 79 (D.D.C. 2003) ("[P]laintiffs cannot demonstrate that the Protocols determine rights or obligations of landowners or that legal consequences flow from the Protocols."). Plaintiffs fail to meet this burden.[6]

### A.    Timber targets are not discrete agency action.

As discussed in Federal Defendants' opening brief, timber targets are not discrete agency actions reviewable under the APA. Dkt. No. 40 at 29-31; *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62, 64 (2004) (requiring an agency action to be sufficiently "discrete" to be reviewable under the APA). Rather, they are the sum of the Forest Service's anticipated timber sales for the fiscal year, of the sort this district recently determined does not qualify as a discrete agency action. *Ctr. for Biological Diversity v. Burgum*, No. 1:24-cv-2014, 2026 WL 180258, at * 10 (D.D.C. Jan. 23, 2026) ("Both the APA and NEPA thus foreclose the Center's attempt to convert multiple actions into one.").

In an attempt to distinguish *American Forest Resource Council*, Plaintiffs characterize the allowable sale quantity ("ASQ") at issue in that case as "nonbinding." Dkt. No. 42 at 21. But as

---

[6] Plaintiffs claim that Federal Defendants cannot move for summary judgment on the same grounds as their Motion to Dismiss, citing a 20-year-old district court case that offers little support and has not been cited by any other court in this Circuit for this proposition. Dkt. No. 42 at 20 n.12 (citing *PDK Labs Inc. v. Ashcroft*, 338 F. Supp. 2d 1, 7 (D.D.C. 2004)). But even the court in that case recognized that a plaintiff must make a greater showing on summary judgment, *PDK Labs Inc.*, 338 F. Supp. 2d at 7 n.3 (citing *Wilderness Soc'y v. Grilles*, 824 F.2d 4, 16 (D.C. Cir. 1987) ("In sum, while a motion to dismiss may be decided on the pleadings alone, construed liberally in favor of the plaintiff, a motion for summary judgment by definition entails an opportunity for a supplementation of the record, and accordingly a *greater showing is demanded of the plaintiff*.") (emphasis added)), and that law of the case is prudential, not jurisdictional. *Id.* at 7 n.4.

the record makes clear in this case, the timber targets are similarly nonbinding. They are bottom-up estimates of the volume of timber that may be produced from the various units of the National Forest System. Indeed, the O & C Act at issue in *American Forest Resource Council* provides that the Bureau of Land Management "shall" sell the declared ASQ (called the "annual sustained yield capacity" in the statute) "annually, or so much thereof as can be sold at reasonable prices on a normal market." 77 F.4th at 804 (quoting 43 U.S.C. § 2601). If anything, this statutory language has a greater claim to the ASQ being binding on the agency than the Forest Service's timber targets, which are internal performance goals. AR_17013-16. Nevertheless, the D.C. Circuit held that the ASQ was not a discrete agency action under the APA. *Am. Forest Res. Council*, 77 F.4th at 804-805. There is no principled distinction between the declared ASQ in *American Forest Resource Council* and timber targets. Neither are discrete agency actions reviewable under the APA.

Next, Plaintiffs mischaracterize Federal Defendants' argument by stating that timber targets are not budget requests. Dkt. No. 42 at 21. But Federal Defendants did not argue that timber targets are budget requests. Rather, Federal Defendants argued they are performance metrics established as part of the budgeting process, Dkt. No. 40 at 35, and pointed to *Fund for Animals v. U.S Bureau of Land Management* where the D.C. Circuit held that a strategy that "represents the sum of 'many individual actions,' including some 'yet to be taken'" was not a reviewable final agency action under the APA. 460 F.3d 13, 20 (D.C. Cir. 2006) (citing *Lujan*, 497 U.S. at 893); Dkt. No. 40 at 34-35. Like in *Fund for Animals*, timber targets are performance goals representing the sum of individual timber contracts the Forest Service hopes to sell in that fiscal year, *i.e.*, the sum of "many individual actions." *Fund for Animals*, 460 F.3d at 20; AR_17013-16; *see also Am. Forest Res. Council*, 77 F.4th at 805 ("The total timber volume the BLM offers for sale in a given year is thus not a discrete agency action."). Thus, under binding D.C. Circuit precedent timber

13

targets are not discrete agency actions reviewable under the APA.

### B.    Timber targets have no legal consequences for Plaintiffs and therefore are not suitable for review under the APA.

Further, and as discussed in Federal Defendants' opening brief, timber targets fail the second prong of *Bennett v. Spear*, in which the reviewing court considers the "actual legal effect (or lack thereof) of the agency action in question on regulated entities." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014); *Nat'l Treasury Emp. Union v. Vought*, 149 F.4th 762, 778 (D.C. Cir. 2025) (agency action reviewable only if it "impose[s] 'direct and appreciable legal consequences' on the plaintiffs." (quoting *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 598 (2016)); *see generally* Dkt. No. 40 at 31-38. This second prong "is not so much" about "finality" as "the types of agency action suitable for review." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 426-27 (D.C. Cir. 2004) ("The answer seems obvious once we examine the concrete impact the [the agency action] had on [plaintiffs]—in short, none whatsoever."). Since timber targets have "no independent legal authority" (no party can rely upon them), no one faces a "penalty or liability of any sort" if the timber target is not met, and they do not "affect" Plaintiffs or any regulated entities, they are not reviewable under the APA. *Cal. Communities Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019).

Rather than demonstrate that timber targets have actual, direct, and appreciable legal consequences on Plaintiffs, they claim that *National Treasury Employees Union v. Vought* is no longer "good law" because the D.C. Circuit granted a petition for rehearing en banc. Dkt. No. 42 at 23. This is incorrect. The D.C. Circuit vacated the judgment, not the opinion, 2025 WL 3659406 at *1 (D.C. Cir. Dec. 17, 2025), consistent with standard procedures under Circuit Rule 40. D.C. Cir. Rule 40(d) ("If rehearing en banc is granted, the panel's judgment, but ordinarily not its opinion, will be vacated . . . ."). Thus, the published opinion is still binding until the full court sitting en

14

banc or the Supreme Court overturns it. *LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (noting a decision of a panel is "the decision of the court" until overruled "by the full court").

Regardless, the truism articulated in *Vought* that the agency action must have a direct legal effect on *Plaintiffs* to be reviewable under the APA has a firm foundation. *See Nat'l Mining Ass'n*, 758 F.3d at 252; *Fund for Animals*, 460 F.3d at 22 (recognizing "this court's consistent refusal to review agency orders 'that do[] not [themselves] adversely affect complainant'" (citations modified)); *see also Radtke v. U.S Bureau of Customs & Border Protection*, No. 17-cv-2412, 2025 WL 2718979, at * 10 (D.D.C. Sept. 24, 2025) ("As to the second *Bennett* factor, however, [the agency's] challenged agency actions have no 'legal consequence' *for Plaintiffs*." (quoting *Bennett*, 520 U.S. at 178) (emphasis added)).

In fact, the D.C. Circuit has repeatedly characterized prong two of the *Bennet v. Spear* inquiry with respect to the effect on regulated entities:

> When deciding whether guidance statements meet prong two, this Court has considered factors including: (1) 'the actual legal effect (or lack thereof) of the agency action in question on *regulated entities*"; (2) 'the agency's characterization of the guidance'; and (3) 'whether the agency has applied the guidance as if it were *binding on regulated parties*.'

*Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020) (quoting *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014)) (emphasis added); *id.* (noting that *Hawkes* "relied on a long line of cases illustrating a pragmatic approach to finality by focusing on how agency pronouncements actually affect regulated entities" (citing 578 U.S. at 599-600)).

In *Sierra Club*, the D.C. Circuit considered whether a guidance document constituted final agency action subject to review under the Clean Air Act and reiterated the "proper test" under *Hawkes* and *Bennett v. Spear*. 955 F.3d at 58, 62. The Court held that the guidance document imposed no obligations or restrictions; preserved enforcement discretion; was insufficient to

15

support a permitting decision; and was not required for a permitting decision; and thus, it was not reviewable final agency action. *Id.* at 63-65 ("The [guidance] by itself does not expose any regulated entity to the possibility of an enforcement action or to enhanced fines or penalties.").

Like in *Sierra Club*, timber targets are neither sufficient to authorize timber projects nor are they necessary to authorize timber targets. They impose no obligations or penalties. They preserve the agency's enforcement discretion, and they do not prohibit challenges to individual timber projects. They are the agency's goal for the amount of timber it will sell that year. AR_17013-16. In short, they have no legal consequences for Plaintiffs, and Plaintiffs fail to prove otherwise.

Plaintiffs assert that the timber targets are binding on Forest Service staff, but disregard that the Forest Service retains discretion to decide the scope and scale of timber operations on a National Forest, within the confines of the applicable forest plan, when it authorizes individual projects. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729-30 (1998) (detailing steps necessary to authorize a timber project); *Fund for Animals*, 460 F.3d at 22 (noting the considerable "legal distance" between the strategy and implementation (quoting *Ohio Forestry Ass'n*)). Nor do timber targets themselves alter the legal regime set forth by statute and regulation that dictates how the Forest Service administers public lands, including the authorization of timber projects. *See* Dkt. No. 40 at 12-13 (describing the legal framework in which the Forest Service authorizes logging); AR_16785-86. As Plaintiffs acknowledge, timber targets have long been a benchmark for measuring agency performance. This does not render them reviewable under the APA.

## IV.    NEPA does not apply to timber targets.

Timber targets are not subject to NEPA because they are not proposals for major federal actions significantly affecting the environment and the Forest Service cannot meaningfully evaluate the environmental effects of these performance metrics in a vacuum. Dkt. No. 40 at 38-40.

16

Remarkably, Plaintiffs ignore whole sections of Federal Defendants' opening brief to erroneously claim Federal Defendants do not contest that timber targets are major federal actions with reasonably foreseeable significant environmental effects. Dkt. No. 42 at 24. *See, e.g.*, Dkt. No. 40 at 38 (Timber targets are not "'proposals' for 'major federal actions' triggering NEPA."); *Id*. at 25 ("Even assuming timber targets are major federal actions under NEPA (they are not, *see infra* Section III) . . . ."). In fact, throughout the briefing in this case, Federal Defendants have made clear that timber targets have no effect at all, let alone a significant effect on the environment. *See e.g.*, Dkt. No. 40 at 33.

Rather, the major federal actions in the Forest Service's timber program are (1) the forest plans that establish the framework for approving projects and (2) the projects that authorize timber harvesting, both of which are subject to NEPA. *See* Dkt. No. 40 at 12-13. As discussed in Federal Defendants' opening brief, the Forest Service is obligated to produce a sustained yield of timber from National Forests annually. 16 U.S.C. §§ 529, 531(b). The forest plan for each National Forest unit identifies the volume of timber that can be sustainably harvested from the unit, areas suitable for timber harvest, and standards and guidelines to guide timber harvests. 16 U.S.C. § 1604(k); 36 C.F.R. § 219.11; AR_19618; *see also* AR_2558-59 (designating over 271,000 acres for emphasis on sustained-yield timber management in Nantahala and Pisgah Forest); AR_2749 (setting ASQ as 36.9 million board feet annually for Nantahala and Pisgah Forest);[7] AR_8222 (setting ASQ for the Sumter National Forest as an average of 13.9 million cubic feet annually); AR_8380 (designating 259,313 acres of Sumter National Forest as suitable for timber production); AR_16227-28 (designating ASQ for the Mark Twain National Forest as an average of 103 million board feet

---

[7] This is the forest plan that was in place when the Buck Project was authorized in 2020. The Forest Service has since revised this forest plan.

annually); AR_16227 (designating 996,712 acres of Mark Twain National Forest as suitable for timber management). Forest plans are developed and revised in accordance with NEPA, and thus the public has an opportunity to comment on not only this sustained yield, but also the potential environmental effects of the forest plan as a whole. 16 U.S.C. § 1604(g)(1); 36 C.F.R. § 219.4 (describing public participation required for forest plan development and revision following 2012 planning rule);[8] *see also* AR_3811 (Forest Plan EIS for Sumter National Forest); AR_15477 (Forest Plan EIS for Mark Twain National Forest).

The Forest Service then develops site-specific projects to achieve the numerous goals of individual forest plans, AR_1139; AR_5100; AR_14663, and these site-specific projects are also subject to NEPA. AR_1126; AR_5133; AR_14866; AR_16785. The Forest Service appropriately considers the reasonably foreseeable environmental effects of projects, including carbon, at the site-specific level. *See generally*, AR_1128; AR_5094; AR_14659. The Forest Service then issues timber sales pursuant to authorized site-specific projects. AR_16785. Timber targets, conversely, are merely the aggregation of these anticipated sales for a fiscal year, and not themselves major federal actions significantly affecting the environment.

Plaintiffs argue that the Forest Service's Disturbance Assessment Report shows that the environmental effects of timber targets can be meaningfully evaluated. Dkt. No. 42 at 24. But this report and others like it are derived at the National Forest unit level and then scaled to the regional level because forest carbon dynamics depend on local conditions. AR_21056 ("Carbon assessments were developed for individual national forests or small groups of national forests which have been administratively combined; assessments were then aggregated to regional scales.").

---

[8] Forest plans developed or revised following the 2012 planning rule must identify and evaluate existing information related to baseline assessment of carbon stocks. 36 C.F.R. § 219.6(b).

As disclosed in that report, "forest [carbon] trends and the relative impacts of disturbance and environmental factors are highly variable across the United States." AR_21057. Temperature, precipitation, carbon dioxide concentration, and nitrogen deposition, all influence carbon stocks and the net carbon effect of timber harvesting, AR_21065-66, and these indisputably vary across the country. *Compare* AR_21059-60 (noting that climate trends in the Southern Region "have had a moderately positive effect on [carbon] stocks") *with* AR_21060 (noting that climate trends in the Northern Region "have had a mostly negative effect on [carbon] stocks"); *see also* AR_21064 ("There are strong regional differences.").

In addition, the carbon cycle on forests "varies geographically and by forest type, and by the frequency, magnitude, and type of disturbance events." AR_21064; AR_21068 ("Different ecosystems sequester carbon in different ways, at different rates, and within differing mosaics of landscape plans and trends"). For example, "[v]igorously growing young stands may contain less carbon stocks than stands containing many large dead trees, while sequestering carbon from the atmosphere at higher rates." AR_17023 (noting "many intricacies associated with forest carbon dynamics"). And "[f]orest ecosystems capable of adapting to changing conditions" *i.e.* managed forests, "will sequester [carbon] and store it more securely over the long term, while also furnishing woody materials to help reduce fossil fuel use." AR_21066.

The type of authorized timber harvesting also impacts carbon. A salvage sale, for example, harvests dead and dying trees that would otherwise emit carbon dioxide through decay and contribute to catastrophic wildfire risk and converts them to wood products where carbon can be stored for decades. AR_16980; AR_20121 ("In the absence of commercial thinnings, harvests, and fuel reduction treatments, forests will thin naturally from mortality-inducing disturbances or aging, resulting in dead trees decaying and emitting carbon to the atmosphere."); AR_21078. Evaluating

19

the carbon effects of a 3.4 billion board feet national timber target is meaningless without this type of site-specific context.

## V.    The Court cannot compel a programmatic EIS under § 706(1).

As discussed in Federal Defendants' opening brief, this Cout cannot compel a programmatic NEPA analysis of timber targets under 5 U.S.C. § 706(1) because it is not a discrete agency action required by law. *See* Dkt. No. 40 at 40. Section 706 applies only to "the ordering of a precise, definite act about which an official ha[s] no discretion whatever." *SUWA,* 542 U.S. at 64 (citation modified). And the caselaw is clear that an agency has discretion whether to prepare a programmatic review. *Kleppe v. Sierra Club*, 427 U.S. 390, 412, 414 (1976); *Nat'l Wildlife Fed'n v. Appalachian Reg'l Com'n*, 677 F.2d 883, 889 (D.C. Cir. 1981).

Plaintiffs dispute that *Kleppe* held that an agency has discretion whether to prepare a programmatic EIS. Dkt, No. 42 at 25. But that is exactly how the D.C. Circuit and others have interpreted both *Kleppe* and NEPA. *Nevada v. Dep't of Energy*, 457 F.3d 78, 92 (D.C. Cir. 2006) ("The decision whether to prepare a programmatic EIS is committed to the agency's discretion." (citing *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 374 n.73 (D.C. Cir. 1981)) (discussing *Kleppe*); *Appalachian Reg. Commission*, 677 F.2d at 888-89 ("The proper scope of an EIS and the corollary decision whether to prepare a programmatic EIS at all are matters initially committed to agency discretion." (citing *Kleppe*, 427 U.S. at 412); *id.* ("The Supreme Court has held that determining need for programmatic environmental consideration is within the province of agency expertise."); *Env'l Def. Fund, Inc. v. Higginson*, 655 F.2d 1244, 1248 (9th Cir. 1981) ("Whether [cumulative] effects can be properly evaluated in site-specific EISs is left to the [agency's] discretion, subject to the scope of review specified in *Kleppe*.").

In fact, by demanding a programmatic EIS of the Forest Service's timber program in

20

aggregate, Plaintiffs implicitly concede they are asserting an impermissible broad programmatic challenge. NEPA defines a "programmatic environmental document" as an EIS or EA "analyzing all or some of the environmental effects of a policy, program, plan, or group of related actions." 42 U.S.C. § 4336e(11). And the Supreme Court has made clear that a plaintiff may not assert broad programmatic attacks under the APA. *Lujan*, 497 U.S. at 891 ("But respondent cannot seek *whole-sale* improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made."). Accordingly, in *Center for Biological Diversity v. Burgum*, this district recently declined to compel a supplemental programmatic review under section 706(1), finding plaintiffs' claims to be an impermissible pro-grammatic attack. 2026 WL 180258, at * 11.

Plaintiffs attempt to distinguish cases related to supplemental NEPA analyses by arguing that the challenged Projects here are incomplete, Dkt. No. 42 at 27, thereby conflating the alleged agency action of a timber target with numerous separately authorized projects. But if a timber target is itself a major federal action, as Plaintiffs argue, Dkt. No. 38-1 at 44, then that action is completed by expiration of the fiscal year, and the Court cannot compel NEPA. *W. Org. of Res. Council v. Zinke*, 892 F.3d 1234, 1243 (D.C. Cir. 2018) (declining to compel NEPA where action had terminated). "As *SUWA* makes clear, the fact that actions continue to occur in compliance with the Program does not render the original action incomplete." *Id.* If it is the Project timber harvesting that is the major federal, and not the target itself, then NEPA was not required for the target in the first place. 42 U.S.C. § 4332(2)(C). Plaintiffs cannot have it both ways.

## VI.   The Projects' cumulative effects analyses comply with NEPA.

As explained in Federal Defendants' opening brief, the Forest Service went to great lengths to disclose the potential carbon effects of the Forest Health Initiative Project, the Buck Project,

and the White Pine Management Project. Dkt. No. 40 at 44-46. Nonetheless, Plaintiffs dispute the quality of the Forest Service's analyses. *See* Dkt. No. 42 at 27-31. First, Plaintiffs attempt to distinguish the facts of *Seven County* from this case, but the Supreme Court's legal findings apply to all NEPA claims. Second, Plaintiffs demand a list of the carbon emissions of all other projects and mischaracterize the Administrative Record to argue that the Forest Service did not address the Projects' cumulative impacts on climate change. On both points, Plaintiffs fail to demonstrate that the Forest Service's decisions are arbitrary or capricious.

In *Seven County*, the Supreme Court emphasized "the substantial judicial deference required in NEPA cases." 605 U.S. at 179. In particular, the Supreme Court cautioned lower courts not to excessively second guess whether an agency provided enough detail about a project's impacts. *See id.* at 180-81. Indeed, *Seven County* recognizes that an agency is "better equipped to assess what facts are relevant to the agency's own decision than a court is." *Id.* at 181. And courts should defer to agencies' decisions about where to draw the line, like whether to analyze environmental effects *from other projects* separate in time or place from the project at hand. *Id.* at 182.

Plaintiffs suggest that the Forest Service's "sole authority" over its timber projects distinguishes this case from *Seven County*. *See* Dkt. No. 42 at 29. But the substantial deference owed to the Forest Service's "fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry" applies here as it does in any NEPA case. *Seven County*, 605 U.S. at 183 (admonishing the courts that have "strayed and not applied NEPA with the level of deference demanded by the statutory text" and the Supreme Court's cases). This Court must therefore review the Forest Service's analyses of the potential effects of the individual projects with substantial deference to the Forest Service's reasoned line-drawing choices. *Id.* at 182-83.

22

Viewed through this proper lens, the Forest Service's analyses of the Projects' impacts clearly comply with NEPA. *See generally* Dkt. No. 40 at 44-46. Plaintiffs dislike how the Forest Service presented its cumulative effects analysis, insisting that "aggregating the emissions from other similar projects" is the only way to comply with NEPA. *See* Dkt. No. 42 at 30; *see id.* at 31 ("[T]he Forest Service never *aggregated* the Projects' carbon emissions with those from other logging projects."). On the contrary, "NEPA does not mandate that the effects be presented in a particular form; an agency has discretion in deciding how to organize and present information." *Conservation Cong. v. U.S. Forest Serv.*, 235 F. Supp. 3d 1189, 1205 (E.D. Cal. 2017), *aff'd*, No. 17-16153, 2019 WL 2359434 (9th Cir. June 4, 2019); *accord Sierra Club v. FERC*, 867 F.3d 1357, 1370 (D.C. Cir. 2017) (finding cumulative effects analysis adequate even though agency "did not mention [specific] existing polluters in its discussion").

Here, the Forest Service presented calculations of carbon sequestration at the forest level. *See e.g.*, Dkt. No. 40 at 44. By providing this environmental baseline, the Forest Service accounted for past and present timber projects. *See Town of Cave Creek v. F.A.A.*, 325 F.3d 320, 328-29 (rejecting plaintiffs' cumulative impacts claim because agency considered other projects by measuring the environmental baseline). In addition, the Forest Service explained that the Projects would not cause significant cumulative effects because the forests still balance carbon emissions and sequestration within the United States. *See* AR_1246-48 (Buck Project EA relying on calculations and findings in AR_20099); AR_14856-57 (Forest Health Initiative Project EA relying on carbon density assessment in AR_20514); AR_5122 (White Pine Management Project EA relying on detailed analysis of carbon stocks and trends in AR_12256).[9] Because the forests are *sequestering*

---

[9] *See also* AR_3176; AR_3202; AR_3228; AR_3238; AR_3660; AR_3685; *see generally* AR_20094 (explaining that the net carbon balance is measured "particularly over long time scales"); AR_20243 (estimating carbon stocks "based on historical and projected forest inventory

carbon, it would not be meaningful to calculate emissions from every project. *See* AR_20926 ("Change is not calculated for forestland units smaller than regions because the carbon changes on smaller areas will likely not be significantly different from zero."); *Bark v. U.S. Bureau of Land Mgmt.*, 643 F. Supp. 2d 1214, 1223 (D. Or. 2009) (NEPA does not require "a cataloguing of all past, present, and foreseeable projects by listing the time, type, place, scale, different plans and methods, without regard to the usefulness of this data").

Further, even if the analyses fell short, which they did not, vacatur would be futile because the regulations that previously required an analysis of cumulative effects are no longer in effect, and *Seven County* made clear that such analyses are not required by the statute. *See* Dkt. No. 40 at 49-50. This is not an issue of mootness, as Plaintiffs attempt to frame it. *See* Dkt. No. 42 at 19. Rather, it reflects that any deficiencies are not so serious as to support vacatur because on remand NEPA would not require the kind of cumulative effects review Plaintiffs seek. *See Allied-Signal, Inc. v. U.S. Nuclear Regulatory Com'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (whether to vacate agency action depends on seriousness of agency's error and disruptive consequences of vacatur); *Illinois Com. Comm'n v. I.C.C.*, 848 F.2d 1246, 1257 (D.C. Cir. 1988) (declining to remand because it would be a "meaningless gesture"). The cases Plaintiffs cite do not hold otherwise. *See* Dkt. No. 42 at 19; *Kleppe*, 427 U.S. at 414 (acknowledging that even if a project has cumulative impacts, "practical considerations of feasibility might well necessitate restricting the scope of comprehensive statements"); *Nat. Res. Def. Council, Inc. v. Callaway*, 524 F.2d 79, 88 (2d Cir. 1975) (relying on "the CEQ Guidelines for preparation of impact statements" and citing 40 C.F.R.

---

data from the USDA Forest Service."); AR_20288 (describing the carbon cycle to explain the role of "enhancing sinks, such as uptake and storage (sequestration) in vegetation and soils"); AR_20913 (depicting trends in forest carbon sequestration); AR_20949 (explaining the method for measuring forest carbon); AR_20120 (assessing forest carbon stocks and changes); AR_20146 (evaluating changes in climate monitoring indicators such as sea level rise).

24

§ 1500.8(a)); *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1088 n.30 (D.C. Cir. 1973) (relying on CEQ's "NEPA Guidelines" to hold that cumulative impacts must be considered). If anything, these cases emphasize the substantial deference owed to the Forest Service's determinations. *See Kleppe*, 427 U.S. at 414 (holding that the determination of the cumulative impacts analysis is "a task assigned to the special competency of the appropriate agencies"); *Callaway*, 524 F.2d at 88 ("[A]n EIS is required to furnish only such information as appears to be reasonably necessary under the circumstances for evaluation of the project rather than to be so all-encompassing in scope that the task of preparing it would become either fruitless or well nigh impossible[.]"); *Scientists' Inst.*, 481 F.2d at 1091 (recognizing that NEPA allows "some degree of flexibility and agency discretion in determining the contents of impact statements").

In short, the Forest Service fully complied with NEPA in assessing the potential carbon impacts of the Projects. But, even if those analyses somehow fell short of satisfying the regulations in effect at the time the Projects were authorized, any such shortcomings are not so serious as to support vacatur because NEPA does not require the analyses Plaintiffs seek.

**CONCLUSION**

For these reasons, and those detailed in Federal Defendants' opening brief, Dkt. No. 40, the Court should grant summary judgment in favor of Federal Defendants on all counts.

Respectfully submitted this 23rd day of February, 2026.

> ADAM R.F. GUSTAFSON
> Principal Deputy Assistant Attorney General
> U.S. Department of Justice
> Environment and Natural Resources Division
>
> */s/ Reade E. Wilson*
> Reade E. Wilson
> (ME Bar No. 4992)

25

Krystal-Rose Perez
(TX Bar No. 24105931)
Trial Attorneys
Natural Resources Section
150 M Street NE
Washington, DC 20002
(202) 598-3546 (Wilson)
(202) 532-3266 (Perez)
reade.wilson@usdoj.gov
krystal-rose.perez@usdoj.gov

*Attorneys for Federal Defendants*