**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CHATTOOGA CONSERVANCY et al.,

     *Plaintiffs*,

     v.

UNITED STATES DEPARTMENT OF AG-
RICULTURE et al.,

     *Defendants*.

Civil Action No. 24-518 (TJK)

**MEMORANDUM OPINION**

The National Forest System was established for the twin purposes of improving and pro-
tecting the forests within them as well as producing a continuous supply of timber for the country's
use. This case illustrates the tension that can arise between those purposes. Plaintiffs—an indi-
vidual and two organizations that advocate for the environment—sued the Department of Agricul-
ture, the Forest Service, and related agency officials to challenge the way in which the Forest
Service achieves the second goal. They allege that Defendants violated the National Environmen-
tal Policy Act, or NEPA, as well as the Administrative Procedure Act by setting "timber targets"
without conducting environmental review, and that certain timber projects violated NEPA because
their environmental assessments failed to properly weigh cumulative carbon emissions. The par-
ties cross-move for summary judgment. For the reasons explained below, ultimately, the Court
sides with Defendants on both fronts. First, the setting of timber targets is not a discrete agency
action subject to review under the Administrative Procedure Act. And second, the Forest Service
complied with its obligations under NEPA when approving the projects at issue. So the Court will
deny Plaintiffs' motion for summary judgment, grant Defendants' motion, and enter judgment for
Defendants.

## I.     Background

### A.     Statutory and Regulatory Framework

Defendants are stewards of the National Forest System, which spans over 190 million acres and is made up of over 150 national forests.  Administrative Record ("AR") 17334.  The National Forest System is divided into nine geographical regions, each one headed by a Regional Forester.  36 C.F.R. § 200.2(a) (2005).  The regions are further divided into administrative units, which may consist of one or more forests.  *See id.* § 212.1.  Each year, national forests receive over 150 million visitors for "hunting, fishing, camping, hiking, and other activities."  AR 18151.  Among other services, the Forest Service manages wildlife habitats and watersheds, maintains areas for recreation, conducts scientific research, manages ecosystems to prevent wildfires and national disasters, and grows and harvests timber.  36 C.F.R. § 200.3(b) (2025).

NEPA requires the Forest Service to take certain steps before approving commercial timber harvest projects.  The statute directs agencies to "assess the environmental consequences of 'major [f]ederal actions' by following certain procedures during the decision-making process."  *Nevada v. Dep't of Energy*, 457 F.3d 78, 87 (D.C. Cir. 2006) (quoting 42 U.S.C. § 4332(2)(C)).  NEPA is a "purely procedural statute" that "imposes no substantive environmental obligations or restrictions."  *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 173 (2025).  For major federal actions "significantly affecting the quality of the human environment," the agency must prepare an Environmental Impact Statement ("EIS") that details the expected consequences of a proposed action, take a "hard look" at those consequences, and "consider all reasonable alternatives" that would advance the agency's goals.  *Flaherty v. Raimondo*, 531 F. Supp. 3d 76, 85–87 (D.D.C. 2021); 42 U.S.C. § 4332(2)(C).  The agency may also first issue an Environmental Assessment, a less detailed document "which may be used to determine whether or not an EIS is required" based on the environmental impact of the contemplated action.  *TOMAC, Taxpayers of*

*Mich. Against Casinos v. Norton*, 433 F.3d 852, 857 (D.C. Cir. 2006) (quotation omitted).  If the agency then "finds that an EIS is not necessary," it may instead issue a Finding of No Significant Impact ("FONSI").  *Id.*  At the time of the challenged agency programs, certain NEPA regulations required agencies to consider the direct, indirect, and "cumulative" effects or impacts of proposed action.  40 C.F.R. §§ 1508.7–1508.8 (1978).  Those regulations are no longer in effect.  *See* Removal of National Environmental Policy Act Implementing Regulations, 90 Fed. Reg. 10,610 (Feb. 25, 2025).

### B.    Factual Background

#### 1.    The Forest Service's Timber Program

Each fiscal year, the Forest Service sets a national timber target, measured in billion board feet.[1]  *See, e.g.*, AR 21208.  The timber target is determined in a process that begins with "headquarters ask[ing] the regions for the amount of timber they aim to sell each year for the next 5 years and how much funding they would need to plan and implement timber sales at that level," information that is "provided by the individual units in their region." AR 16786; *see also* AR 19618 ("Prior to the beginning of a fiscal year, the agency begins assembling projections from field units on likely accomplishments associated with volume sold based on budget projections or scenarios.  These projections are rolled up at the regional and then the national level to develop

---

[1] Plaintiffs and Defendants differ in their description of how the agency sets timber targets. *Compare* ECF No. 38-1 at 10–11 (describing a top-down system of binding policy frameworks), *with* ECF No. 40 at 13, 23 (describing a bottom-up system where timber targets have no binding effect).  On summary judgment in APA claims, a "district court may need to resolve factual issues regarding the process the agency used in reaching its decision." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996) (citation modified).  It does so—in all but extraordinary cases—by recourse to the agency record only. *Com. Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 7 (D.C. Cir. 1998).  Accordingly, the Court does so here, and describes the agency's process as the Court understands it to unfold in practice based on a review of the agency record.

3

. . . the agency's 'timber target.'"). National forests base their five-year plans for timber sales on "(1) their forest plans and land management goals, (2) local timber industry needs, (3) staff capabilities, and (4) anticipated budget." AR 16799. "Above all else, timber targets are issued to implement objectives identified in forest plans on each unit." AR 19618. Once the Forest Service arrives at its national timber target, regional targets are allocated in each of the nine regions. Regional Foresters further divide their assigned regional target among the forest units and forests in their region, in line with the original projections from the forest plans. *See* AR 19618 ("After the Regions receive their targets, then timber targets are discussed with the forests based on out-year plans, expected budgets, [and] capacity."); AR 21215; AR 19769 (showing forest-level allocation of Region 9 timber targets in Fiscal Year 2021).

After the timber target has been set and the fiscal year is underway, officials at the national and regional level monitor each forest's progress in meeting its timber target. *See* AR 18726. In one document from late 2022, regional directors were asked to estimate their regions' ability to meet fiscal year 2023 timber targets under different funding scenarios. AR 17320–26. If certain regions were not projected to meet their assigned timber target under any of the scenarios presented, the regional directors were asked to explain why, and to provide "what additional support (financial or otherwise) is needed to meet the identified target." AR 17320.

Achieving the fiscal year's timber target—or coming close—is a priority for Forest Service officials. They describe achieving the timber target as one of the agency's "most significant land management objectives" that they "will use all available capacity and resources to achieve," AR 19397–98, and something they "have to figure a way to hit," AR 21215. Sometimes they have to address funding shortfalls by re-allocating funds away from other areas to meet the timber target. AR 21208–09 (describing how some forest regions instruct staff to "convert non-essential" project

4

funds such as "reforestation" and "invasive weed control" in order "repurpose funds to produce timber output," and proposing other ways to "reallocate" funds to support timber targets). Forest Service officials "diligently work to develop, implement, and administer more timber sales to attain an increased target." AR 21217. One official described that, were his region's timber target to be increased, it "would force units and the Region to attempt to add sales at the end of the [fiscal year]." AR 17628.

### 2. Timber Projects

Timber is sold and harvested through timber projects designed and implemented at the individual forest level. Three timber projects are relevant to this suit. The first, the Forest Health Initiative Project, is in the Mark Twain National Forest in Missouri. AR 14852. The project's "primary objective" was "to improve overall forest health and minimize adverse impacts from insects and disease while protecting other forest resources." *Id.* Its purpose also included "harvest[ing] the declining red oak group . . . in specific areas before they die." AR 14663. To this end, the Forest Health Initiative Project authorized commercial timber logging on 45,885 acres of forest land over ten years, as well as other forest improvements, including tree-planting and roadwork. AR 14854. The Forest Service expected timber harvests from the Forest Health Initiative Project to provide 138,000 MBF (thousand board feet) of timber volume sales. AR 14792. The Forest Service completed an Environmental Assessment of the Forest Health Initiative Project in 2017 and issued a FONSI. AR 14848, 14659.

The Buck Project is located in North Carolina's Nantahala National Forest. AR 1117. The project proposed commercial timber harvesting on 795 acres, as well other improvements, including new stream crossings, erosion management, trash removal, invasive plant treatments, controlled burning, and tree planting. AR 1117–19. The Forest Service completed an Environmental Assessment for the Buck Project in 2020 and issued a FONSI. AR 1115–17, 1128–30.

The White Pine Management Project is located in the Francis Marion/Sumter National Forest in South Carolina. AR 5130. It was developed to "change forest conditions from evenly spaced white pine dominated plantations to more diverse mixed species stands that are ecologically suited to the site and to increase the variety of forest structure." AR 5064. The project called for commercial timber harvest across 1,952 acres. AR 5062. The Forest Service completed its Environmental Assessment of the project in 2021 and issued a FONSI. AR 5094, 5136.

### C.    Procedural History

Plaintiffs are an individual and two organizations that advocate for the environment. In February 2024, they sued the Department of Agriculture, the Forest Service, and officials at those agencies. ECF No. 1. Defendants moved to dismiss several counts, and in response, Plaintiffs amended their complaint. ECF No. 18. Defendants again moved to dismiss, and the Court denied the motion. ECF No. 30. The parties now cross-move for summary judgment. ECF Nos. 38, 40.

The operative complaint brings four counts alleging violations of NEPA and the APA. Counts I, II, and III allege that Defendants violated NEPA and the APA by failing to conduct NEPA review when setting the agency's national, regional, and unit timber targets for fiscal years 2019–2024 (excluding regional targets from fiscal year 2022). ECF No. 18 ¶¶ 244–267. Count IV alleges that Defendants failed to comply with those statutes when approving the Forest Health Initiative Project, Buck Project, and White Pine Management Project by failing to take a "hard look" at the cumulative carbon-emitting effects of the projects. *Id.* ¶¶ 268–282. Plaintiffs request declaratory and injunctive relief. *Id.* at 65–66 (Prayer for Relief).

## II.    Legal Standard

When plaintiff[s] "seek[] review of agency action under the APA," a court has no fact-finding role; it "sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). Under the APA, a court must "hold unlawful and set aside agency action"

6

that is "arbitrary, capricious, . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A court must "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (citing 5 U.S.C. § 706). So when deciding "whether an agency's interpretation of its governing statute is contrary to law," a court "must exercise [its] 'independent judgment' and 'apply[] all relevant interpretive tools' to reach 'the best reading of the statute.'" *Env't Def. Fund v. EPA*, 124 F.4th 1, 11 (D.C. Cir. 2024) (quoting *Loper Bright*, 603 U.S. at 394–95, 400). And when evaluating a claim that agency action is arbitrary or capricious, a court asks whether the agency's action was "reasonable and reasonably explained." *Id.* (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). That is, a court must ensure that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (citation omitted).

## III.    Analysis

### A.    Counts I, II, and III (Timber Target Claims)

Defendants argue that the Court lacks lack subject-matter jurisdiction over these claims, which challenge the agency's national, regional, and unit timber targets, both because Plaintiffs lack standing and the claims are moot. They also argue that even if the Court has jurisdiction, Plaintiffs lack a cause of action because establishing the timber targets is not final agency action subject to review under the APA. The Court finds that it has subject-matter jurisdiction over these claims because Plaintiffs have standing to bring them and they are not moot. But because setting the timber targets is not a final, discrete agency action subject to review under the APA, Plaintiffs lack a cause of action to bring these claims, and so Defendants are entitled to summary judgment.

### 1.    Plaintiffs Have Standing to Bring the Timber Target Claims

A federal court's subject-matter jurisdiction extends only to cases and controversies of the "justiciable sort referred to in Article III"—in other words, claims a plaintiff can show he has "standing" to bring. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "[T]he irreducible constitutional minimum of standing" is that (1) "the plaintiff must have suffered an injury in fact" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of" that is "fairly traceable to the challenged action of the defendant"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560–61 (cleaned up). Defendants focus their challenge on Plaintiffs' showing on the second and third prongs of standing—causation and redressability—so the Court turns to those requirements.[2]

To satisfy standing's second requirement, the plaintiffs' injury must be "fairly traceable to the defendant[s'] allegedly unlawful conduct," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342

---

[2] Defendants do not challenge whether the relevant Plaintiffs have organizational standing, or whether all Plaintiffs have suffered an injury in fact. And the Court concludes that Plaintiffs have satisfied these burdens. When an association sues on behalf of its members, it has standing so long as "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002). The two organizational Plaintiffs have passed this bar. *See* ECF No. 18 ¶¶ 21–30. Plaintiffs have also shown that they have suffered an injury that is concrete, particularized and imminent. *See generally, e.g.*, ECF Nos. 38-24; 38-25; 38-26; 38-27; 37-28 (describing individual members' and Plaintiffs' use of National Forests under threat from timber projects). For instance, Tracey Chapple, a member of one of the organizational Plaintiffs, swears that she lives "directly adjacent" to a portion of the Sumter National Forest covered by the White Pine Management Project. ECF No. 38-24 ¶¶ 4, 8, 13. Chapple reports that she regularly walks, mountain bikes, rafts, takes photographs, and paints watercolors in the White Pine Management Project area, *id.* ¶¶ 5–6, and her recreation and "spiritual renewal" in the forest has been negatively impacted by the ongoing commercial timber harvest in the area, *id.* ¶ 13. Still, Chapple avers, she intends to keep using the area for her preferred activities "as long as [she] can." *Id.* ¶ 6.

(2006) (citation and quotation marks omitted), rather than "result[ing] from the independent action of some third party not before the court," *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 42 (1976). In cases brought under procedural-rights statutes like NEPA, the plaintiffs must establish an "adequate causal chain . . . contain[ing] at least two links: one connecting the omitted [procedural step] to some substantive government decision that may have been wrongly decided because of the lack of [the procedural step] and one connecting that substantive decision to the plaintiff[s']  particularized injury." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 668 (D.C. Cir. 1996). In other words, the plaintiffs must show that "there is a substantial probability . . . that the substantive agency action that disregarded a procedural requirement created a demonstrable risk, or caused a demonstrable increase in an existing risk, of injury to the particularized interests of the plaintiff[s]." *Id.* at 669.

Plaintiffs make an adequate showing for both links in the causal chain. To start, Defendants concede that the agency set the timber targets without conducting environmental review under NEPA. *See* ECF No. 40 at 21. Thus, the first link of causation chain under *Florida Audubon Society*—the omitted procedural step—is satisfied. *See* 94 F.3d at 668.

Plaintiffs also satisfy the second link because they have shown that Defendants' decision to set the timber targets creates a risk of injury to them. They point to several sections of the administrative record—and certain documents outside it—to establish that "the Forest Service designs logging projects *to meet* timber targets."[3] ECF No. 42 at 10. For instance, the Forest Service described its employees "diligently work[ing] to develop, implement, and administer more timber sales to attain an increased target," a priority that may require "reallocation of agency support staff

---

[3] The Court may consider materials beyond the administrative record to assess standing, because standing implicates the Court's subject-matter jurisdiction. *See Pub. Emps. for Env't Resp. v. NPS*, 605 F. Supp. 3d 28, 38 (D.D.C. 2022).

. . . to support this effort."[4]  AR 21217.  Once estimated timber targets for future fiscal years are released, Forest Service regions report their level of "funding necessary to achieve the targets." AR 18671; *see also* AR 17320–24.  Officials worry that certain factors such as staff vacancies and no-bid sales will "have an impact on timber target attainment."  AR 19055, 19928.  Accordingly, officials strategize how to use "volume on other timber sales that will be opened [later in the year] to make [their] target" for the fiscal year.  AR 19928; *see also* AR 20052 (describing the process of "advertising about 35 timber sales to reach our estimated volume target").  Plaintiffs also show that agency officials, in developing the plan for one of the timber projects at issue, requested an exemption to environmental regulations to ensure that the project could offer enough timber to meet the unit's timber targets.  AR 4972; ECF No. 38-5.  Taken together, these portions of the record show that timber targets have the downstream effect of driving the development of timber projects and sales, and adequately reflect that Plaintiffs' injuries are traceable to the targets themselves.

Defendants argue that timber targets do not cause harm to Plaintiffs because they are just performance metrics that do not drive any agency action.  ECF No. 44 at 7.  They assert that the declarations provided by individual Plaintiffs are insufficient to show that timber targets cause timber projects or timber sales.  ECF No. 40 at 23–24.  Defendants also point to portions of the administrative record that establish that initial projections for timber targets are developed in co-ordination with individual forests and that the timber projects at issue have primarily environmental objectives.  *See* ECF No. 44 at 11–12 (providing citations to administrative record).  But even if accurate, none of this changes the Court's traceability conclusion.  For the most part, Defendants

---

[4] One Forest Service publication lists "[timber] target accomplishments" as one of two examples of permissible justifications for overtime work requests (alongside safety-related work) while noting that overtime requests should be an exception.  AR 19141.

have no answer to Plaintiffs' citations to internal memoranda, charts, policy documents, and email messages describing the top-down pressure from Forest Service officials to fulfill timber targets once they are announced. As summarized above, this pressure takes the form of requesting additional funding, re-allocating priorities, allowing overtime, and even—in one case—requesting that environmental regulations be relaxed to allow more trees to be cut down. However (and for whatever initial purpose) timber targets are set, the record reflects that they spur action—timber sales and timber projects—to meet them. So the record shows that the agency's timber targets pose a "demonstrable risk" to Plaintiffs' interest in stopping the commercial harvest of timber. *Fla. Audubon Soc'y*, 94 F.3d at 666; *see Sierra Club v. FERC* (*Sierra Club I*), 827 F.3d 36, 43 (D.C. Cir. 2016) (finding standing where the plaintiffs' concrete injury was "tethered to" the substantive government decision).

To satisfy standing's third prong—redressability—Plaintiffs need only show "a substantial likelihood that the judicial relief requested will prevent or redress the[ir] claimed injury." *Duke Power Co. v. Carolina Envt'l Study Grp.*, 438 U.S. 59, 79 (1978). Courts "relax[]" the redressability analysis in procedural-rights cases like those brought under NEPA. *Sierra Club v. FERC* (*Sierra Club II*), 827 F.3d 59, 65 (D.C. Cir. 2016). In NEPA cases, "'an agency's failure to prepare (or adequately prepare) [environmental review] before taking action with adverse environmental consequences' constitutes the 'archetypal procedural injury' redressable under Article III." *Sierra Club I*, 827 F.3d at 43 (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013)). A plaintiff need only "show that 'the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff.'" *City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1185 (D.C. Cir. 2007) (quoting *Fla. Audubon Soc'y*, 94 F.3d at 664).

Plaintiffs have satisfied redressability for substantially the same reasons that they have

11

satisfied causation. *See Branton v. FCC*, 993 F.2d 906, 910 (1993) (traceability and redressability "tend to merge . . . where the requested relief consists solely of the reversal or discontinuation of the challenged action"). To repeat, Defendants admit that the Forest Service promulgated timber targets without conducting NEPA review. And Plaintiffs have shown that the agency's timber targets are fairly traceable to increased timber sales, which "is the source of [their] injury." *Sierra Club I*, 827 F.3d at 44. It follows, then, that vacatur of the Forest Service's timber targets could redress Plaintiffs' injuries because, "if [the agency] is required to adequately consider each environmental concern, it could change its mind" about the volume of timber it would sell. *WildEarth Guardians*, 738 F.3d at 306. True, Plaintiffs have no evidence proving—or even, as Defendants argue, showing that it is "likely"—that the Forest Service would set different targets if it was required to conduct NEPA review, or that the effect of a lower target would ultimately affect their challenged logging projects. *See* ECF No. 40 at 25. But those standards do not reflect the D.C. Circuit's "relax[ed]" redressability requirement in NEPA cases. *Sierra Club II*, 827 F.3d at 65 Rather, Plaintiffs need only show that the agency "*could* reach a different conclusion if ordered to revisit its procedural error." *Ctr. for Biological Diversity v. Dep't of Interior*, 144 F.4th 296, 304 (D.C. Cir. 2025) (internal quotation omitted). They have met that burden.

### 1.    The Timber Target Claims Are Not Moot

"The fundamental concept of mootness is quite straightforward. . . . As applied in the context of injunctive litigation, if there remains no conduct to be enjoined, then normally there is no relief that need be granted, the case or controversy has ceased, and the jurisdiction of the court has expired under Article III." *True the Vote, Inc. v. IRS*, 831 F.3d 551, 561 (D.C. Cir. 2016). That is, a plaintiff must retain a "continuing interest" in the litigation. *Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 979 (D.C. Cir. 2016) (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 191–92 (2000)). "Article III, Section 2 of the Constitution permits federal courts to

adjudicate only actual, ongoing controversies." *United Bhd. of Carpenters & Joiners of Am., AFL-CIO v. Operative Plasterers' & Cement Masons' Int'l Ass'n of U.S. & Can., AFL-CIO*, 721 F.3d 678, 687 (D.C. Cir. 2013) (quoting *McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud. Conf. of U.S.*, 264 F.3d 52, 55 (D.C. Cir. 2001)). "If events outrun the controversy such that the court can grant no meaningful relief, the case must be dismissed as moot." *McBryde*, 264 F.3d at 55.

Defendants argue that the Court may not exercise subject-matter jurisdiction over these claims because they are moot. Plaintiffs acknowledge the obvious—that they challenge timber targets that applied only to past fiscal years. ECF No. 42 at 17. But they argue that the effects of those targets continue because "timber must be sold in a given fiscal year to count toward that year's target, but it is often not cut for years after it is sold." *Id.* (cleaned up). Further, they say that because "timber projects which implement the expired timber targets are still happening . . . in specific places where [Plaintiffs] have particularized interests," *id.*, they have established that the Court can still grant them relief. The Court agrees. As Plaintiffs have shown, the effects of the challenged actions remain ongoing, and so the Court can grant them relief. Therefore, their claims are not moot.[5]

Defendants argue that timber targets are too attenuated from ongoing commercial timber harvesting for any relief the Court could order to affect that logging. ECF No. 44 at 15. Because the national, regional, and unit-specific timber targets do not directly cause logging, Defendants say, but are "internal agency performance goals that have now expired," any harm flowing from

---

[5] In the alternative, Plaintiffs argue that the Court retains subject-matter jurisdiction over these claims under the "capable of repetition, yet evading review" exception to the mootness doctrine. ECF No. 42 at 17; *see J.T. v. District of Columbia*, 983 F.3d 516, 523 (D.C. Cir. 2020). But the Court need not reach this argument.

them ceased once they were no longer in effect for the given fiscal year. *Id.* But in the end, this is just a repackaging of Defendants' causation argument that the Court rejected.

### 2. The Timber Target Claims Do Not Challenge Final Agency Action

"An agency action is an agency's determination of rights and obligations by way of a rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Am. Forest Res. Council v. United States*, 77 F.4th 787, 804 (D.C. Cir. 2023) (cleaned up). "Whether there has been 'agency action' or 'final agency action' within the meaning of the APA are threshold questions; if these requirements are not met, the action is not reviewable." *Fund for Animals, Inc. v. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006); *see Oryszak v. Sullivan*, 576 F.3d 522, 525 n.2 (D.C. Cir. 2009) ("[T]he provision of the APA limiting judicial review to 'final agency action,' 5 U.S.C. § 704, goes not to whether the court has jurisdiction but to whether the plaintiff has a cause of action.").

Defendants contend that timber targets are not discrete agency actions that are reviewable under the APA. *See* 5 U.S.C. § 704. The Court agrees. Upon review of the complete administrative record, the Forest Service's setting of annual timber targets is not a discrete agency action that is challengeable under the APA, and so Defendants are entitled to summary judgment on Counts I, II, and III.

The D.C. Circuit's decision in *American Forest Resource Council* all but commands this result. In that case, the Circuit considered an APA challenge related to the Bureau of Land Management's timber-selling program, which, like that of the Forest Service, authorizes timber sales in individual projects that take years to develop, plan, advertise, and fulfill. 77 F.4th at 804–05. The Circuit held that the agency's pronouncement of the "total timber volume" it would offer in a year was "not a discrete agency action" because it was a "synthes[ized]" "measurement" developed over time. *Id.* at 805. In particular, the Circuit found that the agency's "complex process of

14

planning, preparing and selling" timber, *id.* at 804, meant that establishment of an amount of timber to sell in a specific year implicated "years' worth of policy choices and site-specific decisions—rather than some particular agency action," *id.* at 805 (internal quotations omitted). Thus, the Circuit held that the agency's decision to set a specific volume of timber allowable for sale each year did "not involve the determination of rights and obligations and [was] not a decision 'from which legal consequences will flow.'" *Id.* at 805 (citing *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). In fact, the Circuit held, the challenge at issue was more like the sort of broad program-matic attack that the Supreme Court had rejected in *Lujan v. National Wildlife Federation*, 497 U.S. 871, 890–91 (1990). *Id.*[6]

So too here. The Forest Service's method for bringing timber to market—like the Bureau of Land Management's—is a complex, years-long process. As discussed, timber sales are offered through timber projects, which are developed through time-intensive processes involving NEPA review, public comment period, scoping, and are often combined with other improvement projects in a section of a national forest. *See, e.g.*, AR 24–25 (initial scoping letter for the Buck Project announcing public comment period in 2017); AR 1115–27 (final decision on Buck Project issued in 2020). The administrative record now shows—contrary to what the Court found at the motion-to-dismiss stage—that the setting of timber targets is not "a particular step in Defendants' lumber program" reviewable under the APA. ECF No. 38-1 at 31 (citing Oral Ruling Tr. at 11:22–23). Rather, it is a high-level policy directive to *have* a timber program which the agency then

---

[6] Unlike here, *American Forest Resources Council* evaluated whether the total timber vol-ume was "discrete agency action" in the context of a suit seeking to *compel* the agency to take action under 5 U.S.C. § 706(1). 77 F.4th at 804. But that distinction makes no difference. The Circuit did not base its conclusion on anything unique to § 706(1), but on what constitutes "agency action," which applies equally to all provisions of the APA. *See id.*

implements by complex series of individual concrete actions, eventually resulting in timber projects and timber sales.  Plaintiffs may not challenge the existence of the program as a whole by mounting a programmatic challenge to the agency's timber targets.  *See Nat'l Wildlife Fed'n*, 497 U.S. at 891 (1990) (plaintiffs "cannot seek *wholesale* improvement of [an agency] program by court decree" but must challenge "some concrete action applying the regulation").[7]

## B.    Count IV (Timber Projects)

Plaintiffs also challenge Defendants' compliance with NEPA when developing and enacting the Forest Health Initiative, Buck, and White Pine Management Projects.  They contend that the Forest Service failed to adequately consider—take a "hard look" at—the commercial timber harvests those projects allowed.  In particular, they contest how the agency considered the cumulative effects of the challenged projects combined with other similar activity, as was required by the since-rescinded NEPA regulations.  To that end, they invoke the five-factor test for a cumulative impact analysis under the NEPA regulations established by the D.C. Circuit in *Grand Canyon Trust v. FAA*, 290 F.3d 339 (D.C. Cir. 2002).  More specifically, with respect to the carbon effects of each project, they argue that the Forest Service failed to comply with the latter three factors: that it did not identify "other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area"; "the impacts or expected impacts from these other actions"; and "the overall impact that can be expected if the individual impacts are allowed to accumulate."  ECF No. 38-1 at 51.  For the reasons explained below, and giving the agency the deference it is owed, the Court disagrees.

---

[7] The same analysis applies to regional and unit timber targets, which represent the same overarching agency policy, just on a smaller scale.  Like the national targets, regional and unit timber targets are part of the "complex" and multi-year process of planning for and implementing timber sales.  *Am. Forest Res. Council*, 77 F.4th at 804.

On review of an agency's adherence to NEPA, the Court's role is a "limited one, designed primarily to ensure that no arguably significant consequences have been ignored." *TOMAC*, 433 F.3d at 860 (citation omitted). This point was underscored by the Supreme Court's recent decision in *Seven County Infrastructure Coalition v. Eagle County*, in which it set out a "course correction" for courts' review for NEPA compliance. 605 U.S. at 184. In that case, the plaintiffs challenged the Surface Transportation Board's NEPA review of a railroad line, claiming the Board failed to consider certain indirect effects of the railroad's development—"increased upstream oil drilling . . . and increased downstream refining of crude oil carried by the railroad." *Id.* at 175. The Supreme Court held that the lower courts had erred in holding that the agency had to consider such indirect effects—instead, "the textually mandated focus of NEPA is the 'proposed action'—that is, the project at hand." *Id.* at 186–87. But the Supreme Court also clarified the deferential standard all courts must apply when reviewing agency NEPA compliance. It cautioned against courts playing "an aggressive role in policing agency compliance with NEPA," in which the "central principle of judicial review . . . is deference." *Id.* at 179. Instead, courts "should afford substantial deference and should not micromanage . . . agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 183.

The D.C. Circuit has yet to consider how its *Grand Canyon Trust* test for cumulative impact analysis is affected by (or whether it even survives) the Supreme Court's guidance in *Seven County* that NEPA review should focus on the project at hand. That case was, admittedly, focused on *indirect* environmental effects, rather than cumulative ones. But even assuming that the *Grand Canyon Trust* test remains intact, it must be tempered by the Supreme Court's general directive that "courts should defer to agencies' decisions about where to draw the line" about what to include in an environmental review. *Seven Cnty.*, 605 U.S. at 182; *see also S. Utah Wilderness All.*

17

*(SUWA) v. Dep't of Interior*, No. 24-cv-2476 (RC), 2025 WL 3680685, at *9–11 (D.D.C. Dec. 17, 2025) (applying *Grand Canyon Trust* test with *Seven County* deference). Thus, Court understands *Grand Canyon Trust*, in light of *Seven County,* to require an agency to show that it undertook a cumulative impact analysis of relevant projects, but that the Court should give substantial deference to the agency's decisions on which projects are relevant and how to measure and contextualize the anticipated cumulative effects. With that deferential standard in mind, each challenged project satisfies the *Grand Canyon Trust* test.[8]

To review the record: for all three challenged timber projects, the agency completed an Environmental Assessment and ultimately issued a FONSI. AR 1115, 1128, 5094, 5130, 14659, 14848. In the Forest Health Initiative Project's Environmental Assessment, the agency explicitly considered the cumulative effects of carbon emissions from past commercial timber harvests "in the analysis area." AR 14857. The Environmental Assessment listed twenty-five projects that affect that area. AR 14681. And the agency concluded that, combining the carbon emissions from the project at issue with the other projects in the analysis area, the cumulative effects would be minimal. AR 14857. The agency compared the possible cumulative carbon emissions of these projects in the analysis area to the scale of emissions of the state of Missouri and concluded that no contemplated actions would tip regional carbon sequestration from a carbon sink to a carbon source. *Id.* The agency also concluded that, overall, "the project is too small to warrant a more

---

[8] Plaintiffs would limit *Seven County* to apply to an agency's consideration of indirect—as opposed to cumulative—effects of a project, and in particular indirect effects not caused by the agency itself. *See* ECF No. 42 at 28–29. Thus, they argue, *Seven County* is irrelevant here because Plaintiffs merely ask the Forest Service to consider the effects of *its own* logging activity. *See id.* But in *Seven County*, the Supreme Court also clarified the general standard of deference courts must apply when considering all aspects of an agency's compliance with NEPA. *See* 605 U.S. at 179–86. And that portion of the Court's opinion—a "course correction" on how courts should undertake NEPA review—is what informs this Court's approach. *Id.* at 184.

formal quantitative analysis." AR 14856.

For the Buck Project, the agency likewise considered the cumulative carbon emissions of the project, combined with other projects in the analysis area, in the Environmental Assessment. AR 1248. As with the Forest Health Initiative Project, the agency concluded that the cumulative amount of carbon emissions between the Buck project and other projects would be "minimal . . . not only at the local level, but at the larger level." *Id.* The agency also projected that the "the rate of carbon release . . . would be minimal for the reasonably foreseeable future" and that "no ongoing" or "reasonably foreseeable" projects within the analysis area "would appreciably contribute to climate change." *Id.* The agency likewise concluded that the Buck Project itself resulted in an "extremely small" contribution to carbon emissions. AR 1247.

The White Pine Management Project Environmental Assessment also considered the carbon-releasing effects of the project but ultimately concluded that the project would not have a sustained negative climate impact. AR 5122. As with the Forest Health Initiative Project, the White Pine Management Project Environmental Assessment contains a list of projects that the agency considered in crafting its cumulative impact analysis. AR 5075. For its carbon analysis, the Forest Service concluded that, while the project "might temporarily contribute an extremely small quantity of greenhouse gas emissions," the long-term effects of the project were "consistent with internationally recognized climate change adaptation and mitigation practices." AR 5122 (cleaned up). This is because the project would "not convert forest land to non-forest uses," would replenish carbon through reforestation, and would transfer carbon to the product sector where it would remain stored. *Id.* The agency's dedicated carbon analysis for the White Pine Management Project also concluded that "[a]n active timber harvesting program ensures that the forests on the

19

Sumter National Forest . . . remain a carbon sink." [9] AR 4975.  The agency assessed that removing old trees through timber harvests and prescribed fires releases fewer carbon emissions than the catastrophic wildfires that non-managed forests are at risk for. *Id.*  The White Pine Management Project also helps to support a "highly diverse forest" which will be "more resilient and resistant to the effects of climate change." *Id.*  The agency's programmatic carbon analysis for the entire Sumter National Forest reached a similar conclusion: that "[f]orest carbon losses associated with harvests on the [Sumter National Forest] have been small." AR 12274.  The agency's "sustainable forest management," it concluded, will allow the forest to maintain its status as a carbon sink. *Id.* Read together, these documents establish that the agency considered the cumulative carbon-emitting effects of the project but concluded that the overall effects would not be negative.

Plaintiffs argue that the Forest Service's cumulative impact analysis is lacking for each timber project.  They point to certain sections of the Administrative Record as evidence that "the Forest Service had ample data on past, present, and reasonably foreseeable logging projects whose effects would accumulate with those of the challenged projects" in the affected area but which it did not consider.  ECF No. 38-1 at 52.  But none of this overcomes the substantial deference which the agency's analysis is owed. [10]  Plaintiffs point mainly to agency spreadsheets purporting to show

---

[9] A court may rely on documents anywhere in the record, including those incorporated by reference in the Environmental Assessment, to determine the agency's compliance with NEPA. *See Ctr. for Biological Diversity v. Blank*, 933 F. Supp. 2d 125, 151–52 (D.D.C. 2013).

[10] In some instances, Plaintiffs point to sections of the Administrative Record which strengthen, rather than undermine, the agency's arguments that it conducted thorough its cumulative impact analysis.  For the Forest Health Initiative Project, for instance, Plaintiffs cite an email chain among agency employees in which an official asks colleagues for information about which projects should be considered for inclusion in the Forest Health Initiative Project's cumulative impact analysis.  ECF No. 38-1 at 52 (citing AR 14943–48).  Far from serving as proof that the agency did not conduct the necessary review, this part of the record bolsters the agency's claims that it considered whether other agency actions would have cumulative effects on the Forest Health Initiative Project area.  The same is true for Plaintiffs' citation to a document which lists the same

planned timber sales in the same national forests or states as the challenged projects. *Id*. But even assuming those future sales were not captured by the logging projects the agency *did* consider, upon consideration of the entire record here, the Court sees no reason to second-guess the agency's judgment about the projects it should include in a cumulative impact analysis. The agency has more information about the precise location, scope, and likely environmental effects of sales that Plaintiffs identify. And determining whether and to what extent an agency project will have impacts on a given area such that it warrants inclusion in a cumulative impact analysis is the type of "speculative assessments or predictive or scientific judgments" or decisions on "what qualifies as significant" that is best left up to agency discretion—and where the Court is "at its 'most deferential.'" *Seven Cnty.*, 605 U.S. at 181–82 (quoting *Baltimore Gas & Elec. Co. v. Nat'l Res. Def. Council, Inc*, 462 U.S. 87, 103 (1983)). Plaintiffs also advance a similar but more ambitious argument that the agency should have considered the cumulative effects of its *nationwide* projected timber harvest. *See* ECF No. 38-1 at 53. But not doing so is clearly the sort of reasonable and manageable line-drawing about what to include in a cumulative impact analysis that *Seven County* permits. *See* 605 U.S. at 182.

Plaintiffs also contend, with respect to the fourth *Grand Canyon Trust* factor, that the Forest Service did not numerically "calculate" and "quantify" the carbon emission of the cumulative projects using "data and studies" to which the agency had access. ECF No. 38-1 at 53–54. But again, based on *Seven County*'s directive that "[t]he agency is better equipped to assess what facts

---

set of projects affecting the Forest Health Initiative Project area as were listed in that project's Environmental Assessment. *Compare id.* (citing AR 16703), *with* AR 14681. The Court considers this an explicit incorporation by reference of those projects into the agency's cumulative impact assessment. *See* AR 14857 (stating that the agency considered cumulative effects of past projects). Likewise for Plaintiffs' citation to a section of the White Pine Management Project Environmental Assessment which listed the Forest Service projects the agency considered for purposes of its cumulative review. *See* ECF No. 38-1 at 52 (citing AR 5075).

are relevant to the agency's own decision than a court is," the Court finds that the level of detail in the agency's analyses complies with NEPA. 506 U.S. at 181. And finally, Plaintiffs also argue that the Forest Service improperly aggregated the cumulative effects of these projects under the final *Grand Canyon Trust* factor, in at least some of its analyses, because it compared them to emissions at the state level, diminishing their impact. ECF No. 38-1 at 54. But this sort of judgment call about how to undertake a cumulative impact analysis is what the Supreme Court instructed lower courts not to micromanage, so long as the approach falls within a broad zone of reasonableness. *See Seven Cnty.*, 506 U.S. at 183. The Court finds this standard met here.

In the end, Plaintiffs' objections to the agency's cumulative impact analysis "fail[] because [they] ask[] [the Court] to demand exactly what *Seven County* says we cannot demand." *Sierra Club v. FERC* (*Sierra Club III*), 153 F.4th 1295, 1308 (D.C. Cir. 2025). Defendants are entitled to summary judgment on Count IV.

## IV.    Conclusion

For all the above reasons, the Court will deny Plaintiffs' Motion for Summary Judgment, grant Defendants' Motion, and enter judgment for Defendants. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: March 30, 2026

22